1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JULIET B. HALEY
   Deputy Attorney General
6  State Bar No. 162823
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
      Telephone: (415) 703-5960
8  Fax: (415) 703-1234
      Email: juliet.haley@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14  **REMON A. SHIELDS,**                    C 08-0274 JF (PR)

15                          Petitioner,      **REPLY TO PETITIONER'S**
                                             **OPPOSITION TO**
16          v.                               **RESPONDENT'S MOTION**
                                             **TO DISMISS PETITION AS**
17  **A. SCHWAZENEGGER, Governor of California,**  **UNTIMELY**

18                          Respondent.

19                          **INTRODUCTION**

20          Petitioner was convicted in 1999 of murder with special circumstances.  His state court

21  judgment became final on February 21, 2006, when the United States Supreme Court denied

22  certiorari.   Petitioner filed the instant petition almost two years later, on January 7, 2008.

23  Respondent has moved to dismiss the petition on the basis that the petition is untimely.  Petitioner

24  opposes the motion on the basis that utilizing the  mailbox rule, his state habeas petitions were filed

25  before the statute of limitations expired and thus entitle him to statutory tolling of the limitations

26  period.   Recognizing that regardless of the statutory tolling the petition is still untimely, he asserts

27  that he is entitled to equitable tolling.   This is our reply.

28

1

**STATEMENT OF THE CASE**

2      In 1999, petitioner was convicted in Alameda County Superior Court of murder with a

3  special circumstance. The California Court of Appeal affirmed the judgment in a published decision

4  filed April 30, 2003. *See People v. Castille,* 108 Cal.App.4th 469, 133 (2003) (NO. A089623),

5  Review was denied by the California Supreme Court on July 30, 2003. Certiorari was granted and

6  the judgment was vacated on March 22, 2004. *See Shields v. California*, 541 U.S. 930, 124 S.Ct.

7  2004 (NO. 03-7276). On remand to the court of appeal the judgment was affirmed. *See People v.*

8  *Castille*, 129 Cal.App.4th 863 (2005). On September 21, 2005, the California Supreme Court

9  denied review. On February 21, 2006, the United States Supreme Court denied certiorari. *See*

10  *Shields v. California,* 546 U.S. 1192, 126 S.Ct. 1380 (2006) (NO. 05-8318).

11      In February 2007, petitioner began collaterally attacking his judgment in the Alameda

12  Superior Court. He filed two documents in that court: an extension of time labeled as a habeas

13  petition (Exh. A); and a habeas petition. Exh B. The extension of time (Exh. A) has a proof of

14  service signed and dated by petitioner with the date of January 28, 2006. The habeas petition has

15  a proof of service signed and dated by petitioner with the date of February 13, 2006.

16      The prison mail log, however, reflects that during that month petitioner gave authorities

17  two pieces of mail addressed to the Alameda Superior Court (Exh D); the log does not identify the

18  contents, just the date and the recipient. The first piece of mail was given to them on February 20,

2007, the second on February 23, 2007. *See* Declaration of Office Services Supervisor (Exh. C).

19  The file stamp received from the Superior Court indicates that it received the extension of time on

20  February 26, 2007, and the habeas petition on February 27, 2007. The envelope from the habeas

21  petition has a United States postal stamp with a date of February 23, 2007.

22      The Alameda Superior Court denied petitioner's habeas petition on April 5, 2007 in a

23  written decision. *Id.* Petitioner filed a state habeas petition in the California Court of Appeal which

24  was summarily denied on May 17, 2007. On June 14, 2007, petitioner filed a habeas petition in the

25  California Supreme Court which was summarily denied on December 19, 2007.

26

27

28

On January 7, 2008, petitioner filed the instant federal habeas petition.[1]

**ARGUMENT**

### THE PETITION IS UNTIMELY; SHIELDS HAS NOT DEMONSTRATED EXTRAORDINARY CIRCUMSTANCES THAT WARRANT EQUITABLE TOLLING

As originally argued in Respondent's motion to dismiss, the year in this case commenced on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Here, that date is February 21, 2006, the date that the United States Supreme Court denied Certiorari. *Wixom v. Washington*, 264 F.3d 894 897 (9th Cir. 2001). Thus, absent any tolling, petitioner had until February 21, 2007, one year, to file a timely federal petition.

Petitioner did not file the instant federal petition, however, until January 7, 2008, almost two years after the statute of limitations had expired.

Petitioner is entitled to tolling during the pendency of any "properly filed application for the State post-conviction or other collateral review with respect to the pertinent judgment or claim," 28 U.S.C. § 2244(d)(2). Petitioner claims in his opposition that "In February 2007 (before February 21, 2007), petitioner submitted a petition for writ of habeas corpus to prison official's to be file/sent and filed in the Alameda County Superior Court." Opp. at 2.[2] He thus contends that under the mailbox rule his state habeas petition was filed before the statute of limitations expired and that his subsequent state habeas filings toll the statute of limitations. *Id.*

We agree that the mailbox rule must be applied to petitioner's state filings. *Anthony v.*

---

1. We calculate his filing date giving petitioner the benefit of the mailbox rule, *see Houston v. Slack*, 487 U.S. 266 (1988); *Dils v. Small*, 260 F.3d 984, 985 (9th Cir. 2001). This date was erroneously calculated in our original motion as January 9, 2008. However, an examination of the prison mail log indicates that the petition was logged on January 8, 2008, which means that Shields gave the petition to prison authorities for mailing the previous evening, on January 7, 2008. See Exhibit E.

2. Petitioner offers no evidentiary support his contentions. The mail log indicates that petitioner requested a copy of it on July 2, 2008, but apparently elected not to submit it to this Court. *See* Exh. D.

Reply To Petitioner's Opposition To Respondent's Motion To Dismiss Petition As Untimely - C 08-0274 JF (PR)

3

*Cambra,* 236 F.3d 568, 575 (9th Cir. 2000). That rule permits constructive filing on the date the inmate "delivered it to the prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 276 (1988); Fed. R. App. P. 4(c)(1) (notice of appeal is deemed timely if it is "deposited in the institution's internal mail system" on or before due date); *Laws v. Lamarque*, 351 F.3d 919, 921 & n. 2 (9th Cir. 2003) (finding habeas corpus petition timely because Laws "delivered a verified petition to prison officials for mailing" by due date). However, the burden is on the inmate to prove that his filing was delivered to prison officials within the pertinent deadline. "Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or by a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid." Fed. R. App. P. 3(d); *see also Allen v. Culliver,* 471 F.3d 1196, 1198-99 (11th Cir. 2006). Once satisfied, the state has the burden of proof on the issue of whether the petitioner timely delivered his pleading to prison authorities. *Id.*

The date of signing is not necessarily the same as the date of delivery to prison authorities. *Henderson-El v. Maschner*, 180 F.3d 984, 985-986 (8th Cir. 1999) (dismissing habeas corpus petition as untimely where the record established only when it was signed and when it was filed, and petitioner "failed to provide any evidence of the date on which he mailed his petition"); *see Jenkins v. Johnson*, 330 F.3d 1146, 1149 (9th Cir. 2003) (finding only that constructive filing date "could have been as early as" the date Jenkins signed his federal habeas petition). The mailbox rule is based on the notion that "a prisoner's control over the filing of his petition ceases when he delivers it to prison officials," *Huizar v. Carey*, 273 F.3d 1220, 1223 (9th Cir. 2001), but not before that time.

Here we note that two documents were filed in the Alameda Superior Court in February. The first, an application for an extension of time, has a proof of service executed by petitioner with a date of January 28, 2006. However, this is not the date that petitioner gave the document to prison authorities. The declaration provided by Layton Johnson makes clear that mail is collected every day from prisoners, logged into the mail room the next morning, and posted in the United States mail the same day. See Exh. D. The mail log reflects that authorities received legal mail from petitioner addressed to the Alameda Superior Court on February 20, 2007 (Exh D), which according to the general mail collection practice of the prison means that it was collected from petitioner on

1  the evening of February 19, 2007.

2          The second document, the habeas petition, has a proof of service executed by petitioner

3  with a date of February 13, 2007.  However, the prison mail log indicates that it received legal mail

4  from petitioner addressed to Alameda Superior Court on February 23, 2007, which again indicates

5  that petitioner gave it to prison officials on the evening of February 22, 2007.  While, as indicated

6  above, the content these two documents is not described in the log, the dates each was received by

7  the Alameda Superior Court (extension of time filed February 26, 2007; habeas petition filed

8  February 27, 2007), supports the conclusion that the extension of time was given to prison

9  authorities on February 19, 2007 and logged by the mail room on February 20, 2007, and the habeas

10  petition was given to prison authorities on February 22, 2007 and logged by the mail room on

11  February 23, 2007.  This conclusion is further bolstered by the fact that the envelope attached to the

12  habeas petition is also dated by the U.S. postal service as  February 23, 2007. (See Exh. E.)

13          In sum,  even giving petitioner the benefit of the mailbox rule,  his habeas petition was not

14  given to prison officials until February 22, 2007, one day after the statute of limitations expired.  *See*

15  *Rouse v. Lee,* 339 F.3d 238 (4th Cir. 2003) (dismissing federal habeas petition challenging capital

16  judgment as untimely because it was filed one day late); *see United States v. Locke*, 471 U.S. 84, 101

17  (1985) ("Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with

18  respect to individuals who fall just on the other side of them, but if the concept of a filing deadline

    is to have any content, the deadline must be enforced.").  Hence,  all of his habeas petitions filed in

19  state court were filed after the statute of limitations period expired (first state habeas filed in

20  Alameda County Superior Court on February 27, 2007).  Once the statute of limitations has run, a

21  collateral action cannot revive it.  *Jimenez v. Rice*, 276 F.3d 478, 482 (9th Cir. 2001).

22          Even assuming that petitioner did constructively file his Alameda Superior Court habeas

23  petition before the statute of limitations expired, he is at most entitled to 309 days of statutory tolling

24  from February 13, 2007 (the date of his Alameda Superior Court habeas petition proof of service),

25

26

27

28  Reply To Petitioner's Opposition To Respondent's Motion To Dismiss Petition As Untimely - C 08-0274 JF (PR)

1   until December 19, 2007 (the date the California Supreme Court denied his habeas petition)[3/].

2   Accounting for 309 days of tolling, petitioner's federal habeas petition had to be filed by December

3   27, 2007 to be timely.  It was not.  As stated above it was signed by petitioner on January 7, 2008,

4   logged by the prison's mail room on January 8, 2008, received by this Court on January 10, 2008,

5   and filed on January 16, 2008.  Under any calculation it was filed after the statute of limitations.

6        Apparently accepting that his federal petition was filed outside the statute of limitations,

7   petitioner contends that he is entitled to equitable tolling.  He is not.

8        A habeas petitioner seeking equitable tolling bears the burden of showing entitlement to

9   it.  *Miranda v. Castro,* 292 F.3d 1063, 1065 (9th Cir. 2002).  "[A] litigant seeking equitable tolling

10  bears the burden of establishing two elements: (1) that  he has been pursuing his rights diligently,

11  and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408,

12  418, 125 S. Ct. 1807, 161 L. Ed. 2d 669 ( 2005).  The obligation to act diligently "does not pertain

13  solely to the filing of the federal habeas petition, rather it is an obligation that exists during the

14  period appellant is exhausting state court remedies as well." *Lacava v. Kyler,* 398 F.3d 271, 277

15  (2rd Cir. 2005); *accord Roy v. Lampert*  465 F.3d 964, 970-73 (9th Cir. 2006). In this Circuit,

16  equitable tolling is warranted only for extraordinary circumstances beyond the petitioner's control

17  that make it impossible to file a timely federal habeas petition.  *Fail v. Hubbard*, 315 F.3d 1059,

18  1061-62 (9th Cir. 2002); *Frye v. Hickman*, 258 F.3d 1036, 1038 ( 9th Cir. 2001); *Miles v. Prunty*,

    187 F.3d 1104, 1107 (9th Cir. 1999).[4/]  Such extraordinary circumstances must be the proximate

19

20        3.  The California Supreme Court's denial of habeas relief is final upon filing.  *Cf Bunney*

21  *v. Mitchell*, 262 F.3d 973, 974 (9th Cir. 2001).  Decisions of the California Supreme Court issued

    after December 31, 2002, are final immediately.  *Phelps v. Alameda*, 366 F.3d 722 n. 1 (9th Cir.

22  2004); Cal. Rules of Court, rule 8.532(b)(2)(C).

23        4.  *Pace v. DiGuglielmo*, 544 U.S. 408, did not alter the burden on a habeas petitioner who

24  seeks equitable tolling to show that some extraordinary circumstance made it "impossible to file a
    petition on time."  In *Espinoza- Matthews v. California*, 432 F.3d 1021, 1026 n. 5 (9th Cir. 2005),

25  the Ninth Circuit court observed that in *Pace* "the Supreme Court had framed the equitable tolling

26  standard in less absolute terms" than "impossible to file a petition on time," it declined to decide
    whether "Pace has lowered the bar somewhat." Since *Espinoza-Matthews*, the court has continued

27  to adhere to the "impossible to file a petition on time" standard. *See, e.g., Roy v. Lampert*, 465 F.3d
    964 (9th Cir. 2006) ("Equitable tolling is applicable only if extraordinary circumstances beyond a

28  Reply To Petitioner's Opposition To Respondent's Motion To Dismiss Petition As Untimely - C 08-0274 JF (PR)

cause of his untimeliness. *Stillman v. Lamarque*, 319 F.3d 1199 (9th Cir. 2003); *see Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000); *Marsh v. Soares*, 223 F.3d 1217, 1221 (10th Cir. 2000). "[T]he threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule." *Miranda v. Castro*, 292 F.3d at 1066. Equitable tolling is thus "unavailable in most cases." *Miles v. Prunty*, 187 F.3d at 1107. "This high bar is necessary to effectuate the 'AEDPA's statutory purpose of encouraging prompt filings in federal court in order to protect the federal system from being forced to hear stale claims.'" *Mendoza v. Carey*, 449 F.3d 1065, 1068 (9th Cir. 2006) (quoting *Guillory v. Roe*, 329 F. 3d 1015, 1018 (9th Cir. 2003) (internal quotation marks and citation omitted)).

Judged by these principles, petitioner's claim fails. First, restricted access to the prison's law library generally does not qualify as an extraordinary circumstance. *See, e.g., Hebner v. McGrath,* 2001 WL 764474*2 (N.D. Cal. June 22, 2001), rev'd on other grounds, 2003 WL 1793259 (9th Cir. Mar. 14. 2003); *Baker v. Norris*, 321 F.3d 769, 771 (8th Cir. 2003)(prison's rules limiting inmates to two hours at a time in the library and requiring them to sign up for access in advance were not enough to make it impossible to timely file).

Petitioner's other proffered basis for equitable tolling is the circumstance of having allegedly been without his legal materials for discrete periods of time. Specifically, petitioner claims he did not receive the complete trial record from state appellate counsel until approximately one month after the United States Supreme Court denied certiorari (February 21, 2006 until March 21, 2006). He claims that he did not have access to legal property when he was committed to outpatient housing unit (July 28, 2006 until September 20, 2006). He claims that he did not have access to legal materials after being sent to Ad-Seg (December 28, 2006 until January 10th, 2007). While such separations can constitute extraordinary circumstances, *see Lott v. Mueller*, 304 F.3d 918, 922 (9th Cir. 2002) (denial of legal files for 82 days toward the end of the limitations period, taken together with a conflux of other unusual facts, constituted extraordinary circumstances

---

prisoner's control make it impossible to file a petition on time." (internal quotation marks and citation omitted)).

1  warranting equitable tolling); petitioner must establish that the loss of legal files was also the "but

2  for" cause of his failure to timely file. *Espinoza-Matthews v. California*, 432 F.3d 1021, 1026 (9th

3  Cir.2005).

4      Comparing the facts at bar with those in *Lott* and *Espinoza-Matthews*, it is clear that

5  petitioner is not entitled to equitable tolling.

6      Petitioner's state court judgment became final on February 21, 2006. He was purportedly

7  delayed getting his materials by one month at the start of the limitations period. His alleged

8  separations occurred July 28, 2006 through September 20, 2006, and December 28, 2007 through

9  January 10, 2007. There was ample time, notwithstanding these brief interruptions to prepare his

10  federal habeas petition. And the situations he describes are merely conditions common to prison

11  confinement and do not qualify as extraordinary circumstances. *See e.g. Hardy v. Conway,* 299

12  F.Supp. 2d 159, 161 (E.D.N.Y); *Lindo v. LeFever*, 193 F.Supp.2d 659, 663 (E.D.N.Y. 2002).

13  Moreover, the mail log indicates that petitioner was preparing and sending legal mail during the time

14  he was purportedly without his legal materials. Petitioner sent out legal mail on February 27, 2006,

15  March 6, 10, 14, 16, and 17, 2006 as well as August 21, 2006; August 29, 2006; September 6, 9,

16  13, and 18, 2007. *See* Exh D. Clearly, even if petitioner was without his legal materials he was not

17  prevented from corresponding with attorneys and the courts. Also, any effect the loss of materials

18  had on his ability to prepare a federal habeas petition dissipated over the many months remaining

    in the limitations period. Given these facts it cannot be said that the periodic absence of his legal

19  materials was the proximate cause of his failure to timely file. In fact, petitioner does not even

20  allege a causal connection between his loss of days and his failure to file. For all of the above stated

21  reasons, petitioner is not entitled to equitable tolling.

22  ///

23  ///

24  ///

25

26

27

28  Reply To Petitioner's Opposition To Respondent's Motion To Dismiss Petition As Untimely - C 08-0274 JF (PR)

1

**CONCLUSION**

2
      Accordingly, respondent respectfully requests that the petition be dismissed as untimely.

3
      Dated:  August 13, 2008

4
                  Respectfully submitted,

5
                  EDMUND G. BROWN JR.
                  Attorney General of the State of California

6
                  DANE R. GILLETTE
                  Chief Assistant Attorney General

7

8
                  GERALD A. ENGLER
                  Senior Assistant Attorney General

9
                  PEGGY S. RUFFRA
                  Supervising Deputy Attorney General

10

11
                  /s/ Juliet B. Haley

12
                  JULIET B. HALEY
                  Deputy Attorney General

13
                  Attorneys for Respondent

14
JBH:jw
20131523.wpd

15

16

17

18

19

20

21

22

23

24

25

26

27

28
Reply To Petitioner's Opposition To Respondent's Motion To Dismiss Petition As Untimely - C 08-0274 JF (PR)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Remon A. Shields v. A. Schwarzenegger, Governor of California**

No.:    **C 08-0274 JF (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>August 13, 2008</u>, I served the attached

**REPLY TO PETITIONER'S OPPOSITION TO RESPONDENT'S MOTION TO DISMISS PETITION AS UNTIMELY**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

**Remon A. Shields**
**P64820**
**CSP-Sacramento**
**PO Box 290066**
**Represa, CA 95671-0066**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 13, 2008, at San Francisco, California.

|  |  |
|---|---|
| J. Wong | |
| Declarant | Signature |

20131530.wpd

MC-275

Name REMON SHIELDS

Address CSP-SACramento/B-1-129

P.O. BOX 290066

Represa, CA 95671-0066

CDC or ID Number P64820

COURT FILED
ORIGINAL ALAMEDA COUNTY

FEB 2 6 2007

CLERK OF THE SUPERIOR COURT
By _____
                                    Deputy

## SUPERIOR COURT OF THE STATE OF CALIFRORNIA

## IN THE COUNTY OF ALAMEDA
(Court)

| | |
|---|---|
| REMON SHIELDS | **PETITION FOR WRIT OF HABEAS CORPUS** |
| Petitioner | SEEKING REVERSAL OF CONVICTION, EVIDENTIARY HEARING AND SENTENCE MOD |
| vs. | No. |
| J. WALKER, Warden et.. al., | *(To be supplied by the Clerk of the Court)* |
| Respondent | 132344 13 |

### INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

FEB 2 6 2007

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

[X] A conviction          [ ] Parole

[X] A sentence            [ ] Credits

[ ] Jail or prison conditions   [ ] Prison discipline

[ ] Other (specify): _____

1. Your name:  REMON SHIELDS

2. Where are you incarcerated?  CSP-SACRAMENTO

3. Why are you in custody?  [X] Criminal Conviction   [ ] Civil Commitment

   Answer subdivisions a. through i. to the best of your ability.

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   MURDER/ACCESSORY TO ATTEMPTED ROBBERY

   b. Penal or other code sections:  P.C. §§187/190.2(a)(17) and 12022.5

   c. Name and location of sentencing or committing court: ALAMEDA COUNTY SUPERIOR COURT, 1225 Fallon Street, Oakland CA 94612

   d. Case number:  132344B

   e. Date convicted or committed:  Aug. 17th, 1999

   f. Date sentenced:  Nov. 18th, 1999

   g. Length of sentence: Life Without Possibility of Parole, plus 10 years.

   h. When do you expect to be released?  N/A

   i. Were you represented by counsel in the trial court? [ ] Yes.  [X] No.  If yes, state the attorney's name and address:

   _____

   _____

4. What was the LAST plea you entered? (check one)

   [X] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

(SEE, ATTACHED MOTION/DECARATION FOR EXTENSION

OF TIME TO FILE PETITION FOR WRIT OF HABEAS CORPUS)

Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

(SEE, ATTACHED MOTION/DECARATION)

upporting cases, rules, or other authority (optional):
*riefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, tach an extra page.)*

(SEE, ATTACHED MOTION/DECARATION)

1

2                          SUPERIOR COURT OF THE STATE OF

3                        CALIFORNIA IN THE COUNTY OF ALAMEDA

4

5

6    REMON SHIELDS

7    Petitioner,                                    No: _____

8
                                                    MOTION/DECARATION FOR AN
9        v.                                         EXTENSION OF TIME TO FILE
     J. WALKER, Warden et.., al..                   PETITION·FOR WRIT OF HABEAS
10            Respondent.                            CORPUS

11   _____

12

13
                                I, REMON SHIELDS, depose and state:
14   I am thename Petitioner in the above-entitled matter, a state

15   prisoner, proceeding in pro-se as a poor person without assistance of

16   counsel; I am a layman unskilled at law; My filing deadline date in

17   State and/or Federal court(s) under AEDPA 28 U.S.C. §2244(d)(1) is

18   Feb. 21st, 2007. It is at this time unforeseeable that I will NOT be

19   able to meet that deadline due to the reason(s) listed in #15 of the

20   PETITION FOR WRIT OF HABEAS CORPUS (See, attached EXHIBIT A).

21

22                    I therefore request that I be granted a time

23   extension of 30 days to meet my filing deadline.

24                    I have not obtainned any pervious time

25   extension in this matter.

26                    I declare under the penalty of perjury under
     the laws of the United States that the foregoing is ture and correct
27   to my own person knowledge.

28
     January 28th, 2007                             REMON SHIELDS

                                         1

8. Did you appeal from the conviction, sentence, or commitment?   [X] Yes.   [ ] No.   If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
THE COURT OF APPEAL OF THE STATE OF CALIFORNIA FIRST APPELLATE Dist.Div.3

b. Result APPEAL DENIED/ Conviction Affirmed   c. Date of decision: May 24th, 2005

d. Case number or citation of opinion, if known: A089623/ 129 Cal.App.4th 863

e. Issues raised: (1) _____ (See attached MC-275 #8(e). Pages 1-2

(2) _____

(3) _____

f. Were you represented by counsel on appeal?   [X] Yes.   [ ] No. If yes, state the attorney's name and address, if known:

STEPHEN GREENBERG, 206 Sacramento St. #208, Nevada City, CA 95959

9. Did you seek review in the California Supreme Court?   [X] Yes   [ ] No.   If yes, give the following information:

a. Result Review denied/ Cert. denied   b. Date of decision: 9-21-06/ 2-21-06

c. Case number or citation of opinion, if known: S135282(29 Cal.Rptr.3d 71) U.S.S.C. No.#05-8318

d. Issues raised: (1) (See attached MC-275 #9(d). Pages 1-6

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

Appellate Attorney did not raise these issue(s)

Direct Appeal; Appellate Attorney told Petitioner the record did not
support the issue(s) raised in this Writ.

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_____

_____

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available?   [ ] Yes.   [ ] No.
*Attach documents that show you have exhausted your administrative remedies.*

MC-275 (Rev. July 1, 2005)               PETITION FOR WRIT OF HABEAS CORPUS               Page five of six

## Table of Contents

|  |  | Page |
|---|---|---:|
| TABLE OF AUTHORITIES |  | ii |
| **INTRODUCTION** |  | 1 |
| **ARGUMENT** |  | 2 |
| I. | THIS COURT'S *CRAWFORD* ANALYSIS CANNOT PROPERLY RELY ON THE ORIGINAL OPINION'S MATERIAL MISREADING OF THE RECORD. | 2 |
|  | A.  Judicial Policy and Appellate Procedure | 2 |
|  | B.  Appellant's Due Process Right to a Fair Appeal | 2 |
|  | C.  No Advisory Opinion | 3 |
|  | D.  Mischaracterization of the Record | 5 |
| II. | THE PROPER CONSTITUTIONAL ANALYSIS IS THAT ANNOUNCED IN *CRAWFORD v. WASHINGTON.* | 11 |
| III. | THE HEARSAY STATEMENTS WERE GIVEN IN RESPONSE TO POLICE INTERROGATION AND WERE THEREFORE "TESTIMONIAL" UNDER *CRAWFORD.* | 12 |
| IV. | THE JOINT INTERROGATION EVIDENCE WAS NOT SUBJECT TO CROSS-EXAMINATION, SO IT WAS INADMISSIBLE UNDER *CRAWFORD.* | 13 |
| V. | THE CONSTITUTIONAL ERROR IS NOT HARMLESS BEYOND A REASONABLE DOUBT. | 16 |
| CONCLUSION |  | 20 |
| WORD COUNT CERTIFICATE |  | 20 |
| PROOF OF SERVICE |  |  |

i

*71 29 Cal.Rptr.3d 71

129 Cal.App.4th 863, 5 Cal. Daily Op.
Serv. 4412,

2005 Daily Journal D.A.R. 6052

Court of Appeal, First District, Division
3, California.

The PEOPLE, Plaintiff and
Respondent,
v.
Clemeth Ray CASTILLE et al.,
Defendants and Appellants.

No. A089623.
May 24, 2005.

Review Denied Sept. 21, 2005.

**Background:** Defendants were convicted in the Superior Court, Alameda County, No. C132344, Robert B. Freedman, J., of first degree murder with a special circumstance. Defendants appealed. The Court of Appeal, 108 Cal.App.4th 469, 133 Cal.Rptr.2d 489, ruled that statements made during a joint interview were properly admitted against each defendant. The United States Supreme Court granted certiorari and remanded the case for further consideration in light of *Crawford v. Washington* (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

**Holdings:** On remand, the Court of Appeal, Corrigan, Acting P.J., held that:

(1) admissions made during joint interview were properly admitted against the other defendants under *adoptive admissions exception to hearsay rule,* and

(2) evidence was sufficient to support first degree murder and felony-murder special circumstance findings.

Affirmed.

*See 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 102; Cal. Jur. 3d, Evidence, § 261 et seq.*

West Headnotes

[1]    Criminal Law ⬤➠338(7)

110 ----
110XVII Evidence
110XVII(D) Facts in Issue and Relevance
110k338 Relevancy in General
110k338(7) Evidence Calculated to Create Prejudice Against or Sympathy for Accused.

[See headnote text below]

[1]    Criminal Law ⬤➠419(1)

110 ----
110XVII Evidence
110XVII(N) Hearsay
110k419 Hearsay in General
110k419(1) In General.

As a general rule, if a party to a proceeding has made an out-of-court statement that is relevant and not excludable as being more prejudicial than probative, the statement is admissible against that party declarant. West's Ann.Cal.Evid.Code § 352.

[2]    Criminal Law ⬤➠419(1.10)

110 ----
110XVII Evidence
110XVII(N) Hearsay
110k419 Hearsay in General
110k419(1.10) Exceptions to Hearsay Rule, and Non-Hearsay Distinguished in General.

Exception to hearsay rule for statements of a party covers all statements of a party, whether or not they might otherwise be characterized as admissions. West's Ann.Cal.Evid.Code § 1220.

[3]    Criminal Law ⬤➠407(1)

110 ----
110XVII Evidence
110XVII(L) Admissions
110k405 Admissions by Accused
110k407 Acquiescence or Silence
110k407(1) In General.

The statute providing for an adoptive admissions exception to the hearsay rule contemplates either explicit acceptance of another's statement, or acquiescence in its truth by silence, equivocal or evasive conduct. West's Ann.Cal.Evid.Code § 1221.

[4]    Criminal Law ⬤➠407(2)

110 ----

© 2006 Thomson/West. No claim to original U.S. Govt. works.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iii

**PETITION FOR REVIEW** ..........................................................1

**ISSUES PRESENTED FOR REVIEW** .................................................2

**I.   CONSTITUTIONALITY OF LAW ENFORCEMENT'S JOINT CUSTODIAL INTERROGATION STRATEGY IN LIGHT OF** *ARANDA, BRUTON* **AND** *CRAWFORD.*....................2

**II.  *MIRANDA* ISSUES**........................................................4

**BRIEF IN SUPPORT OF REQUEST FOR REVIEW** ...........................4

**STATEMENT OF CASE AND FACTS** ......................................4

**ARGUMENT: NECESSITY FOR REVIEW** .........................................8

**I.   REVIEW IS NECESSARY TO RESOLVE A SPLIT IN COURT OF APPEAL AUTHORITY AND EXAMINE FUNDAMENTAL SIXTH AMENDMENT QUESTIONS WITH RESPECT TO USE OF NONTESTIFYING CODEFENDANTS' STATEMENTS OBTAINED BY POLICE DURING A JOINT INTERROGATION.** ......................8
   A. Introduction ............................................................8
   B. *Aranda-Bruton* and the Experimental "Joint Interview" Strategy Used Here ..............................................9
   C. *Castille I*'s Approval of Joint Interrogation Strategy and Its Further Development in California..............................11
   D. California Courts Are Split as to the Evaluation of Joint Interrogation Admissibility in a Joint Trial, and A Fuller Analysis of the Sixth Amendment Issue Is Necessary. ...............13
      1. *Castille I*..........................................................13
      2. *People v. Jennings* .............................................15
      3. *Crawford v. Washington*.......................................16
      4. *People v. Song* (2004) 124 Cal.App.4th 973 ...........17
      5. *People v. Combs* ................................................19
      6. *Castille II*.........................................................21
      a)  "Express Adoptive Admissions"...........................23
      b)  Statements Not Adopted.....................................24
      c)  "Implicit Adoptive Admission" ...........................24
      d)  Interlocking Statements .....................................26
      e)  Harmless Error Analysis.....................................26

i

II.  **REVIEW IS NECESSARY TO RESOLVE ADDITIONAL FIFTH AMENDMENT ISSUES.**..................................................28

    A.  Even After a Suspect's Waiver of the Right to Silence, Police Violate It by Responding "Yes" When He Asks if He Must Answer..........................................................................28

    B.  The Standard Warning of the Right to *Remain* Silent Does Not Adequately or Effectively Inform Suspects of Their Fifth Amendment Right to *Cut Off* Questioning. ..........................29

**CONCLUSION**...................................................................................30

WORD COUNT CERTIFICATION.........................................................30

**APPENDIX — OPINION IN No. A089623**
(in Supreme Court copies, rule 28.1(b)(4)) ..............................25 pp.

PROOF OF SERVICE

Court of Appeal, First Appellate District, Division Three - No. A089623
S135282

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

CLEMETH RAY CASTILLE et al., Defendants and Appellants.

Petitions for review DENIED.

George, C.J., was absent and did not participate.

SUPREME COURT
**FILED**

SEP 2 1 2005

Frederick K. Ohlrich Clerk

DEPUTY

_Werdega_
Acting Chief Justice

# TABLE OF CONTENTS

QUESTIONS PRESENTED FOR REVIEW ..............................................previous page

TABLE OF CONTENTS .................................................................................ii

TABLE OF AUTHORITIES.............................................................................iv

**PETITION FOR WRIT OF CERTIORARI TO THE COURT OF APPEAL
OF THE STATE OF CALIFORNIA, FIRST APPELLATE DISTRICT,
DIVISION THREE** ...................................................................................1

**OPINION BELOW** ...................................................................................1

**JURISDICTION**.........................................................................................2

**CONSTITUTIONAL PROVISIONS INVOLVED** .................................2

**STATEMENT OF THE CASE**..................................................................2

Introduction and Procedural History.........................................................2

Material Evidence at Trial..........................................................................5

**REASONS FOR GRANTING THE WRIT** ...........................................10

I.  **CERTIORARI IS NECESSARY TO RESOLVE FUNDAMENTAL
    SIXTH AMENDMENT QUESTIONS WITH RESPECT TO THE
    ADMISSIBILITY OF NONTESTIFYING CODEFENDANTS' JOINT
    CUSTODIAL INTERROGATIONS.** ..................................................10
    A. Introduction ...........................................................................................10
    B. *Bruton* and the Experimental "Joint Interview" Strategy Used Here .................11
    C. *Castille I*'s Approval of Joint Interrogation Strategy and Its Further
       Development in California.....................................................................13
    D. California Courts Are Split as to the Evaluation of Joint Interrogation
       Admissibility in a Joint Trial, and A Fuller Analysis of the Sixth
       Amendment Issue Is Necessary..........................................................15
       1. *Castille I*.............................................................. 15
       2. *People v. Jennings*................................................ 17
       3. *Crawford v. Washington*...................................... 18
       4. *People v. Song*, 22 Cal. Rptr. 3d 118, 124 Cal. App. 4th 973 . 19
       5. *People v. Combs*................................................... 21
       6. *Castille II* ............................................................ 23
       a)  "Express Adoptive Admissions" ...............................................25

   b) Statements Not Adopted ........................................................................27
   c) "Implicit Adoptive Admission" ..............................................................27
   d) Interlocking Statements ........................................................................28
   e) Harmless Error Analysis .......................................................................29
  E. Florida Courts Are Split as to the Evaluation of a Defendant's Custodial
    Adoptive Admissions Based on a Nontestifying Accomplice's Hearsay. ..........31

**II. CERTIORARI IS NECESSARY TO RESOLVE ADDITIONAL FIFTH
  AMENDMENT ISSUES. ..................................................................................33**
  A. Even After a Suspect's Waiver of the Right to Silence, Police Violate It
    by Responding "Yes" When He Asks if He Must Answer. ...............................33
  B. The Standard Warning of the Right to *Remain* Silent Does Not
    Adequately or Effectively Inform Suspects of Their Fifth Amendment
    Right to *Cut Off* Questioning. ...............................................................34

**CONCLUSION** .....................................................................................................40

**APPENDIX A: CALIFORNIA COURT OF APPEAL OPINION**

**APPENDIX B: CALIFORNIA SUPREME COURT ORDER DENYING
REVIEW**

# Supreme Court of the United States
## Office of the Clerk
### Washington, DC  20543-0001

William K. Suter
Clerk of the Court
(202) 479-3011

February 21, 2006

Mr. Stephen Greenberg
Attorney at Law
206 Sacramento Street # 208
Nevada City, CA  95959

.Re:  Remon Shields
     v. California
     No. 05-8318

Dear Mr. Greenberg:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

*William K Suter*

William K. Suter, Clerk

commitment, or **issue** in any court?  ☐ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

3. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result *(Attach order or explain why unavailable)*: _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result *(Attach order or explain why unavailable)*: _____

    (5) Date of decision: _____

  c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

4. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

5. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

(See, attached MC-275 #15)

_____

6. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

_____

7. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

_____

_____

8. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

This COURT has Jurisdiction.

The undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: January 28th, 2007       ▶ *Remon Shields*
                             (SIGNATURE OF PETITIONER)

1

2  -APPELLATE COUNSEL SOUGHT RELIF (On direct appeal from the

3  California State to the UNITED STATES SUPREME COURT: Supreme

4  Court, SHIELDS v CALIFORNIA No. 05-8318, CERTIORARI was denied

5  Feb. 21st, 2006; Petitioner received the complete court record from

6  Appellate counsel until March 21st, 2006.

7

8  -On July 28th, 2006; Petitioner was committed to "MOHU" Mental

9  Outpatient Housing Unit for Accute Psychological treatment and suicide

10  pervention, at which point Petitioner did not have access to court record

11  (legal property). On Sept. 20th, 2006; Petitioner received his legal property.

12

13  -On Dec. 28th, 2006; Petitioner was sent to Ad-Seg, at which time he did not

14  have access to his legal property; Petitioner was issued his legal property on

15  Jan. 10th, 2007. Upon receipt of Petitioner leglal property, Petitioner noticed

16  and reported missing legal documents (Reporter's transcripts, Volumes 1-6

17  and Juvenile court file record) documents that are critical and relevant to

18  Petitioner issue's address in this Appeal.

19

20  Petitioner submitted PLU (PREFERRED LEGAL USER) form to B-Fac

21  Law Library on Jan. 17th, 2007; Petitiioner was granted PLU on Jan. 22nd,

22  2007, however due to construction Petitioner have not had access to the law

23  library.

24  -Petitioner has a diagnosed learning mental impairment (mildly retarded),

25  has a reading tabe level of 2.5 and Petitioner is in the CDCR Mental Health

26  Program CCCMS level of care.

27

28

PROOF OF SERVICE BY MAIL
(C.C.P. §§1013(A); 2015.5 & U.S.C. §1746)

I, _Remon Shields_____ am a citizen of the state of California, County of Sacramento, over the age of eighteen years, and I (am) (am not) a party to the within cause. My address is, _B-1-129___, P.O. BOX 29, Represa, California 95671.

On _January 28th_____, 20 _07_ I served the original and/or true reproduction (s) thereof of the following documents:

_Motion for EXTENSION OF TIME TO FILE, WRIT OF_

_HEBEAS CORPUS_

By mailing them to:

Superior Court of Alameda County/Appeal Divs.
1225 Fallon St.
Oakland, CA 94612

Said service was executed by placing said documents enclosed in a sealed envelope(s) with postage prepaid fully thereon, and depositing them in the United States Mail. At the time of the mailing there existed normal mailing service between the above parties.

I declare under the penalty of perjury, under the laws of the state of California that the foregoing is true and correct.

Executed on this ___28th_____ of _January____, 20_07_, at Represa, CA. 95671.

PRINT NAME

_Remon Shields_

SIGNATURE

# EXHIBIT COVER PAGE



EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: ___5___ pages.

JURISDICTION:   (Check only one)

☐  Municipal Court

☒  Superior Court

☐  Applellate Court

☐  State Supreme Court

☐  United States District Court

☐  State Circuit Court

☐  United States Supreme Court

☐  Grand Jury

Date: September 5, 2006

To: Malfi, Warden CSP-Sacramento

RE: Legal Property

From: Remon Shields #P64820
      CSP-Sacramento/B-5-207
      P.O. Box 290066
      Represa, CA 95671-0066

     I have been scheduled to transfer to High Desert State Prison for over a month, which I am still waiting to do. All my property was trans-packed on July 28th, 2006.

     Now, I have a legal filing Dead line under the (AEDPA) 28 USC § 2241-2255, and my time is not tolled at this time, it is running out! I have took all the established measures to get my "Legal Property" (1) On, Aug. 15, 2006 I sent an Inmate Request to B-FAC Property Officer c/o. Flory requesting my legal property, and informing him of my legal Dead line; and (2) on Aug. 28, 2006, I filed an Inmate Appeal [CDC-602] requesting my Legal Property and that the State and Federal Court(s) be informed that I not be held responsible under the (AEDPA), for the time that I have lost by not having access to my Legal Property. I would greatly appreciate your assistance in this matter.

                                        Thank you for your time.

CC:  Malfi, Warden CSP-Sacramento
     Dovey, Director of Corrections and Rehabilitation
     Bill Lockyer, Attorney General
     Clerk, Cal. State Supreme Court
     Clerk, U.S. Northern District Court of Cal.

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

| | Location: Institution/Parole Region | Log No. | Category |
|---|---|---|---|
| | 1. _____ | 1. _____ | _____ |
| | 2. _____ | 2. _____ | |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| SHIELDS | P64820 | | B-1-129 |

A. Describe Problem: This is an Appeal Per, Title 15 CCR §3120 (a) and §3122 (a), addressed to CSP-SAC, WARDEN J. WALKER; On Jan. 22nd, 2007 my PLU status was approved by Sr. Librarian Nappi (see attached CSP-SAC PLU APPLICATION-Dated 1-17-07). I have since been denied access to B-FAC LAW Library, due to on-going construction in Law Library. I'm an Pro-se litigant and I need access to the Law Library and Law Library clerk's for researching case(s), case law, case cit-ations, preparing and filing legal documents. Denying my access to the Law Library and Clerk's, is blocking and Denying me "Meaningful access to the courts". B-FAC, 4BLK Ad-Seg PLU Inmates are being escorted to A-FAC LAW Library for PLU uses.

If you need more space, attach one additional sheet.     (SEE Attached CSP-SAC PLU APPLICATION 2 pg.(s))

B. Action Requested: To be given/have access to B-FAC LAW LIBRARY and Clerk's as an PLU inmate in accordance with Federal and State Law; Per, D.O.M. and Title 15 provision's; and/or Escorted to A or C Facility LAW LIBRARY for PLU uses.

Inmate/Parolee Signature: R. Shields    Date Submitted: Jan. 24th, 2007

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

_____

_____

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_____

_____

_____

_____

Signature: _____    Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

**CSP-SAC  PLU (Preferred Legal User)  APPLICATION**        revised  8-1-00

**Name** _Shields_    **CDC#** _P64820_      **Housing** _B-1-105_    **Date** _1-17-07_

Priority access (PLU) is granted only to inmates acting in propia persona (pro per or pro se) withou benefit of counsel, subject to verification of **COURT DOCUMENTATION** supplied by th applicant.  PLU ~~begins~~ 30 days (or less) before the deadline and expires with that date. PLU i renewable ~~only if~~ a new deadline is set and a new application is made.

**Deadline** _Feb. 21st 2007_ / document being filed _State Habeas_

**Case number** _supplied when filed_    **court** _Alameda County Superior Court_

**Document or court rule providing deadline** _Denial from U.S. Supreme Court (starting 1 yr. filing deadline)_ _Attached_

**Job assignment** ~~Denial from the Supreme Court~~ _____ **days off** _____

**Job supervisor** _____ **hours** _____

**Inmate checklist:**
- ■ request is complete and accurate, all blanks completed
- ■ court rule or court order & date establishing deadline entered in blank above
- ■ attorney communications are not acceptable in lieu of a court order or notice
- ■ applications without documentation of a deadline will be denied
- ■ applications w/o documentation for a court appearance date will be verified with Records OTC
- ■ court decisions which do not specify time for an appeal must be researched by the inmate
- ■ priority access for deadlines of more than 30 days, starts 30 days before the deadline
- ■ failure to access the library on a PLU ducat is grounds for cancellation of priority status
- ■ PLU does not stack up, i.e., multiple concurrent deadlines result in single PLU status
- ■ PLU may only be transferred after successful application by the inmate litigant
- ■ Inmates with work assignments must access the library during regular time off
- ■ Inmates making cell changes must notify the library—ducats are not forwarded
- ■ Court documentation and proof of service attached / deadline has not passed

I understand the procedure above & my application is complete.

                    **Inmate signature** _Remon Shields_

---

LTA approval _____    Sr Librarian approval _A. Napp_

___ Approved / date _01-22-2007_    denied / date _____

Confirmed deadline _____    comments _____

_____

_____

_____

_____

_____

# Supreme Court of the United States
## Office of the Clerk
### Washington, DC  20543-0001

William K. Suter
Clerk of the Court
(202) 479-3011

February 21, 2006

Mr. Stephen Greenberg
Attorney at Law
206 Sacramento Street # 208
Nevada City, CA  95959

Re:  Remon Shields
     v. California
     No. 05-8318

Dear Mr. Greenberg:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

William K. Suter

William K. Suter, Clerk

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|
| REMON SHIELDS #P64820<br>CSP-SACRAMENTO/ B1-129<br>P.O. Box 290066<br>Represa, CA 95671-0066 | | |

ATTORNEY FOR (Name):

**NAME OF COURT:**
STREET ADDRESS: ALAMEDA COURT    SUPERIOR COURT
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Appeal divison

PLAINTIFF/PETITIONER:
REMON SHIELDS

DEFENDANT/RESPONDENT:
J. Walker, Warden et.., al.

CASE NUMBER:

**DECLARATION**

On Dec. 28th, 2006; Petitioner was placed in Ad-Seg. Correctional
Officer (c/o) Hanna was charged with logging and packing Petitioner
Personal and Legal property.
On Jan. 10th, 2007; Upon Petitioner receiving his property; Petitioner
reported to Property Officer c/o Flory that numerous item's was missing
out of his property (personal and legal property); Petitioner sent
c/o Flory an itemized list of missing Personal and Legal Property
items.
Petitioner's missing Legal property : Juvenile court file, motion's
and transcripts; and Reporter's Transcript's (Pre-trial and Trial)
Volume 1-6.
On Jan. 17th, 2007; Petitioner filed an inmate complaint on c/o Hanna
for the missing property items , which is currently under review
(see, attached INMATE APPEAL ASSIGNMENT NOTICE, Feb. 8th, 2007 SAC-
B-07-00395).
And that is the reason why the documents is not attached in support of
the facts raise in this    (WRIT OF HABEAS CORPUS).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Jan. 28th, 2007

REMON SHIELDS
.....................................
(TYPE OR PRINT NAME)

▶ _Remon Shields_
(SIGNATURE OF DECLARANT)

☒ Petitioner/Plaintiff ☐ Respondent/Defendant ☐ Attorney
☐ Other (specify):

(See reverse for a form to be used if this declaration will be attached to another court form before filing)

Form Approved by the
Judicial Council of California
DECLARATION

MC-275

itName   REMON SHIELDS

Address   CSP-SACRAMENTO/ B-1-129

P.O. BOX 290066

Represa, CA 95671-0066

CDC or ID Number   #P64820

ORIGINAL F I L E D
ALAMEDA COUNTY

FEB 2 7 2007

CLERK OF THE SUPERIOR COURT
By_____
                              Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

(Court)

| | |
|---|---|
| REMON SHIELDS | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | SEEKING REVERSAL OF CONVICTION, |
| vs. | EVIDENTIARY HEARING, AND SENTENCE MODIFICATION |
| SCOTT KERNAN, CDCR DIRECTOR | No. ___152544B___ |
| Respondent | (To be supplied by the Clerk of the Court) |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

**This petition concerns:**

- [X] A conviction
- [ ] Parole
- [X] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [ ] Other *(specify)*: _____

1. Your name:   REMON SHIELDS

2. Where are you incarcerated?   CSP-SACRAMENTO

3. Why are you in custody?   [X] Criminal Conviction   [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   MURDER/ACCESSORY TO ATTEMPTED ROBBERY

   b. Penal or other code sections:   P.C. §§187/190.2(a)(17) and 12022.5

   c. Name and location of sentencing or committing court:   ALAMEDA COUNTY SUPERIOR COURT, 1225 Fallon Street, Oakland CA 94612

   d. Case number:   132344B

   e. Date convicted or committed:   Aug. 17th, 1999

   f. Date sentenced:   Nov. 18th, 1999

   g. Length of sentence:   Life Without Possibility of Parole, plus 10 years.

   h. When do you expect to be released?   N/A

   i. Were you represented by counsel in the trial court?   [ ] Yes.   [X] No. If yes, state the attorney's name and address:

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6. GROUNDS FOR RELIEF
   **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

_____

_____

        (See, attached MEMORANDA, Ground 1)  Pages 1-4

_____

a. Supporting facts:
   Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly *what* to violate your rights at what time *(when)* or place *(where).* *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

_____

_____

_____

        (See, attached MEMORANDA A. Supporting facts: to Ground 1) Pages 1-4

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority (optional):
   *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

   4th, 5th, 6th and 14th Amendments to the United States Constitution; Roper v. Simmons 543 U.S. 551; In re Winship 397 U.S. 358; Drope v. Missouri 420 U.S. 162, 180; Pate v. Robinson 383 U.S. 375, 378; Moran v. Godinez 972 F.2d 263 (9th Cir. 1992); Moore v. United States 464 F.2d 663 (9th Cir. 1972); In re M.G.S. 267 Cal.App. 2d 329; In re Shawnn E. 34 Cal.App. 4th 184; People v. Edwardo N.G. 166 Cal.Rptr. 873; People v. Day 201 Cal.App. 3d 112, 120.

1

2    MEMORANDA GROUND 1

3    PETITIONER ASSERTS THAT JUVENILE COURT JUDGE/REFEREE
     VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER 5TH, 6TH AND
4    14TH AMENDMENT RIGHTS TO THE UNITED STATES CONSTITUTION.
5    IN FAILING TO ORDER EVIDENTIARY HEARING AS TO PETITIONERS
     COMPETENCY TO STAND TRIAL WHERE JUVENILE COURT
6    JUDGE/REFEREE HAD [SUA SPONTE DUTY] TO DO SO [ONCE] HE
7    RECEIVED AND REVIEWED INFORMATION AS TO PETITIONERS
     HISTORY OF MENTAL ILLNESS AND MENTAL IMPAIRMENT
8    (RETARDATION), REQUIRING REVERSAL.

9    A. Supporting facts:

10   During petitioner's Juvenile court proceeding defense counsel Robert Byers attempted to

11   have Dr. Carol Walser as a defense witness review petitioner's taped statements

12   (individual and joint), transcripts of both tape statements and interview petitioner. Dr.

13   Walser underlined focus and role was to present to the juvenile court judge/referee that

14   due to petitioner's extensive history of mental illness, diagnosed mental impairment and

15   extremely severe mental, emotional, social and physical abuse [prevented and precluded]

16   petitioner from understanding the court proceeding against him, assisting counsel in

17   preparing a defense. And knowingly, intelligently and voluntarily waiving his Miranda

18   rights during interrogation by officers and petitioner was still fit for juvenile

19   jurisdiction/treatment. However, defense counsel Robert Byers never presented Dr. Carol

20   Walser as a defense witness. Defense counsel subsequently submitted a motion to

21   juvenile court Judge/Referee Mark Kliszewski in support of retaining petitioner in

22   juvenile jurisdiction. Exhibits used in support of counselor's motion was documented

23   information of petitioner's history and diagnosed mental illness, mental impairment and

24   extremely severe mental, emotional, social and physical abuse. Juvenile court

25   judge/referee Mark Kliszewski received and reviewed all motions, exhibits and

26   documentation submitted by defense counsel. Despite receipt and review of documented

27   information of petitioners history of mental illness and diagnosed mental impairment.

28   Juvenile court Judge/Referee did not <u>Stay</u> juvenile court proceedings and hold an

1    evidentiary hearings to petitioners competency to stand trial. At the conclusion of

2    petitioner's juvenile court proceeding, (fitness hearing). Juvenile court judge/referee

3    found petitioner Miranda waiver valid and Voluntarily and petitioner unfit for juvenile

4    jurisdiction and treatment and remanded petitioner to the Alameda County Municipal

5    Court to be tried as an adult. Petitioner was them remanded to Superior Court to stand

6    trial for special circumstance-Felony Murder. During pre-trial hearing before Hon. Judge

7    Vernon K. Nakahara. Petitioner sought and was allowed to dismiss court appointed

8    counsel Mrs. Freda Perel and proceed through pre-trial and trial Pro-se, without ever

9    having a evidentiary hearing for petitioner's competency to self representation or stand

10   trial. During trial, petitioner stated to trial court on several occasions that he was

11   confused about and by the court proceeding and did not know what to do or what he was

12   doing. The trial court told petitioner, "Mr. Shields you have chosen to exercise your right

13   to represent yourself in the matter against the advice of defense counsel and Judge

14   Nakahara the odds and hardships have been explained to you, so the burden and

15   consequence of your decision to proceed as your own counsel is yours to bare".

**However, this exchange between petitioner and trial court Judge Robert B.**

**Freedman does not appear in the record. (See exhibit E2)** Petitioner's statements is

supported by his performance during pre-trial and jury trial. [CASE-IN-POINT]

Petitioner failed to object on numerous occasions to critical points of information and

testimony by prosecution and prosecution's witnesses object to critical [circumstantial

evidence] presented by the prosecution and defense counsel. Petitioner did not present a

defense for himself. For the most part petitioner's forte' was mimicking co-defendants

defense counsel, even though a great number of their actions and presentations was

extremely adverse and prejudicial to petitioner's interest. On the critical point **Miranda**

**and Voluntariness**. Petitioner sought to have his **Miranda** waiver and out-of-court

inculpatory tape statements suppressed on the grounds that petitioner's **Miranda** waiver

was not knowingly, intelligently and voluntarily. Officers violated **Miranda** by not

stopping interrogation once petitioner asked for counsel and to speak to grandparents.

The officer's refusal to allow grandmother to present and/or to speak to petitioner,

officer's refusal and failure to comply with petitioner's rights under **WELFARE AND**

**INSTITUTIONS CODE 627 (b)** and officer's refusal to stop tape statement interrogation upon petitioner's request. At the conclusion of the Miranda and Voluntariness evidentiary hearing, trial court ruled petitioner's **Miranda waiver** and tape statements were legally valid under Miranda and admissible against petitioner.

However, the trial court also ruled that neither the prosecution, petitioner or co-defendant defense counsel could present petitioner's individual tape statement to the jury unless and until petitioner testified before the jury in open court. Petitioner nor co-defendants never testified before the jury. The prosecution sought and was allowed by trial court to use defendants joint tape statement in it's case-in-chief against petitioner. The prosecution sought and was allowed by trial court to use defendants joint tape statements to the jury in open court.

The trial court allowed defendants joint tape statement to be submitted into evidence by prosecution and the jury was allowed to have defendants joint tape statement during deliberations, readbacks. The jury found petitioner guilty as charged and trial court imposed the maximum sentence allowable under law. Sentencing petitioner to life without parole, plus 10 years. **(See statement of facts 14-21)**

Petitioner contends that is was error for Juvenile court Judge/Referee not to stay juvenile proceedings in light of receiving and reviewing documentation as to petitioner's extensive history of mental illness and mental impairment (retardation) and even if the documentation information received and reviewed by juvenile court judge/referee was not submitted to question and/or challenge petitioner's competency, where once juvenile court judge/referee received and reviewed documentation as to petitioner's history of mental illness, mental impairment (retardation) and extremely severe mental, emotional, social and physical abuse. Juvenile court judge/referee Mark Kliszewski had a **[sua sponte duty]** to stay all juvenile proceeding and/or findings and order an Evidentiary Hearing as to petitioner's competency to stand trial.

Juvenile court judge/referee error can not be deemed **"Harmless error" or "Harmless beyond a reasonable doubt".** If not for Juvenile court Judge/Referee error petitioner would not have been allowed to waive counsel and/or dismiss court appointed counsel Freda Perel and proceed Pro-Se throughout pre-trial and jury trial without counsel and or

1   [ever] having a evidentiary hearing as to competency to stand trial and self-representation

2   or waive cognent appeal issues. Therefore this court should reverse petitioner's

3   conviction as a matter of law and furthermore, this court should order and evidentiary

4   hearing as required by law.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4 of 4

7. **Ground 2**

_____(See, attached MEMORANDA GROUND 2) Pages 1-3

a. Supporting facts:

(See, attached MEMORANDA A. Supporting facts: to Ground 2) Pages 1-3

b. Supporting cases, rules, or other authority: 4th, 5th, 6th and 14th AMENDMENTS to the

UNITED STATE CONSTITUTION; STRICKLAND v WASHINGTON 466 U.S. 668 (1984)

In re M.G.S. 267 Cal.App. 2d 329

MEMORANDA  GROUND  2

PETITIONER ASSERTS THAT JUVENILE COUNSEL (ROBERT BYERS)
VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE 5TH, 6TH
AND 14 AMENDMENTS OF THE UNITED STATES CONSTITUTION. IN
PROVIDING PETITIONER WITH INEFFECTIVE ASSISTANCE OF
COUNSEL, WHERE COUNSEL FAILED TO INVESTIGATE AND REQUEST A
EVIDENTIARY HEARING AS TO PETITIONER'S COMPETENCY TO STAND
TRIAL AND/OR MIRANDA WAIVER REQUIRING REVERSAL.

Supporting Facts:

During petitioner's juvenile court proceeding. Petitioner's defense counsel Robert Byers,

motioned Juvenile court for a continuance to have Dr. Carol Walser as a defense witness,

review petitioner's tape statements, transcripts of the tape statements and interview

petitioner (due to petitioner's history of mental illness). Defense counsel then submitted

a motion with exhibits in support of retaining petitioner in juvenile jurisdiction for

treatment. The exhibits used in defense counsel's motion were documents that

highlighted petitioner's extensive history of mental illness, mental impairment

(retardation), and extremely severe mental , emotional, social and physical abuse.

Defense counsel indicated to juvenile court that petitioner's mental illness, mental

impairment and abusive history played a major role in petitioner's involvement in the

crime  and confessing to the murder. Defense counsel never presented Dr. Carol Walser

as a defense witness. Despite defense counsel's review and submission of documentation

highlighting petitioner's extensive history of mental illness and mental impairment.

Defense counsel failed to request and/or motion the juvenile court for evidentiary hearing

as to petitioner's competency and/or Miranda waiver. At the conclusion of petitioner's

juvenile proceeding. Juvenile court deemed petitioner unfit for juvenile treatment/

jurisdiction and remanded petitioner to Alameda County Municipal court to be tried as an

adult. Petitioner was subsequently bound over to Alameda County Superior Court to

stand trial for felony murder. During Pre-trial hearing petitioner was allowed to dismiss

court appointed counsel Mrs. Freda Perel and allowed to proceed pro-se through pre-trial

and jury trial, without ever having an evidentiary hearing as to competency to self-

representation or to stand trial against charges. During Miranda and Voluntariness

evidentiary hearing petitioner sought to have Miranda waiver and inculpatory tape statements suppressed. At the conclusion of the Miranda and Voluntariness evidentiary hearing, trial court ruled petitioner's MIRANDA WAIVER and tape statements were valid under Miranda and admissible against petitioner. However the trial court ruled that neither the prosecution, petitioner or co-defendant's defense counsel could present petitioner's [individual] tape statement to the jury unless and until petitioner testified before the jury. The prosecution sought and was allowed by trial court to use defendants "joint" tape statements in it's case-in-chief, against petitioner. Petitioner nor c0-defendants testified at jury trial. The prosecution presented and played defendant's joint tape statement to the jury in open court. Defendants joint tape statement was submitted into evidence by the prosecution. The jury found petitioner guilty as charged. The trial court imposed the maximum sentence allowable under the law. Sentencing petitioner to life without parole, plus ten years. [See statement of facts 14-21].

Petitioner contends that Robert Byers, defense counsel provided petitioner with ineffective assistance of counsel in failing to request and/or motion the juvenile court for a evidentiary hearing as to petitioner's competency to stand trial and/or waive Miranda rights, where counsel submitted motion and documented information as to petitioner's extensive history of mental illness, diagnosed mental impairment (retardation) and motioned juvenile court for continuance, to have Dr. Carol Walser review petitioner's individual and joint tape statements and transcripts and to interview petitioner (due to history of mental illness). **Defense counsel's performance in not motioning or requesting juvenile court for competency evidentiary hearing, fell well below the standard of reasonableness and counsel's unprofessional errors prejudiced petitioner in and throughout all subsequent court proceedings.**

Defense counsel's unprofessional errors can not be deemed "harmless error or "harmless beyond a reasonable doubt. Due to, if not for defense counsel's unprofessional errors, petitioner would not have been allowed to waive counsel and/or dismiss court appointed counsel Fred Perel and proceed pro-se through pre-trial and jury trial without counsel or ever having an evidentiary hearing as to competency to stand trial and self representation or wave cognent appeal issues.

2 of 3

1  Therefore this court should reverse petitioner's conviction as a matter of law and

2  furthermore this court should order and evidentiary hearing as required by law.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ound: 3

(See, attached Memoranda, Ground 3)  Pages 1-2

Supporting facts:

(See, attached Memoranda; B. Supporting facts; to Ground 3)
        Pages 1-2

orting cases, rules, or other authority: Welf ¾ I. C. §627 (b);

h, 5th, 6th and 14th Amendments to the United States Constitution;

per v. Simmons, 543 U.S. 551; In re Winship, 397 U.S. 358; Santosky v. Kramer, 455;

re Gault 387 U.S. 1; Withrow v. Williams, 507 U.S. 680; Yarborough v. Alvarado,

1 U.S. 933 ; Taylor v. Maddox (9th Cir. 2004) 366 F.3d 992; U.S. v Juvenile (9th Cir. 2000);

nn v. Small (9th Cir. 1999) 187 F.3d 650; Haley v. Ohio, 332 U.S. 596; People v.

cFarland, 95 Cal. Rptr. 369; People v. Burton 99 Cal. Rptr. 1; Miranda v. Arizona, 334 U.S 436

MEMORANDA GROUND 3

PETITIONER ASSERTS THAT TRIAL COURT VIOLATED PETITIONER'S
DUE PROCESS RIGHTS UNDER THE 4TH, 5TH, 6TH AND 14TH
AMENDMENTS OF THE UNITED STATES CONSTITUTION, IN RULING
THAT PETITIONER DID NOT INVOKE MIRANDA RIGHTS, WHERE
PETITIONER MADE REQUESTS TO OFFICERS FOR AN ATTORNEY AND
PHONE CALL TO GRANDPARENTS. AND OFFICERS FAILED TO COMPLY
WITH WELF & I.C. 627 (b) REQUIRING REVERSAL

Supporting Facts:

Petitioner (who was a minor) was arrested on December 20, 1996 as a suspect in a

November 11, 1996 attempted Robbery/Murder of a West Oakland store clerk, Abdo

Nashar. Petitioner was taken to the Oakland Police Station (homicide dept.) several

hours later. Petitioner unknowingly waived his Miranda rights and was then interrogated

by officers Bingham and Clark. After several hours of interrogation petitioner was

coerced into making tape statement confessing to the murder of the store clerk. Petitioner

testified during Miranda and Voluntariness evidentiary hearing that: "He (petitioner)

made requests to officers Bingham for an Attorney and for phone calls to grandparents

and requests was also mad to officer Sherman for clothes and a phone call to

grandparents. Petitioner's requests to officers Bingham and Sherman was made prior to

the individual tape statement and that his requests to officers Bingham and Sherman was

denied until he had made taped statements confessing to the murder.

Petitioner's evidentiary testimony as to petitioner's request prior to being coerced into

making individual taped statement, to officers Bingham and Sherman for phone calls to

grandparents and a request for an Attorney went uncontested by the prosecution and by

officer's Bingham and Sherman. At the conclusion of the Miranda and Voluntariness

evidentiary hearing, trial court found petitioner did not make any requests during

interrogation or prior to and/or during petitioner's individual tape statement to officer's

Bingham or Sherman for an attorney or for phone calls to grandparents.

Trial court made it's factual finding, without any testimony form officer's Bingham and

Sherman as to such facts it reached in concluding petitioner never made request to

1   officers for an attorney or for phone calls to grandparents.  Petitioner pointed this fact out

2   to trial court.  Subsequently trial court found petitioner's Miranda Waiver valid, the trial

3   court ruled petitioner's individual tape statement was admissible and therefore defendants

4   (joint) tape statement was admissible against petitioner.  However, trial court ruled that

5   neither the prosecution, petitioner or co-defendants; defense counsel could present

6   petitioner's individual taped statement to the jury unless and until petitioner testified

7   before the jury in open court.  Petitioner nor co-defendant ever testified before the jury.

8   The prosecution sought and was allowed by trial court to use  defendants "joint" tape

9   statement in it's case-in-chief against petitioner, the prosecution presented  and played

10  defendant "joint"  tape statement was submitted into evidence and the jury was allowed to

11  have playbacks of defendant "joint" tape statement during deliberations. The jury found

12  petitioner guilty as charged. The trial court imposed the maximum sentence allowable

13  under the law, Life without possibility of  parole, plus ten years.[See, Statement of facts

    1-6, 8, 10, 18-21]

14  Petitioner contends it was error by trial court to make a factual **determination that**

15  **petitioner did not invoke his Miranda rights during interrogation** and prior to giving

16  taped statements for an attorney and for phone calls to grandparents.  **Officers violated**

17  **welfare and institution code 627 (b).**  Trial court factual determination was made

18  without testimony from officers Bingham and Sherman as to facts reached by trial, was

19  error by trial court.  **Trial court error can not be deemed  "harmless error or**

20  **harmless beyond a reasonable doubt".**  If not for trial court error, petitioners **Miranda**

21  waiver and tape statements would have been deemed invalid and inadmissible and the

22  prosecution would not have been able to introduce defendants joint tape statement to the

23  jury against petitioner.  The only evidence the jury was allowed to used to consider in

24  determining petitioner guilt or innocence was defendant joint tape statements.  Outside of

25  defendants joint tape statement.  There was not any evidence the prosecution could have

26  presented to the jury against petitioner.  Therefore this court should reverse petitioner's

    conviction as a matter of law and furthermore this court should order an evidentiary

27  hearing as required  by law.

28

und : 4

_(See, attached Memoranda, Ground 4) Pages 1-3_

upporting facts:

_(See, attached Memoranda; A. Supporting facts: to Ground 4)_

_Pages 1-3_

orting cases, rules, or other authority:

th, 5th, 6th and 14th AMENDMENTS TO THE UNITED STATES CONSTITUTION;

per v. Simmons 543 U.S. 551; Inre Winship 397 U.S. 358;

ylor v. Maddox (9th Cir. 2004) 366 F.3d 992; Miranda v. Arizona, 334 U.S.

6; In re Patrick W. (App. 2 Dist. 1980) 163 Cal. Rptr. 848, 104 Cal. App. 3d 615,

rtiorari denied 101 S.Ct. 893, 449 U.S. 1096, 66 L.Ed. 2d 824; Welf. & I.C. §627 (b)

MEMORANDA GROUND 4

PETITIONER ASSERTS THAT TRIAL COURT VIOLATED PETITIONER'S
DUE PROCESS RIGHTS UNDER 4TH, 5TH, 6TH AND 14TH AMENDMENTS
OF THE UNITED STATES CONSTITUTION, IN RULING THAT
PETITIONER'S MIRANDA WAIVER AND TAPE STATEMENTS WERE
VALID, WHERE. PETITIONER (IN-CUSTODY MINOR) GRANDMOTHER
WAS AVAILABLE AND CONSTANTLY SOUGHT TO SEE AND SPEAK TO
PETITIONER. OFFICERS WERE UNDER OBLIGATION TO ASK AND/OR
INFORM PETITIONER BEFORE AND/OR DURING INTERROGATION IF
(HE) DESIRED TO SEE AND/OR SPEAK TO GRANDMOTHER, REQUIRES
REVERSAL.

Supporting Facts:

Petitioners grandmother (defense) witness, Mrs. Erma Lavallis testified during

petitioner's Miranda and Voluntariness Evidentiary hearing and jury trial. Mrs.

Lavallis, Miranda and Voluntariness evidentiary hearing testimony was that: She

requested to officers during petitioner's arrest, could she or petitioner's grandfather

accompany petitioner to the police station and she was told by officer Olivas "no one

could accompany petitioner to the police to the police station and then officer Olivas gave

her a number and told her she could call the police station (Homicide division) to get

more information on petitioner's situation. After petitioner was taken to the police

station, she called police station (homicide division) on several different occasions asking

officers could she, petitioners grandfather, attorney or the parish priest come down to the

police station to be with petitioner because petitioner was a minor. Officers told her no

one could be with petitioner until officers finished questioning petitioner. She then

requested to speak to petitioner and officers denied her request to speak to petitioner,

stating, she would be able to speak to petitioner once petitioner is taken to juvenile hall.

Mrs. Lavallis also testified, "had she been allowed to accompany petitioner to the police

station would not have allowed officers to interrogate petitioner and that had she been

allowed to speak to petitioner, she would have advised petitioner not to speak to officers.

Mrs. Lavallis evidentiary and jury trial testimony was uncontested by the prosecution. At

the conclusion of the Miranda and Voluntariness evidentiary hearing , trial court found

that officers did not violate petitioner's Miranda rights by not asking petitioner if he

1  desired to speak to grandmother and not complying with petitioners rights under welfare

2  and institution code section 627 (b) and that petitioner's Miranda waiver was valid. Trial

3  court ruled petitioner's tape statements was admissible against petitioner. However, trial

4  court ruled that neither the prosecution, petitioner or co-defendants defense counsel could

5  present petitioner individual taped statement to the jury unless and until petitioner

6  testified before the jury in open court. Petitioner nor co-defendant never testified before

7  the jury. The prosecution sought and was allowed by trial court to use defendants "joint"

8  tape statement in it's case-in-chief against petitioner. The prosecution presented and

9  played defendants "joint" tape statement to the jury in open court; Defendants "joint tape

10  statement was submitted into evidence and the jury was allowed to have playbacks of the

11  "joint tape statement during deliberations. The jury found petitioner guilty as charged and

12  the trial court imposed the maximum sentence allowable under the law, sentencing

13  petitioner to Life without possibility of parole plus ten years. [See statement of facts 18-21]

14  Petitioner contends it was error by trial court to rule that petitioner's Miranda waiver was

15  valid, where in light of properly presented un-contested testimony to trial court that

16  petitioners grandmother was available and had sought to see and speak to petitioner and

17  was purposely and systematically kept by officers from seeing and speaking to petitioner

18  until officers finished interrogating petitioner and had obtained self incriminating tape

19  statements for petitioner. Trial court determination and ruling that officers failure to

20  inform petitioner of his grandmother's request to speak to him and ask petitioner if he

21  desired to talk to grandmother and to give petitioner the mandated phone calls under

22  Welfare and Institutes code, section 627 (b), did not violate petitioner's Miranda rights or

23  make petitioner Miranda waiver invalid, was error. Trial court error can not be deemed

24  "harmless error" or harmless beyond a reasonable doubt. Due to if not for trial court

25  error, petitioner Miranda waiver and tape statements would have been deemed invalid and

26  inadmissible and the prosecution would not have been able to introduce defendants joint

27  tape statement to the jury against petitioner. The only evidence the jury was allowed to

28  use and consider in determining petitioner's guilt or innocence was defendants joint tape

statement. Outside of defendants joint tape state" there was not any evidence the

1    prosecution could have presented to the jury against petitioner. Therefore this court
2    should reverse petitioner's conviction as a matter of law and furthermore this court
3    should order an evidentiary hearing as required by law.

ound : 5

(See, attached Memoranda, GROUND 5) Pages 1-2

Supporting facts:

(See, attached Memoranda, A. Supporting facts: to GROUND 5) Pages 1-2

porting cases, rules, or other authority:

6th and 14th AMENDMENTS TO THE UNITED

TATES CONSTITUTION; CUNNINGHAM v. CALIFORNIA, U.S.S.C. (2007)

ople v. Haynes (App. 4 Dist. 1984) 207 Cal. Rptr. 139.

MEMORANDA GROUND 5

PETITIONER ASSERTS THAT TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER 6TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION, WHERE TRIAL COURT ON IT'S OWN MOTION FOUND [TRUE] " AGGRAVATING FACTORS' AS TO ELEMENTS OF CRIME AND SENTENCED PETITIONER TO UPPER TERMS, REQUIRING REVERSAL OF SENTENCE INLIGHT OF UNITED STATES SUPREME COURT'S RULING IN CUTTINGHAM V. CALIFORNIA

**Supporting Facts:**

During petitioner's sentencing, trial court (Hon. Judge Robert B. Freedman) before

pronouncing final judgment against petitioner, acknowledge his [court] authority to

exercise discretion under penal code section 190.5 in sentencing petitioner to an

indeterminate term of 25 years-to-life or the upper term of life without the possibility of

parole, as to the juries finding petitioner [guilty] of penal code section 187/190.2 (a) (17).

Trial court then went over "AGGRAVATING FACTORS" as to petitioner's probation

department report, then finding the following [AGGRAVATING FACTORS]:

"Petitioner's a third generation murderer"; Petitioner planned the robbery ; petitioner

was involved in casing the scene prior to the crime; Petitioner had an opportunity to

deliberate and decide whether to proceed or not (with the crime); Petitioner wore a ski

mask and other covering during the crime; The victim's death was not the result of a spur

of the moment confrontation, a moment of passion or any other excusable circumstances,

public safety as an aggravating factors, for petitioner. After trial court found all

"AGGRAVATING FACTORS" [TRUE] and stated, "that due to "AGGRAVATING

FACTORS" being found [TRUE] that petitioner receives the upper term sentences on

[both] guilty findings by the jury as to P.C. 12022.5; Petitioner received the upper term

of ten years, and for P.C. 190.2 (a)(17) petitioner received the upper term of [Life]

without the possibility of parole. [ See statement of facts 20-21]

Petitioner contends it was err for trial court to sentence petitioner to the [upper] terms,

based solely on trial court's finding on it's own motion true "AGGRAVATING

FACTORS" and the "AGGRAVATING FACTORS" listed in petitioner's probation

report [true], where the jury did not find "AGGRAVATING FACTORS" nor did trial court submit aggravating factors to the jury for a "factual finding " **"beyond a reasonable doubt"** as to the [truth] of the "AGGRAVATING FACTORS" before trial court sentenced petitioner to the [upper] terms based on the juries finding petitioner guilty under P.C. 12022.5 and P.C. 187/190.2 (a) (17). In failing to present/submit "AGGRAVATING FACTORS" to the jury for a factual finding "Beyond a reasonable doubt" as to the [TRUTH] of "AGGRAVATING FACTORS", before sentencing petitioner to the [UPPER] terms, trial court violated petitioner's due process rights under the 6th and 14th Amendments.

TRIAL COURT ERR CAN NOT BE DEEMED "harmless error or harmless beyond a reasonable doubt". Due to the indeterminate sentence term imposed by trial court (life without the possibility of parole) prohibits petitioner form ever being eligible for parole and/or paroled and decrees that petitioner dies in prison (Death Sentence), versus a 25 years-to-life term where petitioner would be eligible for parole after serving 25 years in prison. Therefore this court should reverse petitioner's sentence as a matter of law and furthermore this court should order and evidentiary hearing as required by law.

3. Did you appeal from the conviction, sentence, or commitment?    [X] Yes.    [ ] No.    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
THE COURT OF APPEAL OF THE STATE OF CALIFORNIA 1st. APPELLATE Dist. Div.3

b. Result  APPEAL DENIED/ Conviction Affirmed  c. Date of decision: May 24th, 2005

d. Case number or citation of opinion, if known:  A089623/.129 Cal.App.4th 863

e. Issues raised: (1) _____ (See attached MC-275 #8(e) pages 1-2) _____

    (2) _____

    (3) _____

f. Were you represented by counsel on appeal?  [X] Yes.  [ ] No. If yes, state the attorney's name and address, if known:

STEPHEN GREENBERG, 206 Sacramento St. #208, Nevada City, CA 95959

4. Did you seek review in the California Supreme Court?  [X] Yes  [ ] No.   If yes, give the following information:

a. Result  Review Denied/Cert. denied _____  b. Date of decision: 9-21-06/2-21-06

c. Case number or citation of opinion, if known:  S135282(29 Cal.Rptr.3d 71)U.S.S.C. No.#05-8318

d. Issues raised: (1) _____ (See attached MC-275 #9(d) pages 1-6) _____

    (2) _____

    (3) _____

5. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____ Appellate Attorney did not raise these issue(s)

in my direct Appeal; and In light of CUNNINGHAM V. CALIFORNIA(U.S.S.C. 2007)
@

6. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_____

_____

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available?  [ ] Yes.  [ ] No.

[MC-275] #8(e).                          1 of 2

## Table of Contents

|  | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| INTRODUCTION | 1 |
| ARGUMENT | 2 |

I.    THIS COURT'S *CRAWFORD* ANALYSIS CANNOT PROPERLY RELY ON THE ORIGINAL OPINION'S MATERIAL MISREADING OF THE RECORD. — 2

    A.    Judicial Policy and Appellate Procedure — 2

    B.    Appellant's Due Process Right to a Fair Appeal — 2

    C.    No Advisory Opinion — 3

    D.    Mischaracterization of the Record — 5

II.    THE PROPER CONSTITUTIONAL ANALYSIS IS THAT ANNOUNCED IN *CRAWFORD v. WASHINGTON*. — 11

III.    THE HEARSAY STATEMENTS WERE GIVEN IN RESPONSE TO POLICE INTERROGATION AND WERE THEREFORE "TESTIMONIAL" UNDER *CRAWFORD*. — 12

IV.    THE JOINT INTERROGATION EVIDENCE WAS NOT SUBJECT TO CROSS-EXAMINATION, SO IT WAS INADMISSIBLE UNDER *CRAWFORD*. — 13

V.    THE CONSTITUTIONAL ERROR IS NOT HARMLESS BEYOND A REASONABLE DOUBT. — 16

CONCLUSION — 20

WORD COUNT CERTIFICATE — 20

PROOF OF SERVICE

[MC-275] #8(e).                    2 of 2

29 Cal.Rptr.3d 71, 129 Cal.App.4th 863, People v. Castille, (Cal.App. 1 Dist. 2005)                **Page 1**

*71 29 Cal.Rptr.3d 71

129 Cal.App.4th 863, 5 Cal. Daily Op.
Serv. 4412,

2005 Daily Journal D.A.R. 6052

Court of Appeal, First District, Division
3, California.

**The PEOPLE, Plaintiff and
Respondent,
v.
Clemeth Ray CASTILLE et al.,
Defendants and Appellants.**

**No. A089623.
May 24, 2005.**

Review Denied Sept. 21, 2005.

**Background:** Defendants were convicted in the
Superior Court, Alameda County, No. C132344,
Robert B. Freedman, J., of first degree murder with a
special circumstance. Defendants appealed. The
Court of Appeal, 108 Cal.App.4th 469, 133
Cal.Rptr.2d 489, ruled that statements made during a
joint interview were properly admitted against each
defendant. The United States Supreme Court granted
certiorari and remanded the case for further
consideration in light of *Crawford v. Washington*
(2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d
177.

**Holdings:** On remand, the Court of Appeal,
Corrigan, Acting P.J., held that:

(1) admissions made during joint interview were
properly admitted against the other defendants under
adoptive admissions exception to hearsay rule, and

(2) evidence was sufficient to support first degree
murder and felony-murder special circumstance
findings.

Affirmed.

See 1 Witkin, Cal. Evidence (4th ed. 2000)
Hearsay, § 102; Cal. Jur. 3d, Evidence, § 261 et
seq.

West Headnotes

[1]    Criminal Law ☜⟶338(7)

110 ----
110XVII Evidence
110XVII(D) Facts in Issue and Relevance
110k338 Relevancy in General
110k338(7) Evidence Calculated to Create
Prejudice Against or Sympathy for Accused.

[See headnote text below]

[1]    Criminal Law ☜⟶419(1)

110 ----
110XVII Evidence
110XVII(N) Hearsay
110k419 Hearsay in General
110k419(1) In General.

As a general rule, if a party to a proceeding has
made an out-of-court statement that is relevant and
not excludable as being more prejudicial than
probative, the statement is admissible against that
party declarant. West's Ann.Cal.Evid.Code § 352.

[2]    Criminal Law ☜⟶419(1.10)

110 ----
110XVII Evidence
110XVII(N) Hearsay
110k419 Hearsay in General
110k419(1.10) Exceptions to Hearsay Rule, and
Non-Hearsay Distinguished in General.

Exception to hearsay rule for statements of a party
covers all statements of a party, whether or not they
might otherwise be characterized as admissions.
West's Ann.Cal.Evid.Code § 1220.

[3]    Criminal Law ☜⟶407(1)

110 ----
110XVII Evidence
110XVII(L) Admissions
110k405 Admissions by Accused
110k407 Acquiescence or Silence
110k407(1) In General.

The statute providing for an adoptive admissions
exception to the hearsay rule contemplates either
explicit acceptance of another's statement, or
acquiescence in its truth by silence, equivocal or
evasive conduct. West's Ann.Cal.Evid.Code § 1221.

[4]    Criminal Law ☜⟶407(2)

110 ----

© 2006 Thomson/West. No claim to original U.S. Govt. works.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

**PETITION FOR REVIEW** ........................................................... 1

**ISSUES PRESENTED FOR REVIEW** ..................................... 2

**I.   CONSTITUTIONALITY OF LAW ENFORCEMENT'S
       JOINT CUSTODIAL INTERROGATION STRATEGY IN
       LIGHT OF** *ARANDA, BRUTON* **AND** *CRAWFORD.* ................... 2

**II.  *MIRANDA* ISSUES** ................................................................. 4

**BRIEF IN SUPPORT OF REQUEST FOR REVIEW** ........................... 4

**STATEMENT OF CASE AND FACTS** ...................................... 4

**ARGUMENT: NECESSITY FOR REVIEW** ........................................ 8

**I.   REVIEW IS NECESSARY TO RESOLVE A SPLIT IN
       COURT OF APPEAL AUTHORITY AND EXAMINE
       FUNDAMENTAL SIXTH AMENDMENT QUESTIONS
       WITH RESPECT TO USE OF NONTESTIFYING
       CODEFENDANTS' STATEMENTS OBTAINED BY
       POLICE DURING A JOINT INTERROGATION.** ....................... 8
       A. Introduction ................................................................. 8
       B. *Aranda-Bruton* and the Experimental "Joint Interview"
          Strategy Used Here ...................................................... 9
       C. *Castille I*'s Approval of Joint Interrogation Strategy and Its
          Further Development in California............................................. 11
       D. California Courts Are Split as to the Evaluation of Joint
          Interrogation Admissibility in a Joint Trial, and A Fuller
          Analysis of the Sixth Amendment Issue Is Necessary. ................. 13
          1. *Castille I*................................................................. 13
          2. *People v. Jennings* ................................................ 15
          3. *Crawford v. Washington* ........................................ 16
          4. *People v. Song* (2004) 124 Cal.App.4th 973 .......................... 17
          5. *People v. Combs* .................................................... 19
          6. *Castille II* .............................................................. 21
          a)  "Express Adoptive Admissions" ......................................... 23
          b)  Statements Not Adopted .................................................... 24
          c)  "Implicit Adoptive Admission" ......................................... 24
          d)  Interlocking Statements ................................................... 26
          e)  Harmless Error Analysis ................................................... 26

[M( !75] #9(d).                    2 of 6

II.  **REVIEW IS NECESSARY TO RESOLVE ADDITIONAL
     FIFTH AMENDMENT ISSUES**...................................................28
     A. Even After a Suspect's Waiver of the Right to Silence,
        Police Violate It by Responding "Yes" When He Asks if He
        Must Answer..................................................................................28
     B. The Standard Warning of the Right to *Remain* Silent Does
        Not Adequately or Effectively Inform Suspects of Their
        Fifth Amendment Right to *Cut Off* Questioning............................29

**CONCLUSION**....................................................................................30

WORD COUNT CERTIFICATION.......................................................30

**APPENDIX — OPINION IN No. A089623**
(in Supreme Court copies, rule 28.1(b)(4)) ...............................25 pp.

PROOF OF SERVICE

[MC-275] #9(d).                              3 of 6

Court of Appeal, First Appellate District, Division Three - No. A089623
S135282

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

CLEMETH RAY CASTILLE et al., Defendants and Appellants.

Petitions for review DENIED.

George, C.J., was absent and did not participate.

SUPREME COURT
FILED

SEP 2 1 2005

Frederick K. Ohlrich Clerk

DEPUTY

_Wedega_
Acting Chief Justice

# TABLE OF CONTENTS

QUESTIONS PRESENTED FOR REVIEW ........................................previous page

TABLE OF CONTENTS ........................................................................................ii

TABLE OF AUTHORITIES ...............................................................................iv

PETITION FOR WRIT OF CERTIORARI TO THE COURT OF APPEAL
OF THE STATE OF CALIFORNIA, FIRST APPELLATE DISTRICT,
DIVISION THREE ...............................................................................................1

OPINION BELOW ..............................................................................................1

JURISDICTION...................................................................................................2

CONSTITUTIONAL PROVISIONS INVOLVED ............................................2

STATEMENT OF THE CASE.............................................................................2

Introduction and Procedural History................................................................2

Material Evidence at Trial.................................................................................5

REASONS FOR GRANTING THE WRIT .......................................................10

I.    CERTIORARI IS NECESSARY TO RESOLVE FUNDAMENTAL
      SIXTH AMENDMENT QUESTIONS WITH RESPECT TO THE
      ADMISSIBILITY OF NONTESTIFYING CODEFENDANTS' JOINT
      CUSTODIAL INTERROGATIONS.............................................................10
      A.  Introduction .........................................................................................10
      B.  *Bruton* and the Experimental "Joint Interview" Strategy Used Here ......11
      C.  *Castille I*'s Approval of Joint Interrogation Strategy and Its Further
          Development in California.....................................................................13
      D.  California Courts Are Split as to the Evaluation of Joint Interrogation
          Admissibility in a Joint Trial, and A Fuller Analysis of the Sixth
          Amendment Issue Is Necessary.............................................................15
          1.  *Castille I*............................................................................. 15
          2.  *People v. Jennings*............................................................... 17
          3.  *Crawford v. Washington*...................................................... 18
          4.  *People v. Song*, 22 Cal. Rptr. 3d 118, 124 Cal. App. 4th 973 . 19
          5.  *People v. Combs*.................................................................. 21
          6.  *Castille II* ............................................................................ 23
              a)  "Express Adoptive Admissions" ..........................................25

      b)   Statements Not Adopted ...........................................................27
      c)   "Implicit Adoptive Admission"...............................................27
      d)   Interlocking Statements ...........................................................28
      e)   Harmless Error Analysis .........................................................29
  E.  Florida Courts Are Split as to the Evaluation of a Defendant's Custodial
     Adoptive Admissions Based on a Nontestifying Accomplice's Hearsay. ..........31

II.   **CERTIORARI IS NECESSARY TO RESOLVE ADDITIONAL FIFTH
     AMENDMENT ISSUES.** ...........................................................................33
  A.  Even After a Suspect's Waiver of the Right to Silence, Police Violate It
     by Responding "Yes" When He Asks if He Must Answer. ...............................33
  B.  The Standard Warning of the Right to *Remain* Silent Does Not
     Adequately or Effectively Inform Suspects of Their Fifth Amendment
     Right to *Cut Off* Questioning. ...................................................................34

**CONCLUSION** .................................................................................................40

**APPENDIX A: CALIFORNIA COURT OF APPEAL OPINION**

**APPENDIX B: CALIFORNIA SUPREME COURT ORDER DENYING
REVIEW**

[MC-275] #9(d).                              6 of 6

## Supreme Court of the United States
### Office of the Clerk
### Washington, DC 20543-0001

William K. Suter
Clerk of the Court
(202) 479-3011

February 21, 2006

Mr. Stephen Greenberg
Attorney at Law
206 Sacramento Street # 208
Nevada City, CA 95959

.Re:  Remon Shields
      *v. California*
      No. 05-8318

Dear Mr. Greenberg:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

*William K Suter*

William K. Suter, Clerk

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13.  a.  (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b.  (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)        (See attached MC-275 #15)

_____

_____

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
              THIS COURT HAS JURISDICTION.

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: FEB.13th,2007                      ▶ *Remon Shields*
                                            (SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]        PETITION FOR WRIT OF HABEAS CORPUS              Page six of six

[MC-275] #15                                    1 0f 1

1

2   -APPELLATE COUNSEL  SOUGHT RELIF (On direct appeal from the

3   California State to the UNITED STATES SUPREME COURT: Supreme

4   Court, SHIELDS v CALIFORNIA No. 05-8318, CERTIORARI was denied

5   Feb. 21st, 2006; Petitioner received the complete court record from

6   Appellate counsel until March 21st, 2006.

7

8   -On July 28th, 2006; Petitioner was committed to "MOHU" Mental

9   Outpatient Housing Unit for Accute Psychological treatment and suicide

10  pervention, at which point Petitioner did not have access to court record

11  (legal property). On Sept. 20th, 2006; Petitioner received his legal property.

12

13  -On Dec. 28th, 2006; Petitioner was sent to Ad-Seg, at which time he did not

14  have access to his legal property; Petitioner was issued his legal property on

15  Jan. 10th, 2007. Upon receipt of Petitioner leglal property, Petitioner noticed

16  and reported missing legal documents (Reporter's transcripts, Volumes 1-6

17  and Juvenile court file record) documents that are critical and relevant to

18  Petitioner issue's  address in this Appeal.

19

20  Petitioner submitted PLU (PREFERRED LEGAL USER) form to B-Fac

21  Law Library on Jan. 17th, 2007; Petitiioner was granted PLU on Jan. 22nd,

22  2007, however due to construction Petitioner have not had access to the law

23  library.

24  -Petitioner has a diagnosed learning mental impairment (mildly retarded),

25  has a reading tabe level of 2.5 and Petitioner is in the CDCR Mental Health

26  Program CCCMS level of care.

27

28

PROOF OF SERVICE BY MAIL
(C.C.P. §§1013(A); 2015.5 & U.S.C. §1746)


I, ___REMON SHIELDS_____ am a citizen of the state of California,
County of Sacramento, over the age of eighteen years, and I (am) (am not) a
party to the within cause. My address is, _B-1-129___, P.O. BOX 29, Represa,
California 95671.


On _Febuary 13th_____, 20 07  I served the original and/or true reproduction
(s) thereof of the following documents:


_____PETITION FOR WRIT OF HABEAS CORPUS_____

__SEEKING REVERSAL OF CONVICTION, EVIDENTIARY HEARING, SENTENCE MODIFICATION,

AND APPOINTMENT OF COUNSEL._____


_____

By mailing them to:

                    ALAMEDA COUNTY SUPERIOR COURT
                    1225 Fallon St. #209
                    OAKLAND, CA 94612-4293




Said service was executed by placing said documents enclosed in a sealed
envelope(s) with postage prepaid fully thereon, and depositing them in the
United States Mail. At the time of the mailing there existed normal mailing
service between the above parties.


I declare under the penalty of perjury, under the laws of the state of
California that the foregoing is true and correct.

Executed on this _____13th_____ of __Febuary_____, 20_07, at Represa, CA.
95671.

**FILED** FEB 1 3 2007

                              REMON SHIELDS
                              _____
                              PRINT NAME

                              *Remon Shields*
                              _____
                              SIGNATURE

# EXHIBIT: A

INDIVIDUAL TAPE STATEMENT (12-20-96) 7 PAGES
" TRANSCRIPT"

− AND −

MRS. ERMA LAVALLIS JURY TRIAL TESTIMONY (RT 1985−
1994) 10 pages

## STATEMENT OF RAMON SHIELDS

Taken At:                              OPD, Rm 201

Taken By:                             Sgt. Bingham

Date:                                  12/20/96

Time:                                  11:58

Present:                               Sgt. Bingham
                                       Sgt. Clark
                                       Ramon Shields

Transcribed by:                        S. Gordon   **draft**

Date of Transcription:                 7/3/97

* * * * * * * * * * *

SGT. BINGHAM:  Today's date is the 20th of December, 1996.  It's
11:58 hours.   I am Sgt. Bingham of the Oakland Police
Department, Homicide Section.  With me is my partner Sgt. Clark,
in room number 201, and we are talking with Ramon Shields.
Ramon, is that your true name?
SHIELDS:  Yes Sir.

Q.    Can you give me your full name Ramon?
A.    Ramon Arthur Shields.

Q.    And your date of birth Ramon?
A.    7/8.

Q.    Seven what?
A.    7/18/79.

Q.    Okay. Ramon have you ever seen this piece of paper that I am
      showing you?
A.    Yes Sir.

Q.    Okay. And didn't I read from this.  I am going to read it for
      the purpose of the tape, but didn't I read this right before you
      and me started talking about what happened at the market?  Is
      that correct?
A.    Yes.

Q.    And is that your initials right there? R.S.?
A.    Yeah.

Q.    In both places. Just for the purpose of the tape, what I read
      to him is, You have the  right to remain silent, anything you
      say can be used against you in a court of law.  You have the
      right to talk to a lawyer and have him present with you while
      your being questioned.  If you cannot afford a lawyer, one will
      be appointed to represent you before questioning if you wish
      one, if you wish one.  Isn't that what I read to you Ramon?
A.    Yes.

yes, is that correct?

A.    Yes.

Q.    And I also asked you if you want to talk to me and you also said yes is that correct?

A.    Yes.

Q.    Okay Ramon, you remember the day that this happened, the day of the week, or the date?  We're talking about the incident that happened at the store

A.    I don't remember the date.

Q.    How long has it been, approximately?  Think it's been a couple of weeks, three weeks, four weeks, what do you remember?

A.    Huh, seems like yesterday. _sniff_

Q.    Was it in November?

A.    Yes. _crying; cd barely say word_

Q.    Okay.  Now what store are we talking about, where's that store located at?

A.    ~~Can we stop the tape for a minute... inaudible.~~

Q.    Okay we're back on tape at 1200. ~~We stopped for about 60 seconds at Ramon's request. He's very upset um, he's very upset what happened at the store and he is trying to compose himself so we stopped,~~ it just seems like it's about 60 seconds is all. Okay Ramon, just tell me where that store is located. ~~Come on Ramon I know you can do it. I know it's hard.~~  _no answer_

A.    Down the street from us.

Q.    It's down the street a little.

A.    It's on Willow, 7th and Willow.

Q.    Okay.  Now the night that this happened how did you get to the store?

A.    We drove.

Q.    Okay when you say we, who's we?

A.    The driver and Clementh and me.

Q.    I am showing you a photograph right now, who is that?

A.    That's Clementh.

Q.    K number is 37806.  On the back of that, is that your signature?

A.    Yeah.

Q.    Okay I am showing you a, uh, a photocopy of a photo, is that dri--, person who was driving the car?

A.    Yes.

Q.    Okay for the purposes of the tape that's PFN, ADAM, YELLOW, JOHN 469.  And on the back of this piece of paper, is that your signature Ramon?

A.    Yes.

Q.    Okay who was driving the car?  This fellow here?

A.   Yes.

Q.   Okay and you don't know his name

A.   No.

Q.   I'm pointing to ALLAN-- ADAM, YELLOW, JOHN 469.  And where was Clementh, where was he sitting in the car?

A.   In the passenger seat.

Q.   And where were you?

A.   In the back, can we stop again?

Q.   Let's just go on Ramon, okay.  I know this is hard for you.

A.   Yes.

Q.   I know it's hard.

A.   Can we stop just for a second please.

Q.   Alright we will stop the tape again at his request.  It's 12:02 hours.  It's 12:07, we're back on tape.  Ramon is very upset and his stomach is bothering him a little bit but he has agreed he wants to finish.  Okay just briefly Ramon how, how did you get to the store again?

A.   Car was drove.

Q.   Okay whose car, who owned the car?

A.   The driver.

Q.   The driver owned the car.  How long have you known that driver?

A.   Two days.

Q.   Okay and you met him through who?

A.   Clementh.

Q.   Okay how long have you known Clementh?  Just approximately.

A.   Probably uh about 3 years or so.

Q.   Okay and how did you meet Clementh?

A.   He is my brother.

Q.   Does he live in the same neighborhood?

A.   Yes.

Q.   That's, I believe his mother lives in the neighborhood?

A.   Yes.

Q.   Now that night that when you went to the store in the car.  come on Ramon.

A.   I d--

Q.   I know you didn't mean it.  You didn't mean to do it, we understand that, you told us that.

A.   It hurts, it hurts.  It hurts.  It hurts, hurts.

Q.   Ramon?

A.   Yes, it hurts.

Q.   I understand.  When you went to the store, did the driver stay
     in the car?
A.   Yes.

Q.   Did you and Clementh go into the store?
A.   Yes.

Q.   Did you both have shotguns?
A.   Yes.  Yes.

Q.   Okay.  When you went into the store what was your intentions?
A.   Try to, try to get money for to eat.

Q.   Was it your intention to harm anyone?
A.   No.

Q.   What kind of gun did Clementh have?
A.   It was, it was 16 gauge.

Q.   16 gauge?
A.   Yes.

Q.   What kind of gun did you have?
A.   A black one.

Q.   What gauge was it?
A.   It hurts me, hurts, it hurts...

Q.   Come on Ramon...
A.   It hurts, it hurts, it hurts. It hurts.

Q.   Who went to the counter?  Mmm?
A.   Clementh.

Q.   And where did you stand?
A.   I wasn't in the store yet, I was by the door.

Q.   You were by the front door?
A.   Yes.

Q.   Standing outside?
a.   Yes.

Q.   Okay.  What did you see Clementh do?
A.   He walked to the counter and did it.

Q.   Okay he walked to the counter, what did he do?
A.   He walked to the counter and went up to it, I called his name.
     I said Clementh come on.  He, he looked at me, and he looked
     back at.... [*hold your head up*]

Q.   You have to [inaudible] so we can understand you.
A.   He looked, he looked back at the, he looked at the cashier.
     Yeah, I told him, come on, let's go, and I turned and walked
     back, and I looked back at the cashier, and uh he grabbed his
     arm and he, and he pulled his arm, and, and the gun came out
     when he pulled his arm, hit the cashier, he grabbed his arm.

They was struggling with, with the gun when the cashier man, and he was trying to pull it, for the cashier man telling him let it go, and I raised my arm to tell him let's go and my arm hit the door...

Q. Ramon, did your gun go off?  Ramon?
A. Yes.

Q. Did your gun go off?
A. Yes.

Q. Did it hit the clerk?
A. Yes it did.

Q. What did the clerk do when he got hit?
A. He, he ...

Q. Where did you put the gun at ?
A. I lay it on the counter...inaudible... and I stood there and the gun fell on the floor and Clementh ran out.  I stood there. I told the clerk, get up.  He wouldn't move.  I went to go grab him.  The clerk he was on his stomach.  I ran, I ran out the store, then I stopped and I was just standing there scared, I was just standing there and, and I got in the car and I went home, and I went in my room and got on my knees and I prayed for forgiveness and I said ...inaudible. to the clerk...It shouldn't have happened to him, it should have been me, he ain't did nothing to no body.  He ain't never done nothing to me or no body.  It should have been me.  And nobody wanted to do it but everybody wanted to go in the store but I don't know...inaudible.  We ain't never did nothing like this before....inaudible. They ain't bad, they never disrespected me or no body else...inaudible... I can't, I can't talk no more man, it hurts man, it hurts.

Q. Your gun was a ...inaudible?  Your shotgun was a what that you had?
A. I don't know.

Q. You don't know?
A. I don't know...inaudible.  I can't...inaudible.  It hurts.

Q. I know but Ramon ...inaudible.  You said that a gun hit the floor, what gun was it yours or Clementh's?
A. Clementh...inaudible...when the gun went off it, I dropped it...inaudible...

Q. Slow down, take a deep breath...inaudible:
A. Okay.

Q. Take a deep breath.
A. It hurts, it hurts.

Q. We're almost done, I want you to try and calm yourself down.
A. It hurts..

Q. Okay, Ramon. look at me. son. we're almost done. okay. calm

down, I want you to calm yourself down. I only have a couple
more questions okay. Slow down, Ramon...

A. Alright, alright.

Q. You have to calm down so I can ask questions.
A. Alright.

Q. You need to hear what I am going to ask you.
A. Okay.

Q. Okay. Did you have a mask on? Ramon?
A. Yes, yes.

Q. What did Clementh have on?
A. He had on a, he had on a hood.

Q. A hood, like a hood on a jacket?
A. Yes.

Q. Sgt. Clark?
SGT. CLARK: Yeah. What, yeah, Clementh what happened, I'm sorry,
Ramon, what happened with that shotgun?
A. I don't know.

Q. Did you give it to somebody?
A. No I just got out of the car, I went in my room, lay down on my
bed.

Q. Okay. Did we, did we promise you anything or threaten you in
any way?
A. Inaudible.

Q. Were we respectful to you?
A. Yes Sir.

SGT. BINGHAM: One last question. Ramon, the shotguns where did they
come from originally?
A. I found 'em in my basement.

Q. At what, what house?
A. At my old house.

Q. Which is what, what's the address?
A. 1525 Callow Street.

Q. And about long ago was that, just approximately son?
A. Two years.

SGT. CLARK: Ramon, was this thing planned?
A. No.

Q. When did it all, when was it decided that this would happen?
When was it decided son?
A. It was, we was just driving around, I told them to go, we was
going to go ...inaudible... so we wouldn't have to do nothing
like that, I told them to go [inaudible] but ...

Q.   What were you going to use the money for?

A.   We was going to give it to him cause they didn't have no money, and I had money coming in, and...inaudible....so I was going to give it ....inaudible.

Q.   You were going to help them out?

A.   Yeah.  I wish I could go back...inaudible....it should have been me.  I can't go through that ....

BINGHAM:   Ramon is there anything you want to say before we go off the tape?  Your pretty upset.  I think we need to give you a break.

A.   I'm sorry, I'm sorry, I'm so sorry.  If I could take it back I would...inaudible.

Q.   Inaudible.

A.   I apologize, no words I can say to...inaudible.  No words I can say to bring him back or change anything.  It's just uh...inaudible.  I'm sorry I can't do nothing ...inaudible.  If there was anything I could do, I would.  No matter what it is, it's, I just can't, can't turn back the time.  I wish if I could turn it back, I wouldn't even be born, I can't do ...inaudible...right.

Q.   Okay it's 12:21.  We're going to go off the tape now.

END OF TAPE

1    THE COURT:  ALL RIGHT.  MISS CASTILLE, IF YOU'LL

2  HAND ME THOSE TWO ITEMS.

3    THANK YOU VERY MUCH FOR YOUR TIME.  YOU MAY STEP

4  DOWN.

5    MR. CANNADY:  ON BEHALF OF DEFENDANT CASTILLE,

6  YOUR HONOR, WE WOULD REST.

7    THE COURT:  THANK YOU, MR. CANNADY.

8    MR. SHIELDS, WE'LL TURN BACK TO YOUR CASE.  DO

9  YOU HAVE A WITNESS TO CALL?

10    MR. SHIELDS:  YES.

11    THE COURT:  ALL RIGHT.  MR. BYRON, IF YOU'LL

12  ASSIST.

13    THANK YOU.

14    YOU'LL NOTICE WHEN I GET UP, LADIES AND

15  GENTLEMEN, I GET UP SLOWLY.  I HAVE THIS TETHER.  I HAVE A

16  LITTLE NOTE TO MYSELF THAT SAYS UNCLIP, SO I DON'T WALK

17  OFF THE BENCH WITHOUT SLIPPING.  AND THE OTHER REASON IS

18  ALL JUDGES, WE WEAR THESE BLACK DRESSES, AND YOU CAN TRIP

19  OVER THEM.  IT WOULD BE VERY EMBARRASSING IF YOU TAKE A

20  HEADER IN FRONT OF THE JURY.  SO WE TRY TO COME UP SLOWLY.

21    MISS LAVALLIS, PLEASE COME UP AND TAKE THE OATH.

22    THE CLERK:  COULD YOU PAUSE RIGHT THERE AND

23  RAISE YOUR RIGHT HAND, PLEASE.

24    ERMA LAVALLIS

25    CALLED AS A WITNESS ON BEHALF OF

26    DEFENDANT SHIELDS, HAVING BEEN DULY SWORN,

27    WAS EXAMINED AND TESTIFIED AS FOLLOWS:

28    THE CLERK:  THANK YOU.

1    PLEASE BE SEATED AT THE WITNESS STAND.

2    COULD YOU STATE YOUR NAME AND SPELL YOUR LAST

3    NAME FOR THE RECORD.

4    THE WITNESS:  MY NAME IS ERMA LAVALLIS,

5    L-A-V-A-L-L-I-S.

6    THE CLERK:  THANK YOU.

7    THE COURT:  GOOD AFTERNOON, MISS LAVALLIS.

8    I'M GOING TO ASK YOU TO KEEP YOUR VOICE UP, I

9    ASK ALMOST EVERY WITNESS TO DO THAT, SO WE CAN HEAR YOU

10   CLEARLY; TO SPEAK SLOWLY ENOUGH SO THE REPORTER CAN TAKE

11   DOWN WHAT YOU'RE SAYING; AND TO PLEASE LISTEN CAREFULLY TO

12   ANY QUESTIONS THAT MR. SHIELDS OR ANY OF THE ATTORNEYS

13   MIGHT ASK YOU AND JUST RESPOND TO THE SPECIFIC QUESTION

14   ONE STEP AT A TIME.

15   THE WITNESS:  OKAY.

16   THE COURT:  OKAY.  THANK YOU VERY MUCH.

17   GO AHEAD, MR. SHIELDS.

18                    DIRECT EXAMINATION

19   BY MR. SHIELDS:

20   Q.   OKAY.  WHAT IS YOUR NAME?

21   A.   MY NAME IS ERMA LAVALLIS.

22   Q.   OKAY.  AND WHERE DO YOU STAY?

23   A.   1427 CAMPBELL STREET, OAKLAND.

24   Q.   AND HOW LONG HAVE YOU STAYED THERE?

25   A.   53 YEARS.

26   MR. CANNADY:  PERHAPS THE WITNESS CAN MOVE

27   CLOSER TO THE MICROPHONE.

28   THE COURT:  YES.

1987

1         IF YOU CAN SCOOT YOUR CHAIR JUST A LITTLE

2   FORWARD, THAT WOULD HELP.

3         THE WITNESS:  OKAY.

4   BY MR. SHIELDS:

5   Q.    WERE YOU LIVING THERE ON DECEMBER THE 20TH, 1996?

6   A.    YES.

7   Q.    OKAY.  WAS ~~I LIVING THERE WITH YOU DECEMBER THE~~

8   ~~20TH, 1996?~~

9   A.    YES.

10  Q.    OKAY.  AND ON DECEMBER THE 20TH, 1996, WAS I TAKEN

11  OUT THE HOME ON DECEMBER 20TH, 1996?

12  A.    YES.

13  Q.    OKAY.  AND DID YOU ENCOUNTER ANY OFFICERS ON

14  DECEMBER 19 -- DECEMBER THE 20TH, 1996?

15  A.    I DIDN'T HEAR THE FIRST PART.

16  Q.    DID YOU ~~ENCOUNTER~~ ANY ~~OFFICERS~~ DECEMBER THE 20TH,

17  1996?

18  A.    YES, ~~TWO THAT CAME IN MY BEDROOM~~ --

19  Q.    OKAY.  DO YOU KNOW --

20  A.    -- ~~SEARCH.~~

21  Q.    DO YOU KNOW THOSE OFFICERS' NAMES?

22  A.    NO.

23  Q.    OKAY.  AND WHEN THEY CAME IN THERE, WHAT DID THEY

24  TELL YOU?

25  A.    ~~I JUST ASKED THEM WHAT WAS GOING ON, AND THEY SAID~~

26  ~~THERE WILL BE A -- A SERGEANT TO COME AND TELL US AFTER~~

27  ~~THE SEARCH WAS OVER WITH WHAT'S GOING ON.~~

28  Q.    AND DID A SERGEANT COME TELL YOU --

1    A.    YEAH.

2    Q.    -- AFTER THE SEARCH WAS OVER?

3    A.    YES.

4    Q.    AND WHAT DID HE TELL YOU?

5    A.    AH, FIRST I ASKED HIM WHO DID HE TAKE FROM THE HOUSE

6    'CAUSE HE HAD CALLED EVERYBODY OUT OF THE HOUSE.  I ASKED

7    HIM WHO DID HE TAKE, AND HE SAID HE TOOK REMON SHIELDS.

8    Q.    OKAY.  WHAT DID HE TELL YOU IN REGARDS FOR TAKING ME

9    FOR?

10   A.    I ASKED HIM WHY DID HE TAKE YOU, AND HE SAID YOU

11   WAS -- YOU WAS INTRUDING A HOMICIDE --

12         MR. MIFSUD:  CAN I --

13         THE COURT:  CAN YOU REPEAT THE ANSWER AS TO WHAT

14   THE SERGEANT TOLD YOU.  YOU INDICATED THAT YOU HAD ASKED

15   THE SERGEANT WHY HE TOOK MR. SHIELDS, AND THEN IF YOU

16   COULD REPEAT THE RESPONSE.

17         THE WITNESS:  I ASKED HIM WHY DID HE TAKE --

18   TAKE REMON SHIELDS, AND HE SAID THAT YOU WERE, UM, WERE

19   ARRESTED, YOU WAS INTRUDING IN A HOMICIDE.

20   BY MR. SHIELDS:

21   Q.    AND DID HE SAY WHERE?

22   A.    YEAH, HE TOLD ME 18TH AND MARKET.

23   Q.    AND AFTER DID YOU FIND OUT THAT I WAS TAKEN FROM THE

24   HOUSE, DID YOU ASK THE SERGEANT ANY REQUEST?

25   A.    YES, I TOLD HIM, I SAID, WELL, REMON IS A MINOR AND

26   COULD ME AND HIS GRANDFATHER GO WITH HIM OR EITHER ONE OF

27   US, AND HE SAID NO, NOBODY.

28   Q.    OKAY.  DID HE GIVE YOU ANY NUMBERS TO CALL?

```
 1   A.   HE -- AFTER HE GAVE ME THE SEARCH WARRANT HE WROTE

 2   UP A NUMBER WHERE I WOULD CALL THE HOMICIDE DEPARTMENT.

 3   Q.   DID HE GIVE YOU THE SEARCH WARRANT BEFORE HE STARTED

 4   SEARCHING OR AFTER?

 5   A.   AFTER.

 6             MR. MIFSUD:  OBJECTION, THAT'S IRRELEVANT.

 7             THE COURT:  THE OBJECTION'S OVERRULED.  THE

 8   ANSWER WILL STAY IN.

 9   BY MR. SHIELDS:

10   Q.   AND DID YOU CALL DOWN THERE TO SPEAK WITH THE

11   OFFICER?

12   A.   YES, I CALLED HOMICIDE DEPARTMENT ABOUT 9:00 O'CLOCK

13   IN THE MORNING.

14   Q.   OKAY.  AND WHAT DID THEY TELL YOU?

15   A.   I ASKED HIM --

16             MR. MIFSUD:  OBJECTION.  OBJECTION, HEARSAY.

17             THE COURT:  ALL RIGHT.  SUSTAINED.

18             MR. MIFSUD:  IF I COULD SUPPLEMENT ALSO,

19   RELEVANCY.

20             THE COURT:  SUSTAINED ON BOTH GROUNDS.

21   BY MR. SHIELDS:

22   Q.   DID I HAVE A BEDROOM IN THE HOUSE AT 15 -- AT

23   1427 CAMPBELL STREET?

24   A.   I DIDN'T HEAR.

25   Q.   DID I HAVE A BED -- WHERE WAS MY BEDROOM LOCATED AT

26   1427 CAMPBELL?

27   A.   IN THE BASEMENT.

28   Q.   OKAY.  AND WHO ROOM WAS THAT?
```

1990

```
1    A.    THE -- WHAT?

2    Q.    WHO ROOM WAS THAT?

3    A.    THAT WAS YOU AND YOUR BROTHER'S ROOM.

4    Q.    OKAY.  AND WHAT IS MY BROTHER NAME?

5    A.    DERRELL SHIELDS.

6    Q.    OKAY.  DID THE SERGEANT SEARCH THAT ROOM?

7    A.    I WOULDN'T KNOW.  THEY SEARCHED THE WHOLE HOUSE.  AT

8    FIRST I WAS IN MY ROOM.  THEY SEARCHED THE WHOLE ROOM.  MY

9    HUSBAND SAID THEY SEARCHED THE WHOLE HOUSE AND THE

10   GROUNDS.

11   Q.    HOW WAS EVERYONE TAKEN OUT OF THE HOUSE?

12   A.    HOW MANY WAS TAKEN OUT OF THE HOUSE?

13   Q.    NO.  HOW WAS THEY TAKEN OUT?  WERE THEY CALLED OUT,

14   PULLED OUT?

15   A.    WHEN THEY CAME ABOUT 4:00 O'CLOCK THEY CALLED

16   EVERYBODY OUT OF THE HOUSE.  IT WAS EIGHT, NINE PEOPLE IN

17   THE HOUSE.  THEY CALLED THEM ALL DOWN IN THE MIDDLE OF THE

18   STREET.

19   Q.    AND THIS WAS DECEMBER, WASN'T IT?

20   A.    IT WAS WHAT?

21   Q.    THIS HAPPENED IN DECEMBER, WASN'T IT?

22   A.    YES, DECEMBER.

23   Q.    AND IT HAD JUST FINISHED RAINING, IS THAT RIGHT?

24   A.    YEAH.

25   Q.    DO YOU KNOW WHAT OFFICERS WAS THERE?  WAS IT THE

26   SWAT TEAM, OR YOU WASN'T AWARE OF ANYONE THAT WAS THERE?

27   A.    NO, I DIDN'T KNOW.  I DIDN'T KNOW ANY OF THE

28   OFFICERS.  BUT THE ONE, MR. OLIVAS, HAD COME IN THE
```

1    ~~BEDROOM AFTER THE SEARCH WAS OVER.~~

2    Q.    YOU EVENTUALLY GOT A LAWYER.

3            WHEN DID YOU GET A LAWYER?

4            MR. MIFSUD:  OBJECTION, RELEVANCE.

5            THE COURT:  SUSTAINED.

6            MR. ROSENTHAL:  I DIDN'T HEAR THE QUESTION, I

7    GUESS.

8            MR. MIFSUD:  WHEN DID YOU EVENTUALLY GET A

9    LAWYER.

10   BY MR. SHIELDS:

11   Q.    ~~WHEN DID YOU LEARN ABOUT WHAT WAS GOING ON?~~

12   A.    ~~WHEN I WENT TO 150TH.~~  WHEN I CALLED THE HOMICIDE

13   DEPARTMENT THEY TOLD ME NOT TO CALL NO MORE ---

14           MR. MIFSUD:  OBJECTION, YOUR HONOR, HEARSAY.

15           THE COURT:  SUSTAINED.

16           MR. MIFSUD:  MOVE TO STRIKE.

17           THE COURT:  THE RESPONSE FOLLOWING THE REFERENCE

18   TO 150TH WILL BE STRICKEN.  THE PRECEDING PORTION WILL

19   REMAIN.

20   BY MR. SHIELDS:

21   Q.    WHEN DID YOU CONTACT 150TH?

22   A.    ~~THE OFFICER TOLD ME TO GO THE NEXT DAY TO 150TH.  I~~

23   ~~WANTED TO GET MORE INFORMATION.~~

24           MR. SHIELDS:  I HAVE NO FURTHER QUESTIONS,

25   YOUR HONOR.

26           THE COURT:  THANK YOU.

27           MR. MIFSUD, YOU MAY CROSS-EXAMINE.

28           MR. MIFSUD:  JUST CHECKING MY NOTES, YOUR HONOR.

1           I MAY NOT HAVE ANY QUESTIONS.

2           I DO HAVE SOME.   SORRY.

3                    CROSS-EXAMINATION

4   BY MR. MIFSUD:

5   Q.    YOU DID RECEIVE A SEARCH WARRANT WHICH WAS MORE THAN

6   ONE PIECE OF PAPER?

7   A.    ONE PIECE OF PAPER.

8   Q.    JUST ONE PIECE OF PAPER?

9   A.    ONE PIECE OF PAPER.

10  Q.    OKAY.   YOU KNEW THAT YOUR SON WAS BROUGHT -- YOUR

11  GRANDSON WAS BROUGHT DOWN TO THE OAKLAND POLICE

12  DEPARTMENT, CORRECT?

13  A.    YEAH, AFTER MR. OLIVAS CAME IN MY BEDROOM HE TOLD ME

14  WHO HE HAD TAKEN, REMON SHIELDS.

15  Q.    OKAY.   AND HE TOLD YOU WHERE HE WAS BEING TAKEN?

16  A.    TO THE HOMICIDE DEPARTMENT.

17  Q.    AND HE TOLD YOU THAT HE WAS BEING TAKEN BECAUSE HE

18  WAS BEING ARRESTED FOR HOMICIDE, CORRECT?

19  A.    THAT'S WHAT HE TOLD ME.

20           MR. MIFSUD:  THANK YOU.

21           NOTHING FURTHER.

22           THE COURT:  MR. ROSENTHAL, ANY QUESTIONS?

23           MR. ROSENTHAL:  I DON'T HAVE ANYTHING FURTHER.

24           THE COURT:  MR. CANNADY, ANY QUESTIONS?

25           MR. CANNADY:  NO, YOUR HONOR.

26           COULD WE HAVE JUST A SECOND, YOUR HONOR, PLEASE?

27           THE COURT:  YES.

28  / / /

1993

<u>CROSS-EXAMINATION</u>

BY MR. CANNADY:

Q.    MA'AM, DID MR. SHIELDS HAVE SOME SCHOLARSHIPS AT THE
TIME THIS HAPPENED?

        MR. MIFSUD:  RELEVANCE.

        THE WITNESS:  ~~HE GOT A SCHOLARSHIP WHEN HE WAS~~
~~IN 150TH.  HE WAS SIX MONTHS WHEN HE WAS GRADUATED.~~

        THE COURT:  THE OBJECTION'S OVERRULED.  THE
ANSWER AS FAR AS YOU GOT WILL STAND.

        DID YOU FINISH YOUR ANSWER?

        THE WITNESS:  PARDON.

        THE COURT:  DID YOU FINISH YOUR ANSWER TO THE
QUESTION?

        THE WITNESS:  I DON'T KNOW.

        MR. CANNADY:  I DON'T EITHER, YOUR HONOR.

        THE COURT:  GO AHEAD, MR. CANNADY.

BY MR. CANNADY:

Q.    DID HE HAVE SOME ATHLETIC SCHOLARSHIPS AT THE TIME,
BACK IN '96?

A.    NOT AT THE TIME.  HE GOT THE SCHOLARSHIP LATER.

Q.    WHILE HE WAS IN JAIL?

A.    ~~(THEY DIDN'T KNOW HE WAS IN JAIL AT THE TIME, AND THE~~
~~SCHOLARSHIP CAME, 'CAUSE HE WAS UP FOR A SCHOLARSHIP FOR~~
~~PLAYING FOOTBALL.~~

Q.    DID YOU -- HAD YOU APPLIED FOR HIM ON HIS BEHALF?

        MR. MIFSUD:  RELEVANCE.

        THE COURT:  SUSTAINED.

        MR. CANNADY:  NOTHING FURTHER, YOUR HONOR.

1              THANK YOU.

2              THE COURT:  MAY THIS WITNESS BE EXCUSED?

3              MR. MIFSUD:  YES.

4              MR. ROSENTHAL:  YES.

5              MR. CANNADY:  YES, YOUR HONOR.

6              THE COURT:  ALL RIGHT.

7              THANK YOU VERY MUCH FOR YOUR TIME,

8    MISS LAVALLIS.

9              YOU MAY STEP DOWN.

10             MR. SHIELDS, DO YOU HAVE ANY OTHER WITNESSES TO

11   CALL?

12             I'M SORRY, SIR, ANY OTHER WITNESSES?

13             MR. SHIELDS:  NO, I'M FINISHED.

14             THE COURT:  ARE YOU RESTING YOUR CASE AT THIS

15   POINT?

16             MR. SHIELDS:  (NODS HEAD.)

17             THE COURT:  YOU HAVE TO ANSWER SO I CAN HEAR

18   YOU.

19             MR. SHIELDS:  YES.

20             THE COURT:  THANK YOU.

21             ALL RIGHT.  ALL DEFENDANTS HAVE RESTED.

22             MR. MIFSUD.

23             MR. ROSENTHAL:  I HAVE A MOTION, SUBJECT TO

24   CERTAIN COMMENTS THAT I'D LIKE TO --

25             THE COURT:  NO, WE HAVE MATTERS TO TAKE UP AFTER

26   THE JURY IS EXCUSED.

27             IS THAT CORRECT?

28             MR. ROSENTHAL:  RIGHT.

# EXHIBIT: B

JOINT TAPE STATEMENT (12-20-96) 54 PAGES

" TRANSCRIPT "

1

2

3  <u>STATEMENT OF SHIELDS, CASTILLO, AND BROWN</u>

4  Taken At:                        CAPTAIN'S OFFICE, OPD

5  Taken By:

6  Date:                           12/20/96

7  Time:

8  Present:                        LT. LACER
                                   SGT. BINGHAM
9                                  SGT. MADARANG
                                   SGT. OLIVAS
10                                 SGT. FOSTER
                                   RAMON SHIELDS
11                                 CLEMENTH CASTILLE
                                   ROBERT BROWN

12

13  Transcribed by:                 S. GORDON    DRAFT

14  Date of Transcription:          12/27/96

15              *  *  *  *  *  *  *  *  *  *  *  *

16  LT. LACER: The date today is the 20th of December, 1996.  I'm uh Lt.
    Ralph Lacer, L,A,C,E,R.  We're in the uh Captain's Office of the
17  Oakland Police Department and I have a time of, looks like 1335.
    Uh, in the room we have uh, three gentlemen and I have uh four
18  other investigators in here.  So let me just go around the table
    and introduce who'se here and I'll start on my right with uh
19  Greg Bingham.

20  BINGHAM:  Sgt. Bingham.

21  MADARANG:  Sgt. Madarang.

22  LACER:  Again, I am Ralph Lacer.

23  OLIVAS: Sgt. Olivas, I'm the case agent.

24  FOSTER:  And Sgt. Foster.

25  LACER:  Okay son, I will start with you.  What is your full name.
    SHIELDS:  Ramon Shields.

26  LACER:    Okay you are going to have to speak up Ramon, a little bit.
27            What is your name?
    SHIELDS:  Ramon Shields.

28  LACER:    Okay.  And your name sir?
    BROWN:  Robert Brown.

OFFICE OF 29

1    LACER:      Robert Brown.  And your name sir?
     CASTILLE:   Clementh Castille.
2
     LACER:      Clementh Castille.  Okay now earlier today um we had um, we
3                had served some search warrants and basically we had, we
                 had contacted uh you, you three respective houses is that
4                right?

5    ~~A.    YES.~~ *uk-1 i-yoy-i, h emaani iby*
     ~~A.    Yes.~~

6    LACER:  Okay and uh later on you were uh interviewed by investigators
             and I'll just go down one at a time.  Uh, Mr. Shields,it looks
7            it uh, at 5 minutes to 9, uh Sgt. Bingham advised you of your
             rights off this statement form and you answered uh yes that
8.           you'd talk to Sgt. Bingham, is that correct?
     SHIELDS:  Yeah.
9
     LACER:  Okay and then uh, Mr. Brown, apparently at uh 9:36 am, you
10           were interviewed by Sgt. Olivas and he advised you of your
             Miranda rights off this form, and you answered yes that you'd
11           speak with him.  Is that correct?
     BROWN:  Yeah.
12
     LACER:  Okay.  And uh Mr. Castille, let's see, it looks like elev--,
13           at 9:51, you were advised of your rights by Sgt. Foster and uh,
             off this statement form and you agreed to speak with him, is
14           that correct?
     CASTILLE:  Yes.
15
     LACER:  Okay and you bo--, you have your, those rights in mind as we
16           speak now, is that correct?  All three of you.  Mr. Shields?
     SHIELDS:  Yes.
17
     LACER:  And Mr. Brown?
18   BROWN:  Yes.

19   LACER:  And Mr. Castillo?
     CASTILLE:  Yes.
20
     LACER:  Okay.  Um now I am probably... I'm just going to start the
21           questions here son and then I am going to give it over to Sgt.
             Olivas because he knows the case much better than I do.  You
22           haven't seen me out there, but I think we'd  like to start on
             11th of November '96, at about uh 6:30 in the evening, and I
23           believe uh...inaudible...1668 uh 15th Street, is, is whose home
             is that?  Mr. Castille is that yours?
24   CASTILLE:  What?

25   LACER:  Uh 1668 15th Street?
     CASTILLE:  Yes.
26
     LACER:  Okay um, at, at some point, at that time had we gone by the
27           store.  This is the uh Sharif's Market at that time?
     A.      Some part about, could you repeat the question.
28
     LACER:  Well, when, this is about 6:30 in the evening, ~~had we driven~~
29           ~~by the store at~~. at Sharif's Market there.  I believe it's 11th

1  LACER:    11th and Willow.
   CASTILLE: Today?

2

3  LACER:  Uh that was on, on the 11th of November.  The day that the
           shooting took place.
   OLIVAS:  It was during a holiday weekend.

4

5  LACER:    Maybe an easier question would be, apparently, my
           understanding, you guys drove by the store and then you would
           leave and come back.  About what time do you think you drove by

6          the store?  Uh, let me ask the question of Mr. Shields.

   SHIELDS:  I don't know uh, I don't know what time we went by the
7          store.

8  Q.   Okay.  Was it in the afternoon?
   A.   No it was at night time but I don't know the time.

9

10 Q.   Night time.  Okay.  And who was driving the car?
   A.   Robert.

11 Q.   Who was?
   A.   Robert.

12
   Q.   Robert.  Wha--, you were driving the car Robert?

13 BROWN:  Yes.

14 Q.   And, and whose car was that?
   A.   My car.

15 Q.   Your car.  And what kind of car do you have?

16 A.   77, 77 Pontiac Bonneville.

17 Q.   Okay and what color is it?
   A.   Grey.

18
   Q.   And two door, four door?

19 A.   Two door.

20 Q.   Is that your car or your dad's or?
   A.   That's mine.

21
   Q.   Your, and you know the license number?

22 A.   No I don't.

23 LACER:    Okay.  And just, I'm, I'm still trying to get, kind of what
           is a good place to start.  When you drove by the store, uh,

24         who all was in the car there, there. Mr. Brown, who was in
           the car with you?

25 BROWN:  Us three.

26 Q.   You three?
   A.   Yes.

27
   Q.   Uh where were you, the driver?

28 A.   Yes.

1    A.    Uh, in the backseat.

2    Q.    Passenger..
      A.    Yeah.

3

4    Q.    Backseat?
      A.    Yeah

5    Q.    And Mr. Castille, where was he?
      A.    Passenger seat.

6

7    LACER:   Okay is that correct?
      SHIELDS:   Yeah.

8    LACER:   And Mr. Castille is that correct?
      CASTILLE:   Yes.

9

10   LACER:    Okay. When we drove by the store, which I, I guess we're talking about night on the 11th of November, was there conversation in the car about robbing the store?

11   BROWN:   A little bit, yes.

12   Q.    Okay and Mr., Mr. Brown what do you remember about the conversation about robbing the store?

13   A.    I just remember we pointed it out, but I mean it wasn't, we didn't say we were going to go rob the store, cause I had, had

14         gone in the store.

15   Q.    Okay you went in the store?
      A.    Yes.

16

17   Q.    Okay let me just ask were the, were, did you guys have any guns with you at that time?

18   A.    No.

19   Q.    Okay and why did you go in the store?
      A.    I went into the store to purchase something at the store.

20   Q.    To do what?
      A.    Buy something from the store.

21

22   Q.    Okay was there any intention to look and see what was in the store or, if you kind of use the term casing it for a robbery?

23   A.    Not really, no.

24   Q.    Okay.
      BINGHAM:   Robert, can you speak up a little bit cause, I, I am having a hard time hearing you okay?

25   OLIVAS:   And that will go for all three when you answer, just, just speak clearly okay. Thank you.

26

27   LACER:   Okay um when you went in the store, when we talked about, and I'll ask Mr. Brown. Mr. Brown, when you went in the store and there was conversation about robbing the store, where did that

28         conversation take place at?

29   BROWN:   Where did the conversation take place?

1   Q.   Yeah what, where did you, where were you guys when you were talking about robbing the store?

2   A.   At Clementh's house.

3   Q.   At Clementh's house.

     A.   Yes.

4

     Q.   Okay. And what do you remember about the conversation?

5   A.   I remember that, we were talking about, you know what I'm saying, how we didn't have any money, and how, and I just lost

6     my job. And we're just talking about we be, you know what I am saying, we need to get some money. That's about it.

7

     Q.   And who brought up uh the robbing the Sharif's Market?

8   A.   Brought it up?

9   Q.   Yeah who brought up the, that idea?

     A.   I don't know, it was probably Ramon.

10

     LACER:   Okay. Uh, Ramon is that correct

11   SHIELDS:  I can't, I can't even tell you.

12   Q.   How, how do you remember, how do you remember the conversation at uh Castille's house?

13   A.   That's what I am saying, that's what I tell them, I don't know who brought it, or we was just talking. The stuff about money

14     problems and stuff, I was, I said I don't know what it but popped up, but I don't know who brought it up.

15

     Q.   Okay. When, when it came up to rob the store, what do you

16     remember talking about, did you think it was a good idea, bad idea?

17   A.   I was, it was, it was, everybody thought it was shaky, it wasn't, it wasn't like one person just over-powered us. Say, Oh

18     we going to do, we, we all three of us know'd that it was wrong and stuff you know, none, all of three of didn't want, you know,

19     we didn't want to do it or nothing like that.

20   Q.   Okay, but some how we ended up robbing the store right?

     A.   At, um, I can't, at that moment, at that moment I can't, we was

21     just, heat, heat of the moment thing, it wasn't, I, we, cause, we wouldn't you know...

22

     Q.   It just kind of seemed like a good idea as you spoke is that it?

23   A.   It, it didn't, it didn't really seem like a good idea, you know, but it was just, we ain't no bad kid, you know, we ain't no bad

24     people or nothing like that, we just, at that time, it was just, at the heat of the, heat of the moment thing.

25

     Q.   Let me ask Mr. Castille, what do you remember of the

26     conversation, son?

     CASTILLE:  I, talk...

27

     OLIVAS:  Speak up a little bit Mr. Castille. Thank you.

28   CASTILLE:  We was just talking and everything, about, you know what I am     saying, I have no money or whatever, ...inaudible, you

1    up. Cause it was like, you know what I am saying, folks
2    was disagreeing on it, but you know what I am saying.

3    LACER: Was there any talk about robbing other stores?
     A.    Nope.

4    Q.    Okay. So when we talked about it at Castille's house... when we
5          left Mr. Castille's house to go, I guess, Mr. Brown says to buy
           something in the store, was there an effort, was there another
6          reason to go buy something at the store - if we talked about
           robbing it, and then we go to the store, was that any reason to
7          look over the store? To see how many clerks were there, or who
           was there, or anything like that?
8    SHIELDS: I think we went to the store before we even, before that
9             subject even came up. I, I don't know, but I think it was
              most likely we went to the store before that subject even
              came up.

10   LACER:    Cause, now Mr. Shields, you think that, you think you
11             might have been to the store the first time, even before
               the subject came up on robbing it?
12   SHIELDS:  Yeah.

13   Q.    Okay, and how, how do you remember, did you go back to
           Castille's house and then had this conversation or was it
14         before?
     A.    No we was, we was, we just, it was, it's hard man cause it's
15         kind of, you know it's kind of, it's painful to think about that
           though, cause somebody lost their life in that, it was,
16         ...inaudible...you know, over something stupid.  It was just
           like, no, I, I know we wouldn't go to the store then
17         ..inaudible... we had to go to the store before they even came,
           we came back, we was just you know, it was just, it was, we was
18         just talking about stuff you know, what we been through, what,
           what we going to go to college and stuff, we needed money and
19         stuff, and, and just, it was just stuff like you know, it wasn't
           even that bad, it was, it was, we was talking about nothing bad
20         at first.  You know, we, everything was positive, we was, you
           know, joking around, talking and laughing, about the other times
21         we had, we, we had remembered and stuff, old memories and stuff,
           and then it just, it, it came up, you know, just out of, just
22         came up out of no where, you know, just....

23   Q.    Had you remembered it coming up before or after you visit the
           store?  And I am just trying to put it in a side-wind, son,
24         that's all.
     A.    It's, it's mostly like, before, before we visited the store.

25   Q.    Okay.
     A.    Or it had to be, we went to the store before the subject even
26         came up.

27   Q.    Okay so you went, do you believe it went to the store.  How
           about, how about, Mr. Brown, do you remember it that way, or how
28         do you remember it?
     BROWN: It's, it's hard to remember but, I think it was before we
29         went to the store, but I could be wrong though. I don't know.

1   LACER:  Okay, and Mr. Castille?
    CASTILLE:  Probably.
2
    Q.   Pardon me?
3   A.   Probably did.

4   Q.   Probably did what?
    A.   Go to the store with...inaudible...I don't know.
5
    Q.   Okay that, that maybe kind of a gray area.
6   SHIELDS:  Yeah it is.

7   LACER:    So why, why don't we go on to the next point so that, we
              went and visited the store, and, and, I guess Mr. Brown
8             went in?
    BROWN: Yes.
9
    Q.   And you purchased something, is that right?
10  A.   Yes.

11  Q.   Okay did either one of the other two gentlemen go in with you?
    A.   No.
12
    Q    Okay.
13  BINGHAM:  Question Boss.  Did, do you remember what you purchased?
    BROWN:  Purchased a pack of B.D's.
14
    BINGHAM:  Pack of what?
15  BROWN:  B.D.'s.

16  BINGHAM:  You didn't purchase, like say alcohol, where you had to
              show your ID?
17  BROWN:  No.  I showed, I had to show my ID for that.

18  BINGHAM:  You did show your ID?
    BROWN:  Yes.
19
    BINGHAM:  And you remember which clerk you showed it to?
20  BROWN:  Mmm, I can't, I don't, what do you mean by which clerk?

21  BINGHAM:  Well do you know the, the I.., when you showed your ID,
              there's a coup---, there's three men that work in that store, do
22            you know if the person that you showed your identification to
              was the person who was actually uh killed by (inaudible)?
23  BROWN:  No.

24  BINGHAM:  You don't know, okay.
    LACER:  Um, when, after you made your purchase Mr. Brown, and you got
25          back in the car uh, was there conversation in the car at that
            time?
26  BROWN:  Not really.  We headed back to his house.

27  LACER:  Headed back to Mr. Castille's house?
    BROWN:  Yes.
28
    Q.   Okay and what happened at Mr. Castille's house?
29  A.   We just started talking about, what we were talking about

1    before.

2    Q.    And what was that?
     A.    Continued the conversation about how we was broke, or whatever,
3          that's about it.

4    Q.    Okay and the conversation did it involve robbing Sharif's
           Market?
5    A.    Yeah.

6    Q.    Okay. And what do you remember about that conversation?
     A.    Remember that much. I just remember, they just pointed it out.
7          I mean it wasn't a lot of conversation about it. They just
           pointed it out. We didn't just sit there and talk about it
8          though.

9    Q.    How much money did you expect to get out of the robbery? You,
           yourself?
10   A.    Had no idea.

11   Q.    Did you expect to get anything of value?
     A.    Mmm, I don't know, I didn't have no idea, I didn't have any
12         idea.

13   Q.    Were you going to do it for free?
     A.    Didn't think about it.
14

     Q.    Did you expect to get money son?
15   A.    I guess I did.

16   Q.    Okay. I, I'm just asking, you know. Did you, did you expect
           you know, $5's, more than $5's, less than $5's?
17   A.    I didn't even think about it.

18   LACER:    Didn't think about it. Mr. Brown, how about yourself, do
               you remember the conversation on your part?
19   BINGHAM:  Shields.

20   LACER:    I'm sorry, Mr. Shields. I'm back at Shields'. Mr. Shield,
               what, what do you remember about the conversation back at
21             that Clementh's home?
22   SHIELDS:  I don't remember that....inaudible...we was just...

     LACER:    You got to speak up a little bit son.
23   SHIELDS:  I remember there was this gloomy-like, we first was
               talking about good times and stuff, and then it seemed like it
24             just got quiet on that subject, it just.

25   Q.    How about yourself, do you remember how much money you expected
           to get out of the robbery?
26   A.    To tell you the honest God truth, nothing.

27   Q.    You were going to do it for free?
     A.    No cause, cause I have, I have money every month and stuff.
28         It's just, that I was just thinking that, cause I cared, me, for
           my feelings though, know it's strong, cause I care, I care
29         about, I care about a lot of stuff, you know but, it, cause I

1   know where I'd done been and what happened to me and I seen a
    lot of people you know, cause he could say something about his
2   past and it could click in my head that I know somebody just
    like that, you know, and, and how they....

3
Q.  Why don't, why don't just keep it kind of on the subject here
4   guy. For some reason, we went back in and robbed that store, is
    that correct?
5   A.  Yes Sir

6   Q.  Okay.
    A.  You know... It's just...
7
Q.  And how, why, why ....
8   A.  Inaudible.

9   Q.  Why did we go, why did you go in there, why did you go in there?
    A.  I was going to give the money to them  cause they said they
10      needed it.

11  Q.  Okay and how much money did you expect to be able to give them?
    A.  Inaudible. Whatever I got, it was just. At a point we tried to
12      turn back...

13  LACER:   We'll, we'll come to that.
    BINGHAM:  Hold on. What the Lieutenant is asking, how much money
14      you think that, when you went in the store that they had in the
        cash register? I mean what did you think. You must have had
15      some idea of how much money was in that cash register before you
        went in there.
16  SHIELDS:  I can't, I can't even tell you.

17  LACER:   Under $100, over $100?
    SHIELDS: I can't, it's,it's been in my head trying to block out so
18      much, I can't, it's just hurts me.

19  Q.  Did you expect to get any money?
    A.  Yeah, of course. I...
20
    LACER:   Okay. That's fine. Mr. Castille, how much did you expect
21      to get guy?
    CASTILLE:  Really nothing.
22
Q.  You didn't expect to get any money out of that?
23  A.  No.

24  Q.  Okay. Why, why would we do a robbery if we weren't going to get
25      money, or, what, what did you expect to get out of it, of value
        to you?
    A.  I really ...inaudible...last minute thing, split decision. You
26      know what I am saying....inaudible...you know what I am saying.
        What I planned on, it was like, let's go back do this and do
27      that, you know what I am saying.

28  Q.  Okay we, we probably, you know we probably have to agree you
        didn't plan it to go back, we're just wondering about you know
29      what you expected to get out of the, out of the store when you

1        went in.  I know, what of value, what, why would it be important
         to you to say, do the robbery, that I would get something for
2        me.  And, you know, if, if I was going to do a robbery I would
         probably expect to get something out of it, that's the reason.
3  A.  Money like everybody else.

4  Q.  Okay.  And do you have any idea how much money you expected to
       get?
5  A.  No just thought  we have...inaudible.

6  Q.  You expected some money but you don't know how much?    Your
       shaking your head no.  That, the tape can't see that.
7  A.  Sorry.

8  Q.  Okay.
  a.  No.
9

  Q.  You didn't expect to get any money out of it?
10  A.  Not really.  I did, and I didn't.

11  Q.  Okay, why don't you explain that to us?
   A.  Explain what.
12

  Q.  Uh, you did and you didn't.
13  A.  Well all I'm saying, I know they have a lot, some kind of money
       in there sometimes, I don't know, but you know what I am saying,
14      I might be able to get to this and then um really expect to get
       nothing cause you know what I am saying everything went down all
15      wrong.  The whole thing...

16  Q.  If it had gone down right...
   A.  Inaudible...mistake.
17

  LACER:  If it had gone down right, and no body got hurt, would you
18      expected to get some money from it?  Okay.
  OLIVAS:  Could you answer it instead of shaking it because the tape
19      can't see that.
  CASTILLE: I'm sorry.  Okay.
20  SGT. FOSTER: Now Ramon, he said that if there was money to be had he
      was going to give it to Robert and you.  Do you agree with that?
21      Was that what you had planned, that, that Ramon was going to
      give the money to Robert and you?
22  OLIVAS:  In other words did he tell you that, or do you remember him
      saying that?
23

  FOSTER:  You have to speak up Clementh.
24  CASTILLE:  I, I don't know.

25  FOSTER:  Okay so, you, you don't remember him saying that you and
      Robert were going to get all the money?
26  A.  I don't know.

27  OLIVAS:   Did Robert know?
  FOSTER:  You have to speak up.  You said, no, right?  Okay.
28

  OLIVAS:  Robert, do you remember mentioning or having Mr. Shields
29     mention that if he was going to get any money that he was going

1      to give it to you and to uh Mr. Castille?
    BROWN: No.
2

3    Olivas: No, okay.
    LACER: That's probably a good point. Mr. Shields did you, were you
4         guys going to...okay go ahead, I'm sorry.

5    LACER : Mr. Shields were you going to split the money evenly or were
         you going to give it to the other two?
6    SHIELDS: I was gonna give it to them to.

7    LACER: Okay that's Mr. Shields who was going to give it. You were
         going to give it to Mr. Brown and Mr. Castille.
8    SHIELDS: But it was, well, what, what was the crazy part about it,
         it wasn't, it wasn't no talk about the money though, you know,
9         really, cause I knew, I knew deep down in my heart at some point
         we was going to turn back, I knew, I knew we would, I knew.

10    LACER: Well, but we didn't is that right?
    SHIELDS: We,....
11

12   Q.   Let me, let me just kind of ask this, Mr. Shields. If, if
       somebody listens to the tape and, and listens to you saying
13      that, Hey we were going to turn back, and I really wasn't after
       any money, they are probably going to say to themselves, Well
14      why did we do the robbery if, okay, and we didn't turn back, and
       why would we do it if we weren't going to get any money, that
15      may be confusing to somebody. It's a little confusing to me.
   A.   We was, I called, I called his name, and we was going out the
16      store, instead the clerk when he grabbed me and that's, it just
       (inaudible) from there. It's not like we went in there and
17      jumped all over, over the clerk and everything. When the clerk
       grabbed him and stuff...

18    LACER: Okay we'll, we'll come to that. Okay. Let me just kind of
         go so we can answer that one question and we can move on here.
19      Um, Mr. Brown, how did you understand that, that the dividing of
       the money was going to be for this robbery?
20    BROWN: Never talked about it.

21   Q.   Cause of what?
   A.   We never talked about it.
22

23   Q.   Never talked about it. Um, you never talked about and even sp-,
       I'm just asking...
24   A.   No.

25   Q.   Did you ever talk about an even split?
   A.   No.
26

    LACER: And Mr. Castille, do you remember how this money was talked
27        about for division here?
    CASTILLE: No never came up. Never talked about splitting no money
28        that I know of.

    LACER Okay. And that probably confuses us here a little bit that's

1       move on here.  Um okay so we're, we're at Clementh's house, we,
        we, we apparently haven't got a great plan for what happens. At
2       one one point now, before we go back to the store, some how some
        guns get in that car.  Your car, Mr. Brown, is that correct?
3  BROWN:  Yeah.

4  Q.    Okay.  Who put the guns in the car?
    A.    Who put the guns in the car?  Mon.
5

6  q.    Who did?
    A.    Mon.

7  LACER:  Uh, Mr. Shields did?  Now he called you Mon, is Mon your
      nickname Mr. Shields?
8  SHIELDS:  Yeah cause, people, people don't like saying Re-mon so.

9  Q.    They just call you Mon?  M,o,n.  Okay.  Uh, that's, that's kind
       of nickname, I guess you'd call it.
10  A.    Yeah.

11  Q.  Okay.  Now he says you put uh, Mr. Brown said you put the guns in
      the car is that right Mr. Shields?
12  A.    Yes.

13  Q.    Okay and where did you get those guns?
    A.    I found them in my basement.
14

15  Q.    Okay and that would be the basement of your home?  Is that
      right?  Okay he can't see you nod your head.
16  A.    Yes, yes.

17  Q.    Now how did those guns get over to Mr. Castille's house?
    A.    At what time? Cause at, at times, we, I would try to sell the
18      guns, at that point, we tried to sell them before anything ever
      took place, we tried to sell them and stuff like that.

19  OLIVAS:  How much were you trying to sell them for?
    SHIELDS:  Not, not that much.
20

21  OLIVAS:  Do you remember a dollar amount?
    SHIELDS:  Nah, not all the way up to a dollar amount.

22  OLIVAS:  ~~Okay Mr. Castille you had, I saw you had your hand up, you~~
      ~~had something to say?~~
23  CASTILLE: Yes.

24  OLIVAS:  Go ahead.
    CASTILLE:  The guns wasn't took to my house.
25

26  Q.    The guns were not taken to your house?
    A.    No.

27  OLIVAS:  Do you know what happened to the, to the guns?
    LACER:  Well are we talking about before the incident Mr. Castille or
28      afterwards?
    CASTILLE:  Before.

1  LACER:   Okay.  We didn't get the guns from your home, or, when we
       talk we, is that the whole group?
2  CASTILLE: Nah.

3  LACER:   Okay well let me just kind of finish with Mr. Shields and
       then we'll come to you.  Okay so Mr. Shields you got the
4      guns from where?
   SHIELDS:  Outta my basement.

5
   Q.   Out of your basement.  Okay and eventually we put them in Mr.
6      Brown's car, cause that is what Mr. Brown tell us, is that
       correct?
7  A.   Yes.

8  LACER:   Okay.
   BINGHAM:  Mr. Shields, you told me on our first interview that you
9      originally found the guns in the basement at 1525 Campbell
       correct?  Okay you net--, you are nodding your head but we can't
10     tape it.
   SHIELDS:  Oh, yes.

11
   BINGHAM:  Okay but you live currently and have lived currently at
12     your grandmother's residence at 1427 Campbell correct?
   SHIELDS: Yes.

13
   Q.   Okay so what the Lieutenant is asking, you told us where you
14     originally got them but now I think the, the lieutenant's
       question is more specific.  Did you go into the house at 1427
15     Campbell, did you store the guns there, or did you have them
       stored some place else?
16 A.   Yeah, yes they was there unfortunately to myself.

17 LACER:  Okay so what I apparently misunderstood Mr. Brown.  When you
       guys had left the store after Mr. Brown made his purchase and
18     you guys went and, to get the guns, or wherever you went, I
       understood you went to Clementh's house, but that, is that
19     accurate?
   SHIELDS:  But the guns were, it was uh, it was...

20
   LACER:  Go ahead Greg maybe you can help me on this one.  I think I
21     am confused.
   BINGHAM:  Well Clementh's, Clementh's mother lives at 1668 Campbell,
22     correct?
   CASTILLE: Yes.

23
   BINGHAM:  So there may be some confusion as to, he, his mother's
24     house...
   CASTILLE:  It's right across the street.

25
   BINGHAM:  Yeah right across the street, their very close to where
26     Ramon is staying.
   LACER:  Oh I see.

27
   BINGHAM:  So I think what Ramon has said, you went into your house to
28     get the guns, but you told me earlier, correct me if I am wrong,
       that you met, or went to the car, was over at Clementh's house,
       which is basically right across the street, am I right?

1  SHIELDS:  Uh hum.

2  OLIVAS/BINGHAM:  You got to speak up a little bit.
   SHIELDS:  Yes.

3
   BINGHAM:  Okay that might help.
4  LACER:  Okay so you went and got the guns from the residence you had
          them at and brought them over to the car is that correct?

5  SHIELDS:  Yes.

6  LACER:  Okay so the guns weren't at Clementh's house to put in the
          car.  They were in another house.

7  SHIELDS:  Yes.

8  Q.  Okay and who lives at that house
   A.  Me, my my grandmother.

9
   Q.  Okay.
10 MADARANG:  And, Robert, it was your understanding that when you,
          Clementh, got in the car, before the guns got there, you waited
11         a couple of minutes and then uh Ramon came to your car with a
          heavy jacket on correct?

12 BROWN:  Yeah.

13 MADARANG:  And it was at that point you believe the guns arrived in
          the car correct?

14 BROWN:  Yes.

15 MADARANG:  Okay.
   LACER:  And Mr. Castille, do you , do you know how the guns got in
16         the car?
   CASTILLE:  Yes.

17
   LACER:  Okay and how, how do you remember it?
18 CASTILLE:  Ramon brought 'em in the car.

19 Q.  Okay were you with Ramon when he went and got the guns?
   A.  Yes I was in the car.

20
   Q.  Okay.  You were at the car waiting for him?
21 A.  Yes.

22 Q.  Okay.  Did you see where he went to get the guns?
   A.  I was across the street waiting for him, came from across the
23         street with them.

24 OLIVAS:  Were the guns, were they visible, could you see them if he
          was just carrying him, or they were in a bag wrapped or what?

25 CASTILLE:  They was wrapped up.

26 Q.  What were they wrapped up in?
   A.  What was they wrapped up in?

27
   OLIVAS:  Mr. Castille, do you remember what they were wrapped up in?
28 CASTILLE:  No.

29 OLIVAS:  Mr. Shields, what, what were they wrapped in?

1  SHIELDS:  Inaudible.  A shirt, I think  a shirt.

2  Q.  A shirt, what color shirt?
   A.  Black.

3
   Q.  It was a black shirt.  Is it like a shirt that I am wearing now,
4      was it solid colors?
   A.  No it was a T-shirt.

5
   OLIVAS:  A black T-shirt?  Mr. Brown, does that ring a bell, do you
6      ever see him a black T-shirt?
   BROWN:  No.

7
   OLIVAS:  No.  Okay.  Lt.
8  LACER:  Okay so after the guns, the guns were put in the car and you,
      and Mr. Shields you put the guns in the car is that correct?
9  SHIELDS:  Yes.

10 LACER:  Okay.  Where did, where did you three go in the car from
      there?
11 BROWN:  Where did we go?

12 Q.  To where?
   A.  We went to the, we went past the store.

13
   Q.  You got to speak up a little bit Mr. Brown.
14 A:  Went past the store.

15 LACER:  Okay that would be, uh Sharif's Market?
   BROWN:  Yes.

16
   Q.  Okay and again, this was in your car?
17 A.  Yes.

18 Q.  And who was driving?
   A.  I was.

19
   Q.  And who was the front seat passenger?
20 A.  Clementh.

21 Q.  And who was the uh backseat passenger?
   A.  Ramon.

22
   Q.  Okay and you say you went by the store - you drove by the store?
23 A.  Pass it, we passed by, and we turned around and came back.

24 Q.  Okay.  And was there any conversation as you went by the store
      that, that, that made you, or, or the reason that you came back
25    to the store?
   A.  It was in the conversation.

26
   Q.  Un-uh.  Was there a decision made to rob the store at that time?
27 A.  May, it's hard to say.  Um, I guess that's what was in our heads
      but...I don't, I don't even know.

28
   MADARANG:  Robert, you said that somebody told you to make a U-turn
      after you passed that store correct?

1  BROWN:  He said turn around.

2  MADARANG:  Who said turn around?
   BROWN:  Who said, who said turn around?

3
   Q.    Yeah who said turn around?
4  A.    I think it was Ramon, I don't remember.  I turned around.

5  MADARANG:  Okay Ramon, when you said, when you told Robert to turn
            around, did he turn around?  Inaudible...turn, turn around
6          toward the store?
   SHIELDS:  Yeah.
7
   MADARANG:  Is that yes?  Okay.  Uh, Clementh, is that what you
8          remember.  That you made a u-turn in front of the store after uh
           Ramon said, turn around?
9  CASTILLE:  Yes.

10 MADARANG:  Okay. At that point Robert you parked in front of the
           store is that correct?
11 BROWN:  Yes.

12 Q.    Okay how far from the front door of the store did you park?
   A:    Like 15 feet.
13
   MADARANG:  Okay now, Ramon, you were in the backseat, is that
14         correct?  I can't hear you.
   SHIELDS:  Yes.
15
   Q.    Okay do you remember being about 15 feet away in the car,
16         approximately?
   A.    I don't know, about... approximately.
17
   Q.    But you were close to the front door?
18 A.    Not that, well...

19 Q.    You were near the front?
   A.    We were near (Inaudible).
20
   MADARANG;  Okay and Clementh, you remember you were in the front seat
21         correct?
   CASTILLE:  Yes.
22
   Q.    So you were near that front door too, right?
23 A.    Yes.

24 Q.    Okay who gets out first.  Clementh, did you get out first
           because you were in the front seat?
25 A.    Yes.

26 Q.    Okay when you get out, um, I understand that you, that you
           pulled up the hood on your jacket, is that correct?
27 A.    Inaudible.

28 Q.    Well you put something on your head is that correct?
   A.    Yeah I had a hood on my jacket.

1   MADARANG:  Okay now did you put on your hood uh, Ramon, at the same
2         time when you got out of the backseat?
  SHIELDS:  Um I...

3   Q.  Did you cover your head some how, when you got out?
  A.  Yeah.

4   MADARANG;  Okay.  Robert, that's what you told me, is that correct
5        that they put something on the hood of their, they put a hood up
       or something on their head?
6   BROWN:  Yes.

7   MADARANG:  Okay now since, Ramon, you just said you got the guns from
8        your place - was this the time in which you gave uh Clementh his
       gun?  Did you hand him the gun?
  SHIELDS:  Yes.

9   MADARANG:  Okay.  Clementh, you took the gun from Ramon at that
10       point?
  CASTILLE:  Yes.

11   MADARANG:  Okay now Robert, what did you do?  Did you stay in the
12   car?
  BROWN:  Yes.

13   MADARANG:  Okay.  Now who was the first one to go through the front
14       door.  Was it, I, I understand Clementh you went to the front
      door...
15   LACER:  Let me just ask one thing here.  Uh, Mr. Shields, what kind
16      of gun did you have?
  SHIELDS:  A shotgun.

17   LACER:  And what, what did it look like?
  SHIELDS:  It was five zeros, a pump.
18
19   Q.  Pump shotgun?  Okay what kind of gun did you give to Mr.
     Castille?
  A.  Sixteen gage.
20
21   Q.  You got to speak up.
  A.  Sixteen gage.

22   Q.  And what did it look like?
  A.  It was brown.
23
24   LACER:    Okay.  And, Mr. Castille, is that correct, is that the kind
     of gun you got?
  CASTILLE:  Yes.
25
26   Q.  Okay and do you know the gage of it?
  A.  No, it was like 6 [inaudible], like a rabbit hunting gun.

27   Q.  Rabbit hunting gun?
  A.  Like, back in the days.
28
  Q.  Single, is it single or double barrel?

1   LACER:    Okay.
    OLIVAS:  And what color was that, was it...
2   CASTILLE:  Brown.

3   OLIVAS:   Brown.
    LACER:   Okay let me do one more question before we go back to Sgt.
4       Madarang.  Wha-, uh, Mr. Shields, why did you carry that gun in,
        in the store?  Why did you take that gun in the store?

5

6                    END OF SIDE ONE, TAPE ONE

7   LACER:  Okay uh Mr. Shields, why did you carry that gun in the store?
        Why did you take that gun in the store with you?
8   SHIELDS:   Inaudible.

9   Q.   I'm sorry, I can't hear you.
    A.   To go up in there to rob.
10
    Q.   Okay and was it, was the gun to, so the man would give you the
11      money?
    A.   Yes.
12
    LACER:   Okay.   And Mr. Castille, why did you carry a gun in the
13      store?
    CASTILLE:  Watch my partners back, really.   Go up in there, we had
14      intentions to rob the place and stuff.

15  Q.   Okay.   Your intention was to rob the place?
    A.   Yes we had tentions to rob the place.
16
    Q.   Okay.  When you say, your kind of watching your partners back,
17      are you talking about Mr. Shields? Yes or no, okay?
    A.   Yes.
18
    Q.   Was Mr. Shields gonna be the main robber, and you were going to
19      be the back-up robber, is that what we have here, or, is that
        what your telling me?  Or are you both, both the main robbers?
20  A.   Inaudible.

21  Q.   You tell me, what, what was it?
    A.   Back-up.
22
    Q.   And Mr. Shields was the main robber?
23  A.   I only had like one shot so I wasn't trying to do nothing.

24  LACER:  Okay, Mr. Shields, what, were you the main robber?
    SHIELDS;  I don't know what you mean by it.
25
    LACER:   Well...
26  SHIELDS:  I understand the question but...

27  Q.   Were you going to go in and dem--, I guess, were you going to go
        in and demand the money and was Mr. Castille just going to stand
28      back and cover your back like you said?
    A.   I guess.

29

1  Q.   I don't know son.  I don't know the answer, you tell me.  Was that your understanding?
2  A.   Yes..

3  Q.   Yes.  Okay.  Were you going to make the announcement that you wanted the money from the man?
4  A.   Yes.

5  Q.   Okay.  A little louder.
   A.   Yes..

6
   LACER:  Okay, uh, let me go to Sgt. Madarang again.  I'm sorry.  Go
7       ahead.
   MADARANG:   Okay who actually walked into the front door first?
8       Between uh Mr., between Ramon and Clementh?  Who walked in first?  Ramon, did you?
9  SHIELDS:  Inaudible.

10 MADARANG:  Okay, you did or didn't?
   SHIELDS:  No sir.
11
   MADARANG:   Okay so, Clementh, did you walk in first then, is that
12      correct?  Is that yes or no?  Okay.  Who was the first one...,
        Ramon,....
13 LACER:  I don't think we could hear in there.  Yes or no?
   CASTILLE:  Yes.
14
   MADARANG:  Ramon, did you follow right in after him or basically
15      after him, at some point?
   SHIELDS:  At some point.
16
   Q.   Okay but very soon after he went in, you went in?  Is that
17      correct?
   A.   Yeah.
18
   Q.   Sorry I can't hear you.
19 A.   Yes.

20 MADARANG:  Okay who is the first one to say anything to any body in,
        in the uh, in the store?  Was it you Clementh?  Was it you
21      Ramon?
   SHIELDS:  No, all, all, all I remember is, I'm going to, to the door,
22      and telling Clementh...inaudible...I just said Clementh, come
        on, and he turned towards me, and he turned...  The man looked
23      at it, and the man just went and grabbed his coat and pulled his
        ...inaudible..., we trying to go, the gun popped out and...
24
   MADARANG:  And then was there a struggle over that gun when it popped
25      out?
   SHIELDS:  And the man grabbed the gun, and he pulled.
26
   Q.   Okay.
27 A.   Clem--.

28 MADARANG:  Clementh.
   CASTILLE:  Yes.
29

1   MADARANG:  Did the man pull at your gun at that point?
     CASTILLE:  Grabbed it.

2

  Q.   Okay when he grabbed it, was he trying to pull it away from you?
3   A.   I don't know.

4   Q.   Were you trying to hold on to it?
     A.   Nope, I let the gun go.

5

  Q.   Okay.  When he...
6   A.   Inaudible.

7   Q.   When he grabbed that gun what happened?
     A.   I was gone.  I let the gun go.

8

  Q.   Did the gun go off?
9   A.   Inaudible.  Yes I think so, I don't know.

10   MADARANG:     Okay Clem--.  Uh, Sgt. Foster.
     FOSTER:  Okay Clementh, in, in our earlier interview, you said you
11        didn't feel like the guy grabbed the gun, but you just threw the
        gun at him.
12   CASTILLE:  I just threw it, you know what I am saying.  I don't know
       if he grabbed it or not cause I wasn't really paying attention.
13        All I looked, you know what I am saying, and I seen Ramon, like
       this, with the gun, and then, you know what I am saying, cocked
14        it and I ducked, ran out the store. Threw the gun down.  Ran out
       the store.  Jumped in the car.

15

16   LACER:  Okay we'll come to that son,  we back up here.
     FOSTER:  So, so your not sure if the man grabbed the gun from you or
17        not, but he may have been able to do that?
     CASTILLE;  Yes, probably.

18   FOSTER;  Probably.
     CASTILLE:  Yes.

19

20   FOSTER:  Okay.
     LACER:  Let, let me just ask John.  I don't think they were actually
21        questioned on who spoke first.  Will you just go over that
       okay.
22   MADARANG:  Ramon, did you speak first in that store?
     SHIELDS:  No sir.

23   MADARANG:  I'm sorry.
     SHIELDS:  No.

24

  Q.   Who did?
25   A.   I don't know.  I didn't, I wasn't even in the store.

26   Q.   Okay.  Now you just got through telling us that you didn't,  you
       were,  you had walked in  soon  thereafter Clementh, okay.
27        Clementh says he didn't say a word, but we know something was
       said.
28   A.   If he didn't say a word, I said it then.

29   Q.   Okay.

1   A.    Cause I said, Come on Clementh.  If, if he didn't say anything,
         I'm, I said something, I said, Come on Clementh.
2
    Q.    What do you think you said.  A little louder so I can
3         understand.  What do you think you said.
    A.    What I said.  I said, Come on Clementh.
4
    Q.    Okay.  Once you said, Come on Clementh, did his, did Clementh's
5         shotgun go off at that point?
    A.    I don't, I don't remember.  I just remember him turning towards
6         me and about to walk towards me, and I remember his coat going
         like that, and the man grabbing the gun.
7
    Q.    And is it that point that the gun went off?
8   A.    I don't know.  I don't remember ...inaudible.

9   MADARANG: Okay.  Clementh, is it that point that your gun went off?
    CASTILLE:  I don't know.
10
    Q.    Okay, what happened.
11  A.    I...inaudible.

12  MADARANG:  Go ahead Sgt. Foster.
    FOSTER:  Um, with regard to who said what when they went in the
13       store.  Clementh, in our earlier interview you said that Ramon
         said, Brace yourself, is that true or not?
14  CASTILLE:  I don't know.

15  FOSTER:  Isn't that what you told me earlier?
    CASTILLE:  I don't know.
16
    FOSTER:  You don't know.
17  LACER:  We, we don't either, we don't either Clementh.  We, we want
         to know what happened out there, and your the one that has to
18       happen, you know why it happened.  So I mean it's not, not a
         case of we know the right answer.  You know, we don't know what
19       your thinking so, you know that's why he asking.  If you could
         tell us you know what happened, what you feel happened, why it
20       happened.  It's important son.
    CASTILLE:  I don't know.  Well I ain't really sure, you know what I
21       am saying, what was said or not.

22  LACER:  Okay.
    MADARANG:  Clementh, you said that you think the gun might have gone
23       off, is that correct?
    CASTILLE:  Yes.
24
    MADARANG:  And then you said, you turned around and you ran after the
25       gun fell to the ground?
    CASTILLE:  Yes.
26
    MADARANG:  Okay, Ramon, what happened next, after that, after he
27       turned and ran, and the dropped gun hit the ground?
    SHIELDS:  Inaudible.
28
    Q.    What did you do?

1    inaudible...have the gun in my hand.  I'm like come on, I raise
     my arm like come on, and he ducked.

2    Q.   Okay, he ducked.
3    A.   And then he...

4    Q.   Clementh ducks?
     A.   Yeah.

5    Q.   Okay.
6    A.   And then I said, Come on.  Then he ran past me and I wanted to
          turn.  When I went to turn and go, run right behind him, my arm
7         hit the door and the gun went off.

8    Q.   So your gun goes off after you say it hits the door?
     A.   My hand.  Cause I had one hand like, Come on, going to turn, go
9         this way.  It hit the door and it went off.

10   Q.   After it goes off, did you hold the gun, did you still have it
          in your hand?
11   A.   I hold it, and I was just looking, but then I had... I dropped
          it and I went closer to look and then I, and then I seen the
12        other, the other cashier, man, he was backing up, going behi---.
          He just kept backing him and he ran behind the counter and I
13        looked, and I looked at the cashier man and....

14   Q.   What did you see when you saw the cashier?
     A.   Do I have to talk about this right now?

15   Q.   Yeah, I'm afraid you have to.
16   A.   I already talked about it.

17   Q.   Did, was he shot?  Is that what your saying?
     A.   I told, I told him, I told the cashier, you know, I was like,
18        Get up, shh--, and the other cashier man was looking at me, and
          he ran by the counter, and I, I went over, I was going to go
19        over there to see what was wrong, ...inaudible, and the other
          man ran behind the counter.

20   Q.   So what did you do at that point?
21   A.   So I picked up both of the guns and I went to the car.

22   Q.   What did you do next?  After you picked up the guns what did you
          do?
23   A.   Inaudible.  I went, I went over to the car and I was, I stood
          there.  And they was telling me to get in, I was ...inaudible..
24        Then I threw, then I threw the guns in the car.

25   Q.   You threw the guns where?
     A.   In the car.
26
     MADARANG:  Okay.
27   LACER: You got to speak up a little bit son.  I know, I know it's
          hard to talk about, you know, you know it's an emotional time,
28        but we just need to know why, what happened.

1   you get in the car?
    SHIELDS:  I got in the car.

2
    Q.   Who was in the car with you that night?
3   A.   All three of us.

4   MADARANG: Okay. Now, Robert, did they get in the car very quickly
             after you heard the shots?
5   BROWN:   Yeah.

6   Q.   So you, how many shots did you hear?
    A.   At least two.

7
    Q.   Okay and when they jumped into the car, who jumped into the car
8   first?
    A.   Clementh.

9
    MADARANG: Clementh.  So, Clementh, you jumped in first?
10  CASTILLE:  Yes.

11  Q.   What seat did you get in?
    A.   In the front seat.

12
    MADARANG: Okay and uh, then, Ramon, you jumped in last, is that
13          correct?
    SHIELDS:  yeah.

14
    Q.   Is that yes?
15  A.   Yes.

16  MADARANG: Okay.  Now, Robert, you said earlier that um when Ramon
            finally got in the car, Clementh said something out loud,
17          is that correct?
    BROWN:   Clementh didn't say anything.

18
    Q.   Who did then?
19  A.   Ramon was like, Damn why you do that?

20  Q.   Okay will you, say it a little louder, I can't hear you.
    A.   Ramon was like, Damn Clementh, why'd you do that, why'd you do
21  that.

22  Q.   Okay, meaning what?
    A.   Like fucked up when he shot him.

23
    MADARANG:  Okay and Clementh, what did you say to Ramon when he said
24          that to you?
    CASTILLE:  Inaudible..it was like, meaning there was nothing I could
25          say.

26  Q.   Okay.  Let me, let me ask you something okay.  When the two of
        you ran out of the store, I know that you had some ski masks
27      okay.  Did you take them off in the car or outside of the car,
        Clementh?
28  A.   I don't remember.

1  A.    I said I don't remember.

2  Q.    Okay.  What color was your ski mask Clementh?  Go ahead and tell
         us.  What color was your ski mask?

3  A.    Purple or blue or..

4  Q.    Purple or blue.  Can you des--, look at me for just a second so
         I can show you something.  The eyes on it, was it one big hole,

5        or was it two holes?

   A.    It was like one big hole.

6
   MADARANG: Just one big hole.  So, Ramon, your ski mask that you had

7        on, what color was that?

   SHIELDS:  It was gray.

8
   Q.    I'm sorry.

9  A.    It was gray.

10 Q.    Gray.  Did it have two holes or one hole for the eyes?

   A.    It was one big hole.

11
   Q.    One big hole.  Did you have a safety pin or something in the

12       middle?  I'm sorry the tape can't hear that.

   A.    Yeah.

13
   MADARANG: Okay.  Robert, do you remember uh, them taking off their

14       ski  masks when they got to the car?

   BROWN:  No.

15
   Q.    You mentioned earlier to me when we were talking earlier that

16       you saw them pull them it off, a ski mask, both of them?  Is
         that not true now?

17 A.    I didn't say that.

18 MADARANG: Okay.  Alright.  Well, Ramon, what did you do with the, the
             gun?  Did you just hold on to them in the backseat of the

19           van?

   SHIELDS:  I don't even, I don't even know why I was...

20
   Q.    Okay.

21 A.    Inaudible... I know I got out of the car and I went into my room
         and got on my knees and prayed.

22
   MADARANG: Okay.  All three of you in the car right now, is that

23           correct?  Before you leave, we all three in the car
             correct?

24 BROWN:  Yes

   CASTILLE: Yes.

25
   MADARANG:  Now, Robert, since your still driving, is that correct?

26 BROWN:  Yes.

27 Q.    You mash off and go?

   A.    Yes.

28
   Q.    Which way do you go?

29 A.    Up, up from Willow, up towards Campbell.

1  Q.    Okay do you go straight to some place or do you stop somewhere?
       Where, where do you go?
2  A.    Right in front of their house.

3  Q.    Whose house?
   A.    Ramon and Clementh.

4
   Q.    Okay did you stop any where?
5  A.    Yes.

6  Q.    Okay, where do you stop?
   A.    In front of Ramon's house.

7
   Q.    Okay now do all three of you get out of the car at that point or
8        what do you do?
   A.    They get out, him and Ramon get out of the car.

9
   Q.    Ramon, just Ramon got out?
10 A.    And Clem.

11 MADARANG: And Clementh.  Clementh, where, where did you guys go, did
            you go somewhere together or did you split up?
12 CASTILLE: I went straight to the house from the ...car.

13 Q.    To whose house?
   A.    My house.

14
   Q.    Okay.
15 A.    My own house.

16 Q.    Okay did you go there alone?
   A.    Yes.

17
   MADARANG:  So Ramon, did you go, where did you go?
18 SHIELDS:  Inaudible.

19 Q.    I'm sorry, I can't understand you.
   A.    To my house.

20
   Q.    You went to your house?
21 A.    Yes.

22 Q.    Okay.
   LACER:  Ramon, why don't you sit up a little guy.  Blow your nose if
23        you have to.  I know it's uh kind of an emotional time.  We got
          some kleenex here.
24 SHIELDS:  Nothing was suppose to happen to...inaudible...dude.

25 LACER:  We understand that.
   SHIELDS:  Inaudible.

26
   MADARANG:    I, I  understand  that,  okay  but  do  me  a
27        favor...inaudible...okay.
   LACER:  We just, we just, we're asking some questions on what would
28        happen.  It is important for the tape to hear cause somebody
          wants to review this, okay.

1 MADARANG:  Now so, Ramon, you say you went back to your house?
  SHIELDS:  Yes.
2
  Q.   Okay when you back home did you tell anybody what happened?
3 A.   How could I go tell somebody in my house that I...

4 Q.   I don't know.  That's why I am asking.
  A.   I just shot somebody.
5
  MADARANG: Okay.  Clementh, did you tell anybody?
6 CASTILLE:  No.

7 MADARANG:  Robert, where did you go?
  BROWN:  Home.
8
  Q.   You went home?
9 A.   Yes.

10 Q.   Okay did you stop any where before you got home?
   A.   No.
11
   Q.   Where is home for you?  At your mom's?
12 A.   Yes.

13 Q.   Okay when you got home did you talk to anybody about this?
   A.   No.
14
   Q.   Okay.  Was there a time when all three of you, either got
15      together or talked over the phone about what happened?  Robert?
   A.   Yes.
16
   Q.   When was that?
17 A.   Probably about 30 minutes after I got home.

18 Q.   The same night?
   A.   Yeah.
19
   Q.   So about what time did you get home?
20 A.   I don't really remember but you said it happened like 8 o'clock,
        I probably got home about 8:30.
21
   Q.   Okay.  And you got home at about, how long after you got home...
22      Did you call or did somebody call you?
   A.   Clementh called.
23
   MADARANG:  Okay so, Clementh, you called Robert at his home that same
24      night correct?
   CASTILLE:  Yes.
25
   MADARANG: Okay and Robert, what was the conversation like.  What did
26      you guys talk about?
   BROWN:  We were all scared and he was telling on his, he was
27      talking about what happened.

28 Q.   Okay tell me specifically what he said?
   A.   I asked him what happened cause I heard the shots.  I didn't
29      know what went on.  I wasn't in the store.  I don't know what

1    went on.

2    Q.    Okay.
     a.    I just asked him what, what happened in there. He just told me
3          what he told you.

4    Q.    Okay what exactly did he tell you? First of all, did he sound
           upset or what was it?
5    A.    He sounded upset.

6    Q.    Okay.
     A.    He told me that, I mean, he went in the store and he tried to,
7          he told the man to open the cash register. He said the mans
           grabbed the gun.

8    Q.    And then?
9    A.    He said the gun just went off and he dropped it and ran out the
           store.

10
     MADARANG: Okay. Clementh, is that basically what you told Robert on
11        the phone?
     CASTILLE: Yes something like that.
12
     MADARANG: Okay so,...
13   LACER:   Inaudible...something like that exactly, is that what you
           told him son, cause that's, that's talking about telling him to,
14         to kind of a robbery intent in there. Is that what you told
           him?
15   CASTILLE: Yeah something like that, yes.

16   LACER:  Well, what, what words do you remember telling him then?
     CASTILLE: I was like, you know what I am saying. First I asked him,
17         you know what I am saying was he alright, did he make it home
           safe and all that, what happened. Then he was like, what
18         happened in the store. I heard some shots.. and I was like, we
           went in the store, then uh, you know what I am saying, Dude....
19
     Q.    The clerk in the store, what did you say to the clerk in the
20         store. That's what I am asking.
     A.    I didn't say nothing to him, really. It was like...
21
     Q.    Now that isn't what we told uh, we told Mr. Brown.
22   A.    It was like... it was like, What's this, cause we came in. Dude
           is like, What's this. And then....
23
     Q.    Did you tell the man it was a robbery?
24   A.    Nope, I just....

25   LACER:    Did you tell him to break yourself?
     MADARANG: Did you ask the man for his cash?
26   CASTILLE:  Nope cause like, soon as he looked, you know what I am
           saying, he just reached. Reached under the counter or
27         somewhere, he reached somewhere. I just threw the gun down and
           I just ran out the place. And I guess the gun went off or
28         something.

29   LACER:  Hold it. The gun just didn't go off by, all by itself.

1      Right?
   MADARANG:   Is that yes or no?
2   CASTILLE: Yes the gun went off by itself, I guess, I don't know.

3   LACER:   Okay were you holding when the gun went off?
   CASTILLE:   No.
4
   Q.   Where was the gun when it went off then?
5   A.   On the floor.

6   Q.   All by itself on the floor?
   A.   What, well, on the counter.  It was somewhere cause I was gone.
7      I left out the store.

8   LACER:   That doesn't make sense Mr. Castille.
   BINGHAM:   Clementh, we have Ramon has already stated he saw the clerk
9      grab the gun.  There was another person in that store.  Do you
   remember him?  There's another employee in that store.
10  CASTILLE:   Yeah.

11  BINGHAM:   I interviewed that man on two occasions.  Okay he saw you
   in a tug of war with that shotgun with that clerk, does that
12     refresh your memory a little bit?  That, your nodding your head
   yes, that does refresh your memory?
13  CASTILLE:   Yes.

14  Q.   So that clerk did pull that gun while it was in your hands is
   that correct?
15  A.   Yes.

16  LACER:   Did you get in a tug of war with the clerk with the gun?
   CASTILLE:   Well, it wasn't no, like no tug of war, cause soon as he
17     pulled it, I let the gun go.  He had the gun.

18  Q.   Had the gun go off then?  Did the gun go off?
   A.   I think so.  I was on the ground and then I was running out the
19     store.

20  BINGHAM:   Do you know what the blast from your gun hit?
   CASTILLE:   No.
21
   MADARANG:   Robert, you talked to somebody else in that phone call
22     correct, that's what you told me.  That same night?
   BROWN:   Yeah
23
   Q.   Correct?  I'm sorry.
24  A.   Yes.

25  MADARANG:   And who, who did you talk to...
   LACER:   ...inaudible..before you go further.  My understanding is
26     Mr. Brown is saying that uh,  uh Mr. Clementh told him that he
   told the guy to break himself or rob--, or risk of robbery, is
27     that correct?
   BROWN: He told me that he just told him to open the cash register.
28
   LACER:   Okay that's just what I am trying to confirm, Mr. Castille.
29     Did you tell the, the clerk to open the cash register?

1  CASTILLE:  Yes.

2  LACER:  No, tell me, did you or didn't you.  I'm, I'm just asking.
   CASTILLE:  I mean...did I tell him.

3
   Q.  Yeah did you tell the clerk to open the cash register?
4  A.  I don't remember saying nothing to him....inaudible.

5  Q.  Okay do you remember telling Mr. Brown that you had told the
       clerk that?
6  A.  No.

7  Q.  Could you have told Mr. Brown that?
   A.  Probably.  Sounds kind of, you know what I am saying, still kind
8      of shaky or whatever.  I probably did, I don't know.

9  LACER:  Okay.
   MADARANG:  Now Robert, you said you talked to somebody else, and it
10     was Ramon, correct?
   BROWN:  Yeah.

11
   MADARANG:  Okay what did Ramon say to you on that phone?
12 BROWN:  He basically, first of all he basically said the same thing
       Clementh said about what happened inside.

13
   Q.  About Clem, Clementh fighting with the guy with the shotgun?
14 A.  Yes.

15 Q.  Okay what else did he say to you about it?
   A.  He said, that's about it.

16
   Q.  Okay did, uh, Ramon, according to you, when you and I talked
17     earlier, um, you said that Ramon also fired his gun, is that
       true?
18 A.  Yes.

19 Q.  Is that what Ramon told you?
   A.  Yeah I think so.

20
   Q.  Okay what exactly did he tell you about firing his own gun,
21     Ramon, that is?
   A.  He said that, he said that after, when Clementh started running
22     out the store, the man, I guess pointed a gun at him or
       something, the gun went off.

23
   Q.  Whose gun went off?
24 A.  His gun.

25 Q.  His meaning who?
   A.  Ramon.

26
   MADARANG:  Okay.  Ramon, is that what happened?  Uh, at some point
27     before that's when he is talking about when you said your elbow
       hit the door and the gun went off?
28 SHIELDS:  Inaudible.

29 Q.  I can't....

1  LACER:  Ramon, take your hand away from your mouth, you hear?
2  SHIELDS:  Elbow didn't hit him, my arm hit the door, uh, as I was
       turn then go up out the store cause I had it in one hand.  When
3      it hit the thing, it went off.

4  MADARANG:  Okay, after it went off you said you, you did say you
       picked up the other shotgun is that correct?  Why did you pick
5      up...
   SHIELDS:  I picked up both of them.

6  Q.  Okay why did you pick up the other shotgun, including your own?
       Was there a reason?  Ramon, why?
7  A.  Cause this is the first time I did it.  I, I seen the man
       [inaudible]... after, after I seen him, I say get up and he
8      didn't move.  And the other clerk was just looking at me, and I
       knew what I had, but I didn't know he, know he was going to die.
9      It's just... I didn't know he got, didn't know I shot him.  I
       thought it had hit ....

10 Q.  Okay.  Robert,....
11 A.  Had hit something behind or something cause  I didn't know it
       hit him.  I thought it hit some up, on the thing cause it just
12     went off and the way it jet, I thought it hit something high and
       I didn't know what had happened to him.

13 Q.  Let me ask you something, the shotgun you had, what kind of
14     round did you have in that shotgun.  Did you have like birdshot
       or what?  Do you know?
15 A.  It's green.

16 Q.  It was the green ones.  Okay.  And the other shotgun, what color
       were the shotgun, the rounds in that?
17 A.  It was red.

18 MADARANG:  It was red, okay.  Now, Robert, did you talk to the other
       fellows, meaning Clementh and uh Ramon any other times after
19     that first conversation on the night it happened?
   BROWN:  I talked to Clem about it.  Never talked to Ramon after that.

20
21 Q.  Okay have you talked to Ramon since than?
   A.  No.

22 Q.  Okay when was the next time Clementh called you?
   A.  Talked to him the next day.
23
24 Q.  The very next day after the robbery?
   A.  Yes.

25 Q.  Okay and about what time was this?
   A.  It was probably in the morning.  I can't really say.
26
27 Q.  Okay and what was the conversation.  Was it about the robbery
       again and the shooting?
   A.  Yeah part of it was.
28
29 Q.  Part of it.  Tell me about the part that was.  What did he tell
       you again, or what did you ask him?

1  A.  I, I can't, I still couldn't believe it was happening.  I was like, I just kept asking the same question about what happened,
2  what happened.  I didn't know what else to say.

3  Q.  Okay and what, what did Clementh say to you?
   a.  The same thing he told me the night before.

4
5  MADARANG:  Okay.  Clementh, when, when Robert was asking you about this whole thing over and over again what, how come, well what
6  exactly did you tell him.  Did you tell him again just the same, basic same uh answers?
7  CASTILLE:  Yes.

8  Q.  Okay do you know what kind of uh round you had in your gun?  Did you have birdshot or what did you have in it?  Or do you know?
   A.  Little B.B.'s.

9
10 MADARANG:  Little B.B.'s, okay.  Now, Robert, did you have conversation with anybody else again or to Clementh in
11 particular?
   BROWN:  Did I have a conversation with him again?

12 Q.  Yeah after that second phone call, the next day?
13 A.  Yeah I probably talked to him the next after that also.

   Q.  The third day afterwards?
14 A.  Yes.

15 Q.  Okay and what was your conversation about?  Was it again about what happened?
16 A.  Ye---, like a little piece it might have been.  We were trying to like, like block it out.

17 Q.  Okay.
18 A.  I don't really know.

19 Q.  When was the first time you knew that somebody was dead, Robert, since you weren't in the store?
20 A.  Um when I read the paper.

21 Q.  A little louder.
   A.  When I read the paper.

22
23 Q.  Okay.  And what di--, when was that, what day was that.  The next day or the day after or what?
   A.  The day after...inaudible... two days after.

24
25 Q.  Okay now did you talk to Clementh and ask him exactly who might have killed this guy.  Who fired the round that killed this guy.
   A.  Did I ask him who fired the round?

26
27 Q.  Yes.  That might have killed him.
   A.  Inaudible.  He just told me both the guns went off so I didn't really know.

28
29 MADARANG:  Okay.  Now, Ramon, you went back in the house with the guns is that correct?

1    SHIELDS:  I can't even tell you.

2    LACER:  You got to put your head up Ramon, we can't hear you.  Okay.
     SHIELDS:  I, I can't even tell you all.  All I remember, this, like
3              you said I've tried to block it out so much...inaudible...

4    MADARANG:  Okay.
     SHIELDS:  Like all I remember is I came out the car and I went to my
5              room.

6    MADARANG:  Okay, Clementh, did you take the guns with you when you
                went in your house?
7    CASTILLE:  Nope.

8    MADARANG:  Okay, Robert, did you take the guns with you?
     BROWN:  No.

9
     MADARANG:  Okay so in your opinion, the guns went with Clementh, with-
10             - Ramon, is that correct?
     CASTILLE:  Yes.

11
     MADARANG;  Okay, Robert?
12   BROWN:  Yes.

13   MADARANG;  Okay Ramon, I know it is hard to remember this, okay.  But
                try to remember it for US.  Think about it a little bit here for
14              me alright?  Where in the house did you put your guns when you
                uh, when you walked in with them?
15   SHIELDS:  I don't remember going in the house with them.

16   Q.   Okay but Robert and Clementh notes said that you took the guns
          and you have been sitting here and you listened to 'em.
17   A.   I know, but I, I can't.....

18   Q.   Just listen to me son.  The guns are, are solid objects and
          their not going to disappear on their own.
19   A.   I know, I can't disagree with them, but I don't remember
          walking, I don't remember.

20
     Q.   Maybe you didn't walk into the house with them, did you put them
21        somewhere outside?  See you, you take them from the scene, their
          in the backseat with you, and when you get out the guns aren't
22        there any more.  Okay so where did the guns go?  Just basically
          tell me.  Did they just go back to your place or not?
23   A.   I don't know, I was in the passenger seat when we left.

24   Q.   Okay but I know that.  And I also know that the guns were not in
          that car.  So did you just throw them aside or what did you do?
25        That's all I am asking.  We just want the truth.  I'm not asking
          you where they are right now... I'm just saying...
26   A.   I know, I know we didn't take them out, I know they was in the
          car, but I know I opened the d--, the window was up, probably,
27        I probably threw them out when we was driving.

28   Q.   You think you might have thrown them out when you was driving?
          Did you or didn't you?
29   A.   It's more than likely I did.  It's just it's not there, you

1        make this kind of hard, just a whole bunch of assumptions coming to my head. It's hard to remember.

2

3   q.   Okay, listen, listen to me. I don't want you to make assumptions and we're not asking you to lie, okay. But I have two men here telling me that you had the guns last. Now I'm just asking you, I'm not asking where they are right now, I'm just asking you if you threw them in the yard or what did you do?

4

5   A.   They must have fell out the car when I got out cause they was on the door.

6

7   Q.   Okay they, on your side they were right there, that's where you saw?

8   A.   Yeah.

9   Q.   Okay so we need...

     A.   Yeah that's the only place I had....

10

11  Q.   Walk me through this okay. Your in the backseat and your sitting behind who?

     A.   I'm in the front seat.

12

13  Q.   Your in the front seat, and the guns were right next to you, next to the door, is that correct, like you said?

     A.   Yeap.

14

15  Q.   Okay so when you get to your house and your block and you get out, do you see the guns fall to the ground?

16  A.   I don't, I just, I just got the car, shut the door, and I run in the house. That's all I do.

17  Q.   Did you hear a clunking noise when you, when you opened the door and ran?

18  A.   I don't, I don't...

19  Q.   Because these two young men say that the guns went with you, and I don't want to, I just want you to tell the truth. Did you hear a clunking noise on the ground?

20  A.   No.

21

22  Q.   Okay now you said earlier that you might have thrown them out the window. Did you throw them out the window when you got to your house?

23  A.   no.

24  Q.   Where did you, where, at one point did you throw them out the window?

25  A.   Inaudible...I know I didn't go in the house with them, that's why I'm saying on the door part.

26

27  Q.   You didn't go out the ho--, in the house with them. I understand that and I believe you. Okay. But you said you took the guns and you threw them out the window...

28  A.   I said I could have probably did that but I know I didn't ...inaudible, cause I was just sitting up, I was just looking

1    could of, but I know I didn't do it though.  I know I didn't.

2  Q.   Okay since you didn't throw them out the window and since the
      guns...
3  a.   I had ....

4  Q.   Just listen to me. · Since you didn't throw them out the window
      and the guns were right next to you, and only you in the front
5     seat, what happened to those guns?
   A.   Had to fall out the car.

6
   Q.   When you got out?
7  A.   Yes.
                          madarang (R+ 18/0)
8  MADARANG:  Okay.
   BINGHAM:  John, Robert, what happened to those guns?
9  BROWN:   When, when they got out of the car, when I pulled up, and
      they both got out of the car, I don't, I just, I just, I thought
10     I saw him pick them up but I don't know.

11 MADARANG:  Saw who pick it up?
   BROWN:  Ramon. Cause they were, I remember he had both of them next
12     to the door.

13 BINGHAM:  Let me rephrase the question.  What eventually happened
      to those guns?
14 BROWN:  Eventually happened to the guns, I don't know.

15 BINGHAM:  You know that this is going to go to court right?
16 BROWN:  Yeah.

17 Q.   And when you go into court, do you want people to believe you
      are telling the truth?
   A.   Yeah.
18
   Q.   What eventually happened to those guns?  Robert, look at me.
19     What happened to those guns.  The truth, Robert.
   A.   Gave them away.
20
   Q.   To who?
21 A.   To somebody we know.

22 LACER:  When did you give them away Robert?
   BROWN:  Probably like a week or two ago.
23
   Q.   [Inaudible] last week, or a week or two ago?
24 A.   Probably last week.

25 BINGHAM :  Who is we.  You said, we.
   BROWN:  Clementh and I.
26
   LACER:  Is that right Clementh?
27 CASTILLE:  Yes.

28 Q.   And what day was it that you gave the guns away?
   A.   I don't know.  Like, like a week or two ago, hard to say.

1   Q.   Was it, okay, was it last, last Wednesday, a week ago?  Was it sooner than that?

2   A.   I don't know.  I'm not too sure.

3   Q.   And who did you give 'em to?
     A.   Some fool.

4
     Q.   Huh?

5   A.   Somebody.  I don't know.

6   Q.   No you know his na---...
     A.   Inaudible.

7
     Q.   You know his name.  What's his name?

8   A.   I don't know.

9   Q.   You don't know his name?
     A.   Nope.

10
     ?:   Robert...

11   LACER;  Robert, do you know his name?
     BROWN:  Yeah.

12
     LACER:  What's his name?

13   BROWN:  Anthony.

14   Q.   What's his last name?
     A.   Brown.

15
     Q.   Okay and the fact that you gave the guns away isn't right

16      either, is it?
     A.   No.

17
     Q.   How much did you sell them for?

18   A.   I didn't sell them.

19   MADARANG:  Who did?
     BROWN:  I don't.... we didn't sell the guns.

20
     MADARANG:  Robert, all we're asking for is the truth, okay.

21   LACER:  Well hold it.  Are we saying that you didn't sell them but
        Anthony sold them?

22   BROWN:  I never touch--, I never had touched, I never had touched
        the guns in my life.

23
     BINGHAM:  Where were ....

24   LACER:  Except...
     BINGHAM:  I'm sorry Lieutenant.  Where were the guns kept.  Where did

25         Anthony obtain the guns from.  He obviously wasn't in the car
        night that this incident happened correct, Ant--, Robert?

26   BROWN:  Yes.

27   BINGHAM:  So he was no where around.  Where did he obtain the guns
        from?  He had to obtain them from somewhere.  What location did

28         he obtain the guns from?
     BROWN:  He went and picked them up from uh Clementh's house.

29

1  Q.    He picked who up from Clementh's house?
   A.    Picked the guns up.

2

   BINGHAM:  You did.
3  BROWN:   It was me and him.
   OLIVAS:  Meaning you and him, meaning you and Anthony?
4  BROWN:   Yes.
   OLIVAS:  Okay
5  BINGHAM:  What house?
   BROWN:   Clementh's house.

6

   BINGHAM:  Which house were you referring to?
7  BROWN:   On 22nd.

8  Q.    22nd Avenue.  Do you know the address?
   A.    No.

9

   OLIVAS:  Who lives at that address at 22nd?  You?
10  BROWN:  No, not me.

11  MADARANG:  Robert who does?
   BROWN:   Who does?

12

   Q.    Yeah.
13  A.    I [inaudible], that's where Clementh was staying.

14  Q.    Okay let me ask you this now.  When you guys went and got, got
      the gun, where did the guns go?
15  A.    Where did they go?

16  Q.    Yeah.
   A.    We took them to uh Anthony's house and that's the last time I
17        saw them.

18  Q.    What did Anthony--- why did you take them to Anthony's house?
   A.    Why did we take them to him?

19

   Q.    Yes.
20  A.    Because he wanted them.

21  Q.    What did he want them for?
   A.    I don't..., I, I didn't ask.

22

   Q.    Do you have any idea what he was going to do with the guns
23  A.    No.

24  Q.    Did he give you any idea at all?
   A.    He said he was going to give them...  Well he said he was going
25        to give them to one of his friends

26  MADARANG:  Clementh, how many guns did they take from your house?
   CASTILLe:  Two.

27

   Q.    Two?  Was it the two guns that were used in this uh robbery?  Is
28        that yes or no?
   A.    Yes.

1  Q.    Okay and was it Clementh and Anthony... I mean Robert and
        Anthony that came get those guns?
2  A.    Yes.

3  Q.    And what kind of car were they driving?
   A.    Same one.
4
   Q.    Okay what did they tell you they wanted to do with the guns?
5  A.    Inaudible

6                    END OF TAPE ONE, SIDE TWO.

7
   MADARANG:  Ask you a question okay, and I just want the truth.  You
8      know, you, you and I ...inaudible.  You've been honest with me
       and I appreciate it.  So I need to ask you, did, did Anthony
9      sell those guns?
   BROWN: Did he sell them?
10
   Q.    Yeah did he sell them.
11 A.    He said he was going to give them to, sell them to a friend.

12 Q.    For how much?
   A.    I think, like $200.
13
   Q.    Okay were he, was he suppose to give you some of the money?  Or
14     give all three of you some of the money?  Did you ask for some
       of the money?
15 A.    No.

16 Q.    Is that no?  Okay.  So have you talked to Anthony since you, you
       guys took the guns?
17 A.    No.

18 LACER:  Let me say, let me go ahead.  This Anth--, who, what is
       Anthony's name?
19 BROWN:  His last name is Brown.

20 Q.    Brown?
   A.    Yeah.
21
   Q.    Anthony Brown?
22 A.    Yes.

23 Q.    Is he involved in this robbery?
   A.    no.
24
   OLIVAS:  Is he related to you?
25 BROWN:  No.

26 LACER;  Okay let me just ask uh Mr. Shield.  Do you know Anthony
       Brown?
27 SHIELDS:  No Sir.

28 Q.    I'm sorry.
   A.    No Sir.
29

1  Q.   Was, was their anybody else involved in this robbery?
   A.   No Sir.

2  LACER:  Okay Mr. Castille, do you know this Anthony Brown, or yeah,
3        Anthony Brown?
   CASTILLE:  Not really.

4  Q.   Okay was he involved in this robbery at all?
5  A.   no.

6  LACER:  Okay that's all I got.
   OLIVAS:  Okay ...inaudible... this Anthony and Robert came to your
7        house, Mr. Castille, and that's where the shotguns were?
   CASTILLE:  Yes.

8  OLIVAS:  Okay.  Who put them in, it's, it's your car the Pontiac
9        correct?
   BROWN:  Yes.

10 OLIVAS:  Mr. uh...
11 ?:  Inaudible.

12 Olivas:  Who put them in the car?
   CASTILLE:  They did, he did.

13 OLIVAS:  Who is he?
14 A:  Anthony.

15 Olivas:  Anthony put them in the car?
   A:  I guess, I don't know, I was still downstairs.  People still in
16        the house.

17 OLIVAS:  Okay Mr. Brown, do you know who put them in your car?
   BROWN:  Anthony.

18 OLIVAS:  Anthony did?
19 BROWN:  Yes.

20 FOSTER:  Well where were the guns being stored Mr. Castille, mmm.
            Where were the guns being stored?  We know their...
21 CASTILLE:  What you mean, where were they stored?

22 Q.   Well their being, the guns, we've already got... were at your
23        house on 22nd Avenue so they had to be kept somewhere?
   A.   Inaudible.

24 Q.   Okay well where were they kept at 22nd Avenue?
   A.   In the house.

25 Q.   What part of the house?
26 A.   In my room.

27 Q.   And your room is located on which floor?  There's three floors
        in there.
28 A.   Third.

29 Q.   On the top floor.

1  A.    Bottom.

2  Q.    Bottom floor?
   A.    Yeah.

3  Q.    You kind of referring to where your father stays, downstairs, in
4        the back?
   A.    I stay downstairs in the back.

5  Q.    So you kept the guns down there?
6  A.    Yeah.

7  LACER:   Would that be in the part where the bathroom is or, or
         underneath the house where you got the bicycles and the tools
8        that's goes to underneath the house there, that's Mr. Castille
         I am asking.
9  CASTILLE:  Where the bathroom and stuff at.

10 Q.    Okay so that's kind of the main downtown, or downtown, down
         underneath the downstairs area is that correct?
11 A.    Yeah.

12 LACER:  Okay and I, I guess when Sgt. Madarang was asking questions
         of Mr. Shields, I never understood how the guns got from, when
13       the car stopped, when Mr. Shields does remember seeing the guns
         if I am correct, to your house.  How did the guns get to your
14       house after the shooting?
   MADARANG:  Can't hear you.  I'm sorry.
15 CASTILLE:  I'm thinking, know what I am saying.  I seen the guns, you
         know what I am saying, I got 'em from Ramon then, you know what
16       I am saying, I put them up, dude must have gave them away.

17 LACER:  Okay so Mr. Shields gave you the guns to keep?
   MADARANG:  Did he give you the guns the next day or that day?  When
18       did he give them to you?  How many days ago?
   CASTILLE:  Two days later.

19
   MADARANG:  So Mr. Shields gave you the guns two days later.  Did he
20       drive over?  Did you come over his house, what?  Did you walk
         over to his house or what?
21 CASTILLE:  Came over my house.

22 MADARANG:  Okay now, Ramon, was it two days afterwards that you gave
         Mr. uh....
23 SHIELDS:  Inaudible.

24 Q.    And you still don't remember giving him the guns?
   A.    No Sir, no.
25
   MADARANG:  Okay, Robert-
26 BROWN:  I have no idea.

27 Q.    Okay answer, answer me this question, okay?  Was there somebody
         else involved in this robbery?
28 A.    No.

29 Q.    Are you sure?

1  A.    Yes.

2  Q.    Are you sure?
   A.    Yes.

3  Q.    Was there somebody else who knew about this before it happened
4        who might not have been there when it happened?
   A.    No.

5  Q.    Are you telling me the truth?
6  A.    Yes.

7  LACER:  So you, you three are the only involved in this robbery.
           There is no body else involved, Mr. Shields, is that correct?
8  SHIELDS:  Yes.

9  LACER:  Mr. Brown:
   BROWN:  What's the question.

10 Q.    Are you three, are the only ones involved in this robbery?
11 A.    Yes.

12 OLIVAS:  Nobody else?
   BROWN:  No.

13 LACER:  And Mr. Castille?
14 CASTILLE:  Yes.

15 MADARANG:  Okay, Robert, have you told anybody else besides the, the
             people in this room about this robbery?
16 BROWN:  I told my father.

17 Q.    Okay and what's your father's name?
   A.    Robert Brown.
18
   Q.    Senior?
19 A.    Yes.

20 Q.    Is he living in Georgia at this point?
   A.    Yes.
21
   Q.    Okay, any one else?
22 A.    No.

23 MADARANG:  Ramon, did you tell anybody else about this at all,
             besides the people in this room?  Yes or no?
24 SHIELDS:  No.

25 LACER:  Hands away from your face Robert.
   SHIELDS:  Ramon, Ramon....inaudible.
26
   LACER:  I'm sorry, I'm sorry, Ramon.
27 SHIELDS:  It's alright.

28 LACER:  Now, now that your hand is away from your mouth, go ahead and
           answer the question.
29 MADARANG:  Have you talked to anybody else about this?

1  SHIELDS:  No I couldn't.

2  MADARANG:  Okay.  Are you sure?
   SHIELDS: Couldn't.  I wouldn't be able to tell nobody nothing.

3
   MADARANG:  Okay.  How about you?
4  CASTILLE: No.

5  MADARANG:  Are you sure?
   CASTILLE:  Yes.

6
   MADARANG:  Any one else, friends, other friends?
7  CASTILLE:  No.

8  LACER:  Robert, uh, uh hold it.  I'll do uh Ramon.  Mr. Shields, did
         you ever tell anybody that you, you were going to sell those
9        guns for $200.  You'd sell the guns for $200.
   SHIELDS:  Uh I tried to get rid of those guns so many times, I don't
10       know, I can't, I don't remember no particular price but I've
         been trying to get rid of them for a long time.

11
   Q.   Okay did you ever tell anybody that there was a murder on these
12       guns and that's why you had to get rid of them?
   A.   No sir.

13
   Q.   Okay.  Mr. Shields .
14 A.   Inaudible.

15 Q.   What?
   A.   Can, may I correct one thing.

16
   Q.   Go ahead.  Anything you want.
17 A.   I was trying to sell the guns even before this even happened.

18 LACER:  Okay.
   MADARANG:  Where did you get the guns from originally?
19 SHIELDS:  Out of my basement.

20 MADARANG:  Okay whose guns were they?
   SHIELDS:  My father, my father.  They probably was my father.  I
21       don't know.

22 Q.   So long have you had these guns?  Known about these guns?
         Before the robbery, how, how long have you known about these
23       guns?
   A.   For about 2 years.

24
   Q.   Two years?
25 A.   Inaudible.

26 Q.   Did you load these guns yourself?  Is that yes?
   A.   Yes.

27
   MADARANG: Okay.
28 LACER:  Did you ever tell anybody that you had to shoot the clerk
         because he grabbed Mr. Castille's gun?
29 SHIELDS:  Not that I recall.  I just, not that I recall.

1  LACER:   Okay now as you sit there, you probably got to think
          somebody, somebody has been talking to us or you three wouldn't
2         be sitting here is that right?  So just kind of think kind of
          strongly if you ever made that statement to anybody.  Do you
3         remember at all?  You never told anybody you had to shoot the
          clerk because he grabbed Mr. Castille's gun?  Okay I can't see
4         you nod your head.
   SHIELDS:  I mean, no.

5  LACER:   No, you don't remember that?  How about Mr. Mr. Brown, did
6         Mr. Shields ever make that statement to you, that he had to
          shoot the clerk because he grabbed Mr. Castille's gun?
7  BROWN:  No.

8  Q.   Never made that statement to you?
   A.   No.
9
   Q.   Did you ever hear him make that statement to anybody else?
10 A.   No.

11 LACER:   Mr. Castille, did you ever hear Mr. Shields make that
          statement that he had to shoot the clerk because the clerk
12        grabbed your gun?
   CASTILLE:  No.
13
   Q.   Okay.  Did you ever hear him make that statement to another
14        person?
   A.   No.
15
   Q.   Mr. Castille did you ever... that shotgun that you had, did you
16        ever fire that shotgun before at another time?
   A.   No.
17
   Q.   Have you ever fired a shotgun?
18 A.   No.

19 Q.   Have you ever fired a gun?
   A.   Yes.
20
   Q.   What kind of gun?
21 A.   Um 22 rifle.

22 Q.   And when was that?
   A.   I don't know, like you know, got O.T., what's the, oh, R.O.T.C.
23
   Q.   R.O.T.C.?
24 A.   Yeah.

25 Q.   And when was that, how long ago?
   A.   It was awhile ago.
26
   Q.   Mr. Castill--
27 A.   Inaudible.

28 Q.   How long?
   A.   I ain't sure cause my sister had it, you know what I am saying,

1  LACER:  Mr. Shields have you ever fired either one of those shotguns
       before?

2  SHIELDS:  Probably when I was little.

3  Q.  Okay when you say little, how long ago? .
    A.  My daddy was at home so I was little.

4

    Q.  About how long ago?
5  A.  My daddy was at home.

6  Q.  Okay.
    A.  That was a long time ago.

7

    Q.  Well how many years, see, we may think different on long.  I
8      mean one, two, three, four years, five years?
    A.  Seven.

9

    Q.  Seven years.  Okay.  Have you ever fired between, I guess,
10    during that seven year period that you fired those shotguns,
     have you fired any other guns?  I can't see, your nodding your
11    head..
    A.  No.

12

    LACER:  Okay.  Uh, Mr. Brown have you ever fired a shotgun?
13  BROWN:  No.

14  Q.  · Have you ever fired, have you fired either one of these two guns
     that were used this night?
15  A.  No.

16  Q.  Have you ever fired a gun?
    A.  Yes.

17

    Q.  What?
18  A.  A 22 rifle.

19  Q.  Okay and when was that?
    A.  When I had gone camping on some private land out by Livermore,
20    be hunting.

21  LACER:  Okay.  Now, Mr. Shields, just so I understand this, your
     telling us that after the clerk had, had grabbed the gun, when
22    you backed up, that's when the gun went off the, the shoot the
     clerk.  Hand in front of your face there son.  That a boy.  Is
23    that how this gun went off?
    SHIELDS:  You said when I backed up...
24       It was some thing like that I guess
    Q.  No, you, you tell me.  I'm asking...
25  A.  No, no...

26  Q.  That's what you told me before. I, is, is that accurate or...
    A.  When I went to turn, to leave out, and my arm hit the thing and
27    went off.  I don't even wha--, I don't know what happened. I
     don't what hap--.  I knew the gun went off but.....

28

    Q.  Why was the gun pointed at the, at the clerk when it went off?
29  A.  It wasn't ...inaudible...I had ...inaudible..like come on

1    Clementh.

2  Q.  Now if the gun, if the man was hit in the head the gun was
       pointed at his head right?  Does that make sense?  So...
3  A.  I know, I know where the guns...I, I, I don't know where he got
       shot at.
4
   Q.  Okay. Wherever you guys...
5  A.  I, I raise my arm.  I raise my arm and the gun went off.  I...

6  BINGHAM:  Show me how.
   SHIELDS:  Mmm, I came in the store, I said come on Clementh.  We was
7        going when he grabbed me cause the door is right here, and I
         said come on, and he hit the screen thing and it went off, and
8        I saw him hit.  I saw him hit the counter and stuff and that's
         when I dropped my gun.
9
   LACER:  Did you ever have the gun pointed at the man in your opinion?
10 SHIELDS:  I, I don't remember.

11 Q.  Okay.  When we go in the store with the shotgun, why do you have
       a shotgun when you go in the store?
12 A.  Um, I was hiding it actually.

13 Q.  I'm just asking why.
   A.  By the door part, but then when I called Clementh and, and the
14     clerk, and the clerk man looked.  He, I guess he got, I guess he
       got scared or something when he seen ...inaudible....come on
15     Clementh and he looked at me.

16 Q.  He probably got scared cause you both had shotguns, is that what
       your saying?
17 A.  He didn't see, he didn't see...

18 Q.  He didn't see.
   A.  He didn't seen mine.  He didn't see mine.  You know....
19
   BINGHAM:  Go ahead and finish it.
20 A.  He didn't seen mine so then.

21 BINGHAM:  Ramon what if I was to tell you that the other clerk that
22       was in that store that I interviewed, he saw your shotgun.  He
         saw both of them.
   SHIELDS:  He  probably saw when I walked in ...inaudible...
23
   Q.  He also said you had that shotgun with two hands, Ramon.  And he
24     held it up, you held it at port-arms which is like this.  Is
       that right?  Did you ever hold a shotgun that night at any time
25     when you went in the store with your hands like this?
   A.  I don't remember.
26
   Q.  You may have?
27 A.  Yes but I don't remember.

28 LACER:  Son, what, what we are just trying to get here, Mr. Shields,
         is, you know, I, I, you seem to be kind of telling me, I don't
29       remember, I had the shotgun as I'm coming out.  I think it hit

1  Q.  Can look at Mr. Castille nodding his head yes.  He agrees that
       it is.
2  A.  Are you asking in my case or...

3  Q.  I'm asking you in your case.  Is there a chance to take a... If
       I'm in there robbing a store with a shotgun, and I got, and I am
4      robbing somebody, is there a chance that person can get shot
       with that shotgun?
5  A.  Yes.

6  Q.  Okay.  So why did you take that chance?  Any reason you know of?
   A.  No.
7
   LACER:  Mr. Castille, you kind of took the chance too.  What, why did
8          you take the chance to go in with that shotgun?
   CASTILLO:  I don't know.  You know what I am saying, I am just
9          saying....inaudible.  Like I said, I was right there by the cash
           register and like, Ramon was like come on [inaudible].  And I
10         looked back at him, dude grabbed the gun I remember, I don't
           know, and um, I let the gun go and I see Mon, the
11         guns....then....

12 Q.  Okay so your sure Ramon has the gun up like he'd have it at his
       shoulder, like somebody with a uh...
13 A.  You know what I amy saying.  If I wouldn't have ducked, it would
       have hit me.  The bullet would have hit me.  You know what I am
14     saying, so I would have been laying down there dead right now.

15 Q.  So Ramon was right close to you and right close to the clerk?
   A.  Yeah.
16
   Q.  How far, how far away do you think the muzzle of Ramon's gun was
17     from the clerk?
   A.  I don't know.  I don't know cause I was right there, and I
18     looked like, soon as I looked up I seen the barrel of the gun.
       And all I is just threw the gun down, and I just ducked.  Ran
19     out the store.  All I heard was blaah.  It was just right there
       you know what I am saying, when I ducked down, it was blah.  And
20     I shot... just had my head ring...inaudible... and on my way out
       the door, I looked back and seen ...inaudible.
21
   LACER:  Let, let me just as you Ramon, do you remember the gun being
22         that close to the clerk, Ramon?
   SHIELDS:  Cause I was, I was right...
23
   Q.  Hands down in front of the face.  I can't hear you.
24 A.  No cause I was right there by the door.

25 Q.  Okay so you don't remember like Mr. Castille does?
   A.  I was, I was by the door, wasn't by the clerk.
26
   Q.  Would it be fair to say that if, if you were as close, if your
27     gun was as close as Mr. Castille remembers it, then you couldn't
       have been at the door, would that be a fair statement?  Mr.
28     Shields?
   A.  I guess.

1    Q.    Is there a chance that you were that close?
     A.    No.

2

3    Q.    Mr. Shields is there a chance that, and, and I you know, I admit
           you are a 17 year old youngster, but uh, is there a chance that
           your uh trying to offer reason why this would happen as opposed
4          to you just shot the man?
     A.    Could you repeat that.

5

6    Q.    Did you just shoot the clerk  cause he was pulling on uh,
           Castillo's gun?
     A.    No sir.

7

8    Q.    Okay.  When you talk about, I hit my arm on the door-- is that
           the truth?
     A.    Yes.

9

10   Q.    It's kind of hard for us to believe that.  That's why we keep
           asking.  Are you sure it's the truth?
     A.    I know it is.

11

12   LACER:  I think Sgt. Bingham had a question.
     BINGHAM: Uh Ramon, you know what trajectory is?  It's the flight of
           the bullet.  The angle up or down.  And you heard the
13         Lieutenant say this clerk was hit in the head.  You heard
           Clementh over here say that when he turned around that gun was
14         next to his head.  How tall are you Clementh?
     CASTILLE:  5, 5-9, 5-10.

15

16   BINGHAM:  And that gun was up to your head?
     CASTILLE:  Yeah.

17   Q.    You see there's no way what your trying to....  Reason the
           lieutenant is asking these questions is because what your
18         describing, the manner in which you said the gun went off is not
           consistent with the trajectory of the bullet, and what Clementh
19         is saying, and where it struck the man.  Cause do you remember
           inside the store that there is plexy glass there?  There is
20         plexy glass on that counter?  Clementh is nodding his head yes.
           Clementh, do you remember the plexy glass on the counter?
21   A.    Mm-hum.

22   Q.    Yes?
     A.    Yes.

23

24   BINGHAM: Ramon, do you remember the plexy glass on the counter?
     SHIELDS:  Yes sir.

25   Q.    Okay and if I told you that it's trajectory is proven by that
           height on that plexy glass, as high as that your round went
26         though that before it struck the clerk, what your describing
           didn't occur as an accident.  The way you were holding the
27         weapon could not have happened.
     A.    That's the way it happened though.  Cause ...

28

     BINGHAM:  Uh just hold on just a second.  I understand that this is
             very difficult for you okay.  This is very hard.  But at the

1    same time, the whole thing that we've ever started and this all
     begins, the whole process with all three of you young men, is
2    that we wanted the truth.   Okay.   That's what we wanted is the
     truth.   And when you sit down and look at this, you can't deny
3    the trajetory of that bullet.   Okay?   That's why I asked you if
     you ever remember holding the gun up in the port-arms.   Mr.
4    Castille said, I believe my recollection is correct, that he
     did.   In fact, the gun was so high that it was at his head.   Mr.
5    Castille, how far was the, the end of the gun from your head
     when you looked?

6    CASTILLE:   He was standing like right there where that clock at, like
     you know past that clock.

7
8    Q.   Okay so that's the distance of about 7 feet.
     A.   Yeah and like I was like right here and then Cas--, the clerk
          dude had the gun and everything, Mon was like come on, so I let
9         the gun go.   I look at Ramon and I see the gun pointing right at
          me so I'm like dang, if he pull the trigger it's going to hit me
10        in my head.   So I ducked and ran out the store.   As soon as I
          ducked, the shot went off.

11
12   Q.   Was he holding the gun with one or two hands?
     A.   Two hands.

13   Q.   Two hands?   He had the rifle up by his face, the shotgun up by
          his face aiming.   Was there any question in your mind which
14        direction he was aiming it?
     A.   I just looked up and seen it.
15
16   Q.   Which, which direction was he aiming?
     A.   Like pointing towards, pointing towards me and the clerk.

17   BINGHAM:   Okay Ramon, you just heard what he said.
     SHIELDS:   Yes.
18
19   Q.   Is what he said true?   Ramon, I know it's hard but you need to
          answer me son.   Is what Clementh just said true?
     A.   If he say it's true, it's true.
20
21   Q.   If he says it's true, it's true.   That's your answer?
     A.   I know.   You know, I don't know for a fact though, I probably
22        did, but I know when I went to turn and walk out the store the
          gun went off.   I know that.   I know that.   I can remember that.
23        I, I won't ever forget that.

24   MADARANG:   Robert, than uh, how many shots did you hear totally?
          Coming from the store?
     BROWN:   At least two shots.
25
26   Q.   Did you hear a third one by any chance?
     A.   Could have.

27   Q.   Okay.   Tell me how quickly or... using the table with your hand,
          show me how quickly you heard the shots.
28   A.   [sound of hitting the table twice]

29   Q.   So you only heard two shots?

1  A.   Afraid so, two shots.

2  OLIVAS:   I have a question.   When you looked up and you saw the
       barrel of, on Mr. Shield's gun pointed right at you, from the
3      end of that barrel to your head how much distance do you think
       it was Mr. Castillo?  About me to you as we are sitting at this
4      table now?  To Sgt. Foster?  You can use this table as a gage
       like...
5  CASTILLE:   From right there.

6  BINGHAM:   Pointing at me.  Which is again at a distance of about 7
       1/2 feet.
7  OLIVAS:   7 1/2 feet sound about right?
   CASTILLE:   Yeap, yes.
8
   OLIVAS:   Okay.  Let's go forward.  Uh when you gave those guns...
9      those guns were given away.  They were put in your car, taken to
       this other persons house, is that correct?
10 CASTILLE:   Uh, no.

11 Q.   They were taken out of your house?
   A.   Yes.
12
   LACER:   Okay we're talking to Mr. Castille at that time.
13 OLIVAS:   Right.  Now, were those... it was both guns together?
   CASTILLE:   Yes.
14
   OLIVAS:   They were the same ones that were used at the market?
15 CASTILLO:   Yes.

16 Q.   Were those two guns in... were they bare,  were they in a box,
       were they in a gun container, or, or how were they?
17 A.   They was wrapped up like a bag.

18 Q.   In what, wrapped up like a bag?  In what...
   A.   In a bag.
19
   Q.   What kind of bag is that?
20 A.   Just a bag, you know, like you have a bag, you know what I am
       saying, like a golf bag where you go and play golf.  You got a
21     bag.  Yeah, a bag like that.

22 OLIVAS:   Bag?  They were in that?  Okay.  Uh, Mr. Shields, where does
       your mother live?  What, where does your mother live?
23 SHIELDS:   My mother?

24 Q.   Yes.
   A.   Bakersfield.
25
   Q.   Okay have you ever been down there?  Do you go there often to
26     visit with her?
   A.   Not that often.
27
   LACER:   A little louder Mr. Shields.
28 SHIELDS:   Not that often.

OFFICE OF 29
ICT ATTORNEY     OLIVAS:   Okay do you know how many times you have been down there

1    this year?  1996 to visit with her?
     SHIELDS: Once.

2

     Q.    Once?  When was that?
3    A.    Summer time.

4    Q.    It was in the summer time?  And how long did you stay down there
           for?
5    A.    8 to 10 days.

6    Q.    8 to 10 days, okay.  These two guns that were used at the
           market, where did you get them from?  In the very beginning when
7          you first, when they ever came to your house for the first time.
     A.    Who me?
8
     Q.    Yeah.
9    A.    The one that they got out the closet and the other one was in my
           basement.  The black one was, got that from Bakersfield.
10
     Q.    You got that from Bakersfield?
11   A.    Yes.

12   Q.    How did you get that from Bakersfield?
     A.    Somebody was selling.
13
     Q.    Somebody was selling it at Bakersfield?
14   A.    Yeah.

15   Q.    Who was selling it in Bakersfield?
     A.    A Mexican man.
16
     Q.    A Mexican man?  Okay is this when you were visiting your mom for
17         those 8 to 10 days, is that during the summer time?  Is that
           correct?
18   A.    Yes.

19   Q.    Okay.  Did you take those guns from any place that ... you are
           shaking your head, could you answer?
20   A.    No.

21   OLIVAS: No.  Sgt. Madarang [inaudible].
     MADARANG:  I have no further questions.
22   SGT. ?:   I don't either.

23   LACER:  Let me just ask Mr. Shields, that gun was taken in a burglary
             in Bakersfield, did you commit the burglary?
24   SHIELDS:  No.

25   Q.    Okay if we go down there and send your prints down there is it
           going to come up with your prints on it?
26   A.    No.

27   Q.    No.  You just happen to buy it from uh a man on the street?
     A.    The Mexican man was in our complex.  He stopped me one night
28         when I was walking to the store.

29   Q.    Do you know his name?  Yes or no?

1  A.    No.

2  Q.    How much you pay for the gun?
   A.    Like $50.
3
   Q.    How much?
4  A.    50.

5  OLIVAS:  Just 50.
   LACER:  Do you know what kind of gun it was?
6  SHIELDS:  Just sold it to me.

7  LACER:  I mean do you know what make the gun was?
   SHIELDS:  No.
8
   Q.    Remington, Winchester.  The gun that had the barrel sawed off.
9        Did you saw it off?
   A.    The barrel?
10
   Q.    Yes or no?
11 A.    No.

12 LACER:    Is that, those guns when you sold them, they were wrapped,
             Mr. Castille, they were wrapped in a bag?
13 CASTILLE:  You know like a golf bag.

14 Q.    Okay.
   A.    I didn't sell them, gave them away.
15
   Q.    Did you ever see those guns in a blanket?
16 A.    Blanket?

17 Q.    Yeah.
   A.    No.
18
   LACER:  Mr. uh.. Brown, did you ever see those guns in a blanket?
19 BROWN:  When he gave them to um, when we handed them to the guy, I
           mean, I was, I wasn't even paying attention.  The guy went out
20         and put them in the car so I didn't really see them.

21 Q.    When you gave them to this Anthony person, they, he put them in
         the car?
22 A.    Yeah.

23 Q.    So there was no blanket that was taken from your residence to
         wrap the guns up?
24 A.    No.

25 MADARANG:  How about the back of your car where, where the guns were
              put?
26 BROWN: No.

27 Q.    Did you have a blanket in that car at all any time?
   A.    No.
28
   LACER:  How about you Mr. Castille is there a blanket...

OFFICE OF 29
CT ATTORNEY

1                        END OF SIDE ONE, TAPE TWO

2   LACER:    Okay let me um...I'm getting close to the end of my
            questions.  Let me just kind of ask this of the, of the three
3           gentlemen, um, uh, Mr. Castille, uh, we're coming close to the
            end of our uh, all the questions we have to ask, um, is there
4           anything you want to add here son?
    CASTILLE:  No I said everything that had to be said.
5
    Q.    Okay did you understand everything we talked about here, and do
6         you agree with everything we talked about?
    A.    Yes.
7
    LACER:    Okay.  Mr. uh, Brown, is there anything you want to add here
8           son?
    BROWN:   No.
9
    Q.    Okay do you understand everything we have talked about and uh do
10        you agree with everything we've talked about here?
    A.    Yes.
11
    LACER:   Okay.  Mr. uh, Ramon Shield?
12  SHIELD:  Yes.

13  Q.    Okay do you uh, is there anything you want to say son?
    A.    I just want to say that...
14
    Q.    Okay you got to speak up a little bit so we can pick it up.
15  A.    I just want to say that I am sorry to, to the wife, and to the
          baby kids, and his, and his family and stuff.  Inaudible, cause
16        I just want to say I'm sorry.

17  Q.    Okay.
    A.    Ain't nothing, ain't nothing I could do to change or bring him,
18        bring him back, I'm, I'm just, I'm sorry for what happened.  And
          if I could change it, I would.
19
    Q.    Mr. Shields do you uh understand and agree with uh, everything
20        we have talked about here?
    A.    Yes.
21
    Q.    Okay.  Let me just go around to see if there are any other
22        follow-up questions, and uh, I'll start with uh, um, we'll talk
          with Sgt. Madarang.
23  MADARANG:  No I have no other questions.

24  LACER:  Sgt. Bingham?
    BINGHAM:  I have no other questions either.
25
    LACER:  Sgt. Olivas?
26  OLIVAS:  I have no further questions either.

27  LACER:  Sgt. Foster?
    FOSTER:  No.
28
    LACER:  Um, that's all the questions we have sons, and we appreciate
29  all three of you being candid with us and uh we'll have the D.

1   review it and I appreciate your cooperation.
?:     Inaudible.

2   LACER:  And um I am going to end the section of tapes.  Let me, I
3       guess let me just kind of ask this, and just kind of confirm,
        um, we uh, let's see we've had a number of conversations with
4       you.  This would be the uh, the second taped conversation from,
        from all of you but the first one we kind of took as a group,
5       and then there were other taped conversations that were taken
        between individual sergeants and you individually, is that
6       right?
    CASTILLE/BROWN/SHIELDS:  Yes, yes,yes.

7
    LACER:  Is that right Mr. Castille?
8   CASTILLE:  Yes.

9   LACER:  Is that right Mr. Shields?
    SHIELDS:  Yes.

10
    LACER;  Is that right Mr. Brown?
11  BROWN:  Yes.

12  LACER:  Okay at that point I'll end the uh, it better be when I have
        the time of 1512 hours and it is still the uh 20th of December,
13      1996.

14

15                      END OF TAPE 3, SIDE ONE.

16

17

18

19

20

21

22

23

24

25

26

27

28

29

# EXHIBIT: C

CID INTERVIEW LOG SHEET (12-20-96) 2 PAGES

EX. C

969

## CID INTERVIEW ROOM LOG SHEET

ROOM # _ZOI_

INTERVIEW PERSON: _SHIELOS, RAMON_

SUSPECT [ ]          WITNESS [ ]          OTHER [ ]

INVESTIGATOR: _____

CRIME: _____

COMPLAINANT: _____

REPORT NUMBER: _____

ACTIVITY LOG   (Use to log in bathroom, coffee, meals, etc.)

| TIME | ACTIVITY | INITIAL & S/N |
|------|----------|---------------|
| OTCO | placed into interview room | (RM) SOSIA |
| 0818/0827 | BATHROOM | MC 72C8C |
| 0850 | Water | L Wallace |
| 1048 | Break after 2½ x ½r question time | 7C76 |
| 1052 | Taken to So/2/05 | 7136 |
| 1058 | Returned | 7136 |
| 1333 | Moved to CAPT DumBAus offices | LW 7192 |
| 1525 | TAKEN TO BATHROOM | MC & BS |
| 1530 | BACK TO ROOM | u |
| 1540 | FOOD | 7136 C |
| 1545 | call 834-41-57 Gramora Brotha | MC 72C8C |
| 1645 | TAKEN TO YSD | SA 6902C |
| 1650 | RETURNED TO ROOM | SA 6902C |
| 1700 | GIVEN JACKET & SHOES (SLIPPERS) | SA 6902C |
| 1745 | TAKEN TO YSD | SA 6902C |
| 1824 | RETURNED TO ROOM 201 | SA 6902C |
|  | out of interview room |  |

1st Interview
1332 & 1½
Fri 9:13 - 1052

970

| 1905 | DA BACK IN | 2/0 71936 |
| 1915 | DA OUT | 2/S 6902C |
| 1915 | BATHROOM BREAK | 2/1 6902C |
| 1920 | RETURNED TO ROOM 201 | 2/1 6900C |
| 1950 | GIVEN DINNER SANDWICH 2 TG | 2/0 7193C |
| 2055 | TRANSPORTED TO ISD 7TH WINGATE | 2/1 6902C |

13

# EXHIBIT: D

D.D.A. TAPE STATEMENT (12-20-96) 2 PAGES

" TRANSCRIPT "

MAY-25-99 02:58 PM 52 OCTAVIA LAW OFFICES 415 31 45744 P.09

Ex D

# STATEMENT OF RAMON SHIELDS

| | |
|---|---|
| Taken At: | Oakland Police Department |
| Taken By: | Sgt. Lisa Foster |
| Date: | December 20, 1996 |
| Time: | 7:11 |
| Present: | Sgt. Lisa Foster, DDA Darryl Stallworth, and Ramon Shields |
| Transcribed By: | Brigitte Holland/ draft |
| Date of Transcription: | June 23, 97 |

***************************

Sgt. Lisa Foster: Today's date is December 20, 1996. The time is 7:11 PM. Deputy DA Darryl Stallworth and myself Inspector Lisa Foster are in at the Oakland Police Department Homicide Section and we're interviewing Ramon Shields. We admonish Ramon previously at approximately 6:50 however the tape was not running. The record button wasn't pushed. Ramon asked for some time asks us to go off tape because he wanted to discuss exactly he was concerned whether or not everything was pointed in his direction. And he wanted to talk to us about that. We are now back on tape, and the record button is pushed and we're ready to discuss that with Ramon. We did read Ramon his rights. Is that correct Ramon?

A: Yes.

Q: And you did agree to speak with us?
A: Yes ma'am.

Q: And when we did go off tape, you did speak to us regarding your concerns about how everything was pointing at you?
A: Yes ma'am.

Q: And now we're back in the room and we're going to read you your rights again for the record again. You understand that Ramon?
A: Yes.

Darryl Stallworth:    Okay,  Ramon.  You have the right to remain
                      silent.  Anything you say can and will be used
                      against you in a court of law.  You have the
                      right to talk to a lawyer and have him present
                      with you while you are being questioned.  If
                      you  cannot  afford  a  lawyer, one  will  be
                      appointed  to  represent  you  before  any
                      questions if you wish.  Do you understand each
                      of these rights I've explained to you?

A:    Yes.

Q:    Having these rights in mind do you wish to talk to us now?
A:    Yes.

Sgt. Foster:    Is that yes?  Can you speak a little louder?
A:    I don't have no lawyer or nothing.

Darryl Stallworth:    Do you understand that if you cannot afford a
                      lawyer one could be appointed to represent you
                      before any questioning.  Do you want to talk
                      to us without a lawyer or do you want a
                      lawyer?

A:    (Inaudible). "Lawyer."

Q:    We're going to stop the tape now.

Sgt. Lisa Foster:    The time is 7:13 pm and we're going off tape.

# EXHIBIT: E1

DECLARATION. (E1, 2 PAGES) (2-13-07)

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and ...:*    TELEPHONE NO.:    FOR COURT USE ONLY

REMON SHIELDS #P648..
CSP-SACRAMENTO/ B1-129
P.O. Box 290066
Represa, CA 95671-0066

ATTORNEY FOR *(Name)*:

NAME OF COURT:
STREET ADDRESS: ALAMEDA COURT    SUPERIOR COURT
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Appeal divison

PLAINTIFF/PETITIONER:    REMON SHIELDS

DEFENDANT/RESPONDENT:    J. Walker, Warden et.., al.

**DECLARATION**

CASE NUMBER:

---

On Dec. 28th, 2006; Petitioner was placed in Ad-Seg. Correctional
Officer (c/o) Hanna was charged with logging and packing Petitioner
Personal and Legal property.
On Jan. 10th, 2007; Upon Petitioner receiving his property; Petitioner
reported to Property Officer c/o Flory that numerous item's was missing
out of his property (personal and legal property); Petitioner sent
c/o Flory an itemized list of missing Personal and Legal Property
items.
Petitioner's missing Legal property : Juvenile court file, motion's
and transcripts; and Reporter's Transcript's (Pre-trial and Trial)
Volume 1-6, pages (R.T, 1 - 1161).
On Jan. 17th, 2007; Petitioner filed an inmate complaint on c/o Hanna
for the missing property items , which is currently under review
(see, attached INMATE APPEAL ASSIGNMENT NOTICE, Feb. 8th, 2007 SAC-
B-07-00395).
And that is the reason why the documents is not attached in support of
the facts raise in this    (WRIT OF HABEAS CORPUS).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:
    Feb. 13th, 2007

REMON SHIELDS
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(TYPE OR PRINT NAME)

► *Remon Shields*
(SIGNATURE OF DECLARANT)

☒ Petitioner/Plaintiff  ☐ Respondent/Defendant  ☐ Attorney
☐ Other *(specify)*:

(See reverse for a form to be used if this declaration will be attached to another court form before filing)

Form Approved by the
Judicial Council of California    DECLARATION

## INMATE APPEAL ASSIGNMENT NOTICE

To: INMATE SHIELDS, P64820                         Date: February 8, 2007
Current Housing: FB1 1 00000029L

From: INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER: SAC-B-07-00395

ASSIGNED STAFF REVIEWER: FB CAPT SGT
APPEAL ISSUE: PROPERTY
DUE DATE: 03/27/2007

Inmate SHIELDS, this acts as a notice to you that your appeal has been sent to the above
staff for FIRST level response. If you have any questions, contact the above staff
member. If dissatisfied, you have 15 days from the receipt of the response to forward
your appeal for SECOND level review.


I. O'BRIAN / R. CARTER
APPEAL COORDINATORS
CSP - SACRAMENTO

# EXHIBIT: E2

DECLARATION  (E2, 1 PAGE) (2-13-07)

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Add

RMMON SHIELDS #P64820
CSP-SACRAMENTO/ B-1-129
P.O. Box 290066
Represa, CA 95671-0066

ATTORNEY FOR (Name):

TELEPHONE NO.:

FOR COURT USE ONLY

NAME OF COURT: ALAMEDA COUNTY SUPERIOR COURT
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: Oakland, CA 94612
CITY AND ZIP CODE:
BRANCH NAME: Appeal divison

PLAINTIFF/PETITIONER: REMON SHIELDS

DEFENDANT/RESPONDENT: J. WALKER, Warden et.., al.

**DECLARATION**

CASE NUMBER:

Petitioner (with an extensive history of mental illness and diagnosed
mental impairment (retardation), who was Pro-se duging Pre-trial,
Trial and all subsequent proceeding thereafter. Stated  expressed
and/or indicated to trial court (Hon. Judge Robert B. Freedman)
on several occason's during Jury trial that: He(Petitioner was
confused "about and by" the court proceeding's and did not know
what to do and/or what he was doing!
On at least one occasion, Trial court gave the following statement
in response to Petitioner above statement(s): "Mr. Shields, you have
chosen to to exercise your right to represent yourself in this
matter, against the advice of Defense counsel and Judge Nakahara;
The odds and hardship's have been expressed and explained to you.
So the burnden and consequence of your decision to proceed as your
own counsel is your to bare".
Petitioner can not recall the time, date or court proceeding (on
or off the record) that he stated the above, or the response that
Trial court gave. However, Petitioner is positive it was during
Jury trial.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Feb. 13th, 2007

REMON SHIELDS
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(TYPE OR PRINT NAME)

▶ _Remon Shields_
(SIGNATURE OF DECLARANT)

☒ Petitioner/Plaintiff  ☐ Respondent/Defendant  ☐ Attorney
☐ Other (specify):

(See reverse for a form to be used if this declaration will be attached to another court form before filing)

# EXHIBIT: F

PROBATION REPORT AND RECOMMENDATION (9-22-99)
7 PAGES

-AND-

SENTENCING TRANSCRIPT NOV. 18th, 1999 (RT 40-43, 45-46, 49-54, 59-60) 14 pages

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF ALAMEDA, STATE OF CALIFORNIA

THE PEOPLE OF THE STATE OF CALIFORNIA

VS

SHIELDS, RAMON ARTHUR

DEFENDANT

# FILED
ALAMEDA COUNTY

NOV 18 1999

CLERK OF THE SUPERIOR COURT
By _____
DEPUTY

## PROBATION OFFICER'S REPORT AND RECOMMENDATION

EVENT NAME   **SHIELDS, RAMON ARTHUR**
C.I.I. NAME **SHIELDS, RAMON ARTHUR**                    JUDGE   FREEDMAN

ADDRESS  1427 Campbell St., Oakland, CA. 94607          DEPARTMENT NO.   **002**

D.O.B   **07/18/79**          (AGE:   **20**   )         DOCKET NO.   **132344B**

SEX   **MALE**            ETHNIC **BLACK**              REFERRAL DATE   **08/17/99**
  HT. **5FT   9IN** WT. **220**      HAIR   **BLACK**
C.I.I. NO.  **11769871**                                COURT DATE   **10/01/99**

CEN.   **7147626**                                      DEFENSE ATTORNEY   **PRO PER**

PFN.   **AYP717**                                       REPORT BY _____
                                                        DEPUTY PROBATION OFFICER

CHARGES FILED   **PC 187 SC&A&U F**

CURRENT CHARGES   **PC 187 SC&A&U F**

CHARGE STATUS   **COURT DECISION**

DATE AND PLACE OF   **ARREST**              ARREST AGENCY **SHERIFFS OFFICE**

  **12/26/96 1427 CAMPBELL          OA**

CURRENT CUSTODY STATUS   **IN CUSTODY**     DAYS IN JAIL THIS CHARGE _____

CUSTODY STATUS THIS CHARGE **IN CUSTODY**
                        O.R. ON              BAILED ON        AMOUNT $

MARRIED:   Yes _____   No _____   LIVES WITH ____     INCOME SOURCE ____

Shields, Ramon Arthur                                                    Docket #: 132344B

## CRIMINAL HISTORY

Juvenile:
Date                        Offense and Disposition

8-27-93                     Offense:  288(A) PC.
Oakland
                            Disposition:  12-3-93, placement.

                            9-20-95, dismissal, transfer out of county.

Adult:
Date                        Offense and Disposition

12-26-96                    Offense:  187 PC F.
Oakland
                            Disposition:  Instant offense.

Pending Criminal Cases:  None known.

Prior Probation History:  The defendant's prior probation history is limited to that of when he was a juvenile. He was placed on wardship probation to include placement outside of the family home. Probation was dismissed September 20, 1995 as the defendant and his family apparently moved out of the county.

Institutional and Parole History:  None.

## PRESENT OFFENSE

Offense Summary:  The following has been summarized from the District Attorney's holding order: "On 11-11-96, at 8:30 PM, the defendants killed a cashier, Abdo Nashar (vic), during a botched robbery in Oakland. The victim was from Yemen.

"The defendants were sitting around lamenting the fact that they had no money. They discussed committing a robbery to get money while hanging out at deft Castille's house. The three defendants then drove by Shariff's Market (11th & Willow) at approximately 6:30 PM. Deft Brown was driving his car at the time. Deft Brown got out of the car and purchased some items from the market (presumably to case the store). The three defts returned to Castille's house and talked about robbing a store. After a short time passed, the three defts got back into deft Brown's car. Just before getting in the car, deft Castille got two guns from the basement of his grandmother's house. Deft Brown drove to the market.

"Deft Brown parked on the side of the market with the car running. Defts Shields and Castille got out of the car and put masks on their faces. Defts Shields and Castille went into the market; deft Castille approached the counter and deft Shields stood at the door. Both deft Shields and Castille had sawed-off shotguns in their hands. The victim was standing behind the counter and witness Abdul was standing

2

near the front of the counter. Castille demanded money and Shields stood by the front door of the store as a lookout/cover man. Castille dropped the gun. Shields then fired the fatal shot (a shotgun slug) at vic. The shot passed through some plexiglass striking the vic in the face. Shields picked up both shotguns and both deft Shields and Castille ran out of the store. Deft Shields and Castille jumped into the car and the three men drove away from the store. The defts did not take any money or items from the store.

"Another employee of the store, Abrahim Sharafin, had been upstairs on the phone. After he heard the gunshots he looked out the window and saw Brown's car being driven away from the store. He took his automatic pistol and fired several times at the car.

"The Yemen consulate (very active in following the case) posted a $10,000 reward. Two young men, Donnie Ross and Anthony Brown, implicated the defendants. Anthony Brown went and purchased the murder weapons from defts Brown and Castille per OPD request. OPD did not directly monitor this activity. The defendants were simultaneously arrested and taken to OPD.

"OPD took statements from all three defendants after they waived their rights. OPD then took a group statement from all three defendants. Finally, DDA Stallworth took 'Aranda' statements from defts Castille and Brown.

"Robert Brown statements: Robert Brown told OPD the three men discussed committing a robbery. Furthermore, he admitted going into the same market two hours before the incident. However, deft Brown told OPD he had no knowledge of the robbery until the last moment. He claimed he did not think there was going to be a robbery until defts Sheilds and Brown got out of the car with guns and masks.

"Clemeth Castille statements: Clemeth Castille told OPD he went into the market with deft Sheilds to commit a robbery. Castille said he went to the counter with a sawed-off shotgun. He claimed the clerk reached for something under the counter so he dropped his shotgun and ran. He claimed he heard two shotgun blasts then got in the car and they drove away from the store. Castille claimed his shotgun accidentally discharged when he dropped it.

"Ramon Shields: Shields cried throughout all the interviews. He admitted going to the market for a robbery. He said he stood by the door as deft Castille approached the victim at the counter. Deft Shields told OPD he saw the clerk and deft Castille struggle over Castille's shotgun. Shields claimed his arm bumped the door and his shotgun went off. Shields picked up both guns and ran out of the store. Sheilds did not give a statement to the homicide DA."

Codefendants: Codefendant Robert Brown was convicted at jury trial of Penal Code 32 on August 19, 1999 in Department 02. He is scheduled to be sentenced on October 1, 1999 in Department 02.

Codefendant Clemeth Castille was convicted at jury trial of 187 Penal Code to include special circumstances and an arming clause on August 17, 1999 in Department 02. He is scheduled to be sentenced on October 1, 1999 in Department 02.

Negotiated Plea: None, the defendant was convicted by jury trial.

Shields, Ramon Arthur                                                          Docket #: 132344B

Attorney Statements:

District Attorney: None received.

Defense Attorney: Not received.

Defendant's Statement Re Offense: The defendant declined to make a statement.

Defendant's Statement Re Probation/Diversion: Not applicable.

Victim Information:

Victim's Notification: The victim's next of kin was sent a restitution letter/claim form, however, to date, no response has been received. A check with the Alameda County Victim/Witness Program indicates that the victim's next of kin did not file a claim.

Victim's Statement: None.

Restitution: Unknown.

Fines and Fees: The defendant should be responsible for a $200 restitution fine.

Time in Custody: The defendant was in-custody from December 26, 1999 until October 10, 1999 for a total of 1,022 days.

## SOCIAL FACTORS

Defendant's Living Situation: The defendant, prior to his arrest, had been residing with his maternal grandparents, Earl and Irma Lavallis in Oakland, California.

Family Background: The defendant, born July 18, 1979 in Oakland, California is eldest of four children born to the dissolved union of Raymond Shields and the former Angela Lavallis. Additionally, the defendant has nine half siblings from both his mother and father's prior relationships. The parents married in 1983, divorced within four years in 1987, due to physical abuse on the part of the father.

The defendant boasted that he, being raised in "the streets" was taught how to survive at a young age. He, however, later retracted this statement and commented that it was his grandparents, whom he considers his parents, that were his primary caretakers. The defendant apparently was placed in the grandparent's home as a protective measure. He explains that his father was an extremely violent man who beat the mother for her "check". Reportedly, the defendant was also subject to the father's temper. At one time he was allegedly held hostage by his father and in another separate incident, was struck on the head, causing him to experience memory lapses. When the defendant was in his mother's home, he comments that she provided little structure for him. As she reportedly had her own problems as a result of being physically and emotionally abused, the defendant "stayed out of her way". The defendant complained that his mother often "whopped" him for nothing.

4

Shields, Ramon Arthur                                                      Docket #: 132344B

The defendant, according to a previous juvenile probation report dated February 17, 1997, is from a turbulent family background, one by which violence was prevalent. Thus, the defendant is a product of this dysfunctional family background. Reportedly, the defendant's paternal grandfather murdered his wife. The father allegedly killed his girlfriend and is currently imprisoned. The defendant himself was witness to the father's violence toward the mother. Allegedly the father, on one occasion, attempted to beat the mother with a tire iron and run over her with a car. These incidents, according to a psychological evaluation, were a source of vivid memories for the defendant. It was further noted in this report that the defendant was also a victim of sexual abuse.

Of the immediate family, the mother, apparently a former alcoholic, drank excessively to the point whereby her kidneys are permanently damaged. She was also a heroin addict, an addiction which originated in 1983. Apparently, however, the mother participated in a methadone maintenance program and last known was sober. As noted above, the father has a criminal history as does the mother (ATJ571). The mother, in the past, has accrued convictions which were both property and drug related.

Marital History:  The defendant has never been married. He claims, however, parentage of three children, Ramon, Jr., age three and one half, Rhonda, age two and one half, and D'Mone, age unknown. He was unable to recall the full names of the women by which he fathered these children.

Educational History:  The defendant's education ceased during his senior year while student at McClymonds High School. According to the defendant, he did not learn anything in school, rather "they" just kept passing him from grade to grade. He recalls that he was a special education student most of his junior high years. The above-cited probation report verified the defendant's enrollment in school. It further noted, however, that the defendant frequently missed classes, having accrued many unexcused absences. This report also stated that the defendant, a special education student, was at one-time classified as severely emotionally disturbed.

Employment History:  The defendant claims in the past that he had worked since the age of 16 and held positions as a warehouse person and data entry clerk, both of which were summer jobs. He further advises that he did yard work on an informal basis.

Financial Status:  The defendant has no assets, nor does he have any outstanding debts.

Military History:  None.

Medical/Mental Health History:  The defendant claims that he may possibly be a diabetic as he has a low blood sugar level. He further notes that he is an asthmatic. Regarding his mental health, the defendant relates that he participated in therapy from the third to eighth grades. He was referred to the counselor through the school; the defendant was apparently a behavioral problem and frequently involved in physical fights. Further, the defendant notes that he was hospitalized on one occasion whereby he was apparently diagnosed as mentally retarded and schizophrenic. The above-cited probation report indicated that the defendant saw a therapist while in the group-home and was prescribed a psychotropic drug, Imipramine. Use of this drug, however, was reportedly short-term.

5

Alcohol/Drug History: The defendant advises that he began drinking at age 11, continuing until age 14. He comments that he drank "all the time", whatever was available. His drinking was apparently influenced by his peer group as he drank to "fit in". The defendant's introduction to drugs was through marijuana at age 12 continuing again until age 14. The drug was smoked daily whereby he smoked four to five "joints" daily. His drug use appeared to escalate through his exposure to heroin, whereby he snorted the drug between the age of 13 to 14. This use, however, was described as non-addictive, whereby it was limited to two months only. The defendant further stated that at age 14 he snorted methamphetamine daily for one year.

## SENTENCING FACTORS

**Rule 413:**      Probation Eligibility When Probation is Limited:

(b)            The defendant appears to be statutorily ineligible for probation (absent unusual circumstances) because of the provisions of 1203(e)(1) Penal Code.

**Rule 414:**      Criteria Affecting Probation:

Because the defendant is ineligible for probation, these factors will not be addressed.

**Rule 421**      Circumstances in Aggravation:

(a)      (1)      The crime involved great violence and bodily harm in that the victim died.

(a)      (2)      The defendant was armed with a sawed-off shotgun.

(a)      (8)      The manner in which the crime was carried out indicates planning, sophistication or professionalism.

(b)      (2)      The defendant's prior convictions as an adult and/or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness.

**Rule 423:**      Circumstances in Mitigation:

None of the factors in regard to the crime or to the defendant appear applicable.

## EVALUATION

Appearing before the court regarding the felony offense of Penal Code 187, murder, is a 20-year-old male. This offense is one of great violence as an innocent person was shot during the course of a robbery. The defendant himself, as noted previously, is the product of a dysfunctional family, whereby violence was the norm. At a young age, the defendant was witness to the physical violence inflicted upon the mother at the hands of his father. These recollections are apparently vivid for the defendant and has seemingly been a source of emotional turmoil for this young man. It appears obvious that the defendant has an array of issues stemming from both the physical, emotional and sexual abuse he was subjected to as a young man. The defendant is apparently a product of his environment and has grown

Shields, Ramon Arthur                                              Docket #: 132344B

up himself to be an angry and violent young man. As noted, the defendant had difficulty in school and was combative both inside and outside the classroom.

While the defendant appears to have led a sad life, one whereby he was both a victim and a perpetrator, this does not excuse his behavior. This offense is one which was both callous and calculating as an innocent man, absent provocation, was shot and murdered during an apparent botched robbery. The instant offense further appears to be indicative of a degree of planning and criminal sophistication. Both the defendant and codefendant, masked to disguise their identity, entered the store armed with a sawed-off shotgun with the apparent intent of robbing the victim. Thus, due to the severity of this offense, and for the protection of the community, it is recommended probation be denied.

## RECOMMENDATION

It is respectfully recommended that probation be denied, and that a restitution fine in the amount of $200.00 be imposed pursuant to Section 1202.4(b) of the Penal Code.

If the sentence includes a period of parole, it is recommended that an additional restitution fine be imposed pursuant to Section 1202.45 of the Penal Code in the same amount, and that the fine be suspended unless parole is revoked.

Register pursuant to 290 of the Penal Code.

It is further recommended that restitution be reserved.

Date typed: 9-22-99
bjm

Respectfully submitted,

Approved by:

SYLVIA J. JOHNSON
CHIEF PROBATION OFFICER

By: _____

Sam Meyer
Unit Supervisor

Debra J. Fong
Deputy Probation Officer

I have read and considered the foregoing report.

JUDGE
H:\HOME\CFA\AYP717\SC R&S 10-1-99.doc
7/28/99

7

```
 1    under Item 6 of Mr. Shields' moving papers.
 2            So the Court's contemplation then would be
 3    to deny a motion for new trial on each and all of
 4    the grounds raised by Mr. Shields that we've just
 5    addressed in detail for the reasons indicated.
 6    Unless there is anything new or different that
 7    hasn't already been communicated to the Court in
 8    writing or this afternoon on the record, that will
 9    be the Court's ruling.
10            Mr. Mifsud, anything further?
11            MR. MIFSUD:  No, Your Honor.  Thank you.
12            THE COURT:  Mr. Byron, anything further?
13                    (Off-the-record discussion.)
14            MR. BYRON:  Nothing further from this camp.
15            THE COURT:  Mr. Shields, nothing further on
16    this issue?
17            MR. SHIELDS:  (Nodding head.)
18            THE COURT:  Is that a yes?  Mr. Shields is
19    nodding in the affirmative, I think.
20            Mr. Shields, you know you have to speak
21    out.  You are not to communicate and rely on
22    Mr. Byron.
23            I'm going to speak now and indicate, unless
24    there are any other motions related to the -- to
25    sentence -- first as to Mr. Shields and then as to
26    Mr. Castille.  I'm going to make some comments,
27    which I think apply to both individuals; but,
28    obviously, the sentencing issues will be
```

1    determined individually.

2         There is, on behalf of ~~Mr. Shields~~, a

3    motion or ~~request~~ filed on October 1st ~~to exercise~~

4    ~~discretion~~ as characterized by Mr. Shields under

5    People vs. ~~Dillon~~ 34, Cal 3rd, 441 ~~to reduce the~~

6    ~~crime~~ of which the defendant has been convicted to

7    a lesser offense and sentence him accordingly.

8         There is a ~~request for CYA consideration~~ as

9    to Mr. Shields and as to Mr. Castille.  There is

10   ~~also a request~~ that the Court exercise his

11   ~~discretion under~~ Penal Code Section ~~190.5 with~~

12   ~~regard to the choice~~ between a ~~life~~ sentence

13   ~~without~~ possibility of ~~parole and~~ a sentence of ~~25~~

14   years ~~to life~~.  So that is the context in which

15   the Court intends to address these issues.

16        Let me ask you first, Mr. Shields,

17   Mr. Byron on Mr. Shields's behalf, do you waive

18   arraignment for sentencing?

19        MR. SHIELDS:  What he say?

20                  (Off-the-record discussion.)

21        MR. BYRON:  Mr. Shields has made an

22   observation to me that he wishes to review the

23   transcripts before the sentencing occurs.

24        THE COURT:  Transcript of what?

25        MR. BYRON:  Of the trial, all the

26   proceedings.

27        THE COURT:  Okay.  I do not intend to

28   continue the hearing for the purpose of affording

```
 1      Mr. Shields that opportunity.  Obviously, if there
 2      is an appeal, then Mr. Shields will have the
 3      opportunity -- will have the transcripts provided
 4      to him.  He will have that opportunity to contest
 5      both verdict and the sentence.
 6                      (Off-the-record discussion.)
 7              MR. BYRON:  There is none.
 8              THE COURT:  All right.  Arraignment for
 9      sentencing is waived; is that correct?
10              MR. BYRON:  It is.
11              THE COURT:  There is no legal cause why
12      sentence should not be imposed?
13              MR. BYRON:  No legal cause.
14              THE COURT:  Mr. Cannady, with regard to
15      Mr. Castille is formal arraignment for sentence
16      waived?
17              MR. CANNADY:  Formal arraignment is waived.
18              THE COURT:  Is there any legal cause why
19      sentencing should not now be pronounced?
20              MR. CANNADY:  Just for record, first I
21      would move to amend the probation report as it has
22      one error in it which I pointed out.
23              THE COURT:  I want to come to that, but in
24      terms of any legal cause?
25              MR. CANNADY:  Yes, Your Honor.  Just for
26      the record, sometimes I feel like Don Quixote, but
27      we would object to the defendant being sentenced
28      as an adult.  He was a minor at the time of this
```

```
1     offense.   He was subject to the juvenile courts.
2     He was -- he was bound over by a magistrate on
3     what was alleged to be a close finding.   He wasn't
4     bound over by a Superior Court judge.
5           And our feeling, since he was a minor at
6     that time, is that the juvenile court would be the
7     proper forum and venue with respect to
8     Mr. Castille and with respect to any sentencing in
9     regards to this matter, both emotionally and
10    mentally, and as far as his culpability under the
11    Felony Murder Rule.
12          Thank you, Your Honor.
13          THE COURT:   Thank you.
14          MR. BYRON:   Mr. Shields, would join in that
15    comment.
16          THE COURT:   Let me indicate that the Court
17    has read and considered the Probation Department
18    report submitted as to Mr. Shields and
19    Mr. Castille.
20          I think what Mr. Cannady was addressing in
21    part and what is clearer in the Probation
22    Department report as it describes Mr. Castille's
23    participation in describing the events of
24    November 11th, it is clear that Mr. Shields and
25    Mr. Castille's participation -- and I say clear
26    relative to the evidence that was introduced at
27    trial -- were reversed.   And the Court has not
28    accepted the Probation Department's description of
```

1    Mr. Cannady.

2           MR. CANNADY:   Thank you, Your Honor.

3           THE COURT:   As indicated, I've read the

4    report, and we've acknowledged the error in the

5    report pertaining to Mr. Castille.   I've read

6    Mr. Mifsud's correspondence relating to the

7    People's position on sentencing; I've read, I

8    think, all of the authorities, read or reread all

9    of the authorities cited on behalf of Mr. Shields

10   and Mr. Castille on the CYA issues; the Court's

11   exercise of discretion with regard to Penal Code

12   Section 190.5, including, besides the Dillon case,

13   People vs. Guinn at 28 Cal 4th, 1130; I've looked

14   at the Welfare and Institutions Code references

15   with regard to the Court's authority to consider a

16   CYA referral for diagnostic evaluation purposes

17   separate and apart from the question of

18   incarceration under Welfare and Institutions Code

19   Section 707.2.

20           I have -- Mr. Byron, sometime ago in

21   connection with one of the earlier dates set for

22   report and sentencing -- have requested that the

23   Court have available Mr. Shields' juvenile court

24   file under Case No. 159618.   And I presume that

25   the purpose of having that before the Court was to

26   have the Court consider information about

27   Mr. Shields' youthful background and experience

28   and the rather horrific circumstances under which

```
 1    he was raised.

 2            Is that the purpose?

 3            MR. BYRON:  Yes, sir.  Yes, sir.

 4            THE COURT:  And I have read and considered

 5    that information solely as it relates to the

 6    Court's exercise of jurisdiction.  I've also read

 7    and considered the very articulate letter that

 8    Mr. Shields sent to the Court dated November 14th,

 9    1999, and I -- unless copies were sent to counsel

10    which is not indicated, it may be that neither

11    Mr. Byron, nor Mr. Mifsud have seen the letter.

12    And I'll give you that opportunity if you would

13    like to see it.

14            And, likewise, as to Mr. Shields -- I'm

15    sorry -- Mr. Castille, I read the letter dated

16    November 12 that was provided by Mr. Castille via

17    Mr. Cannady to the Court, which Mr. Mifsud and

18    Mr. Cannady have had an opportunity to review.

19            Let me talk now separately only about --

20            MR. BYRON:  May I interrupt the Court just

21    one moment to have --

22            THE COURT:  Yes.

23                    (Off-the-record discussion.)

24            MR. BYRON:  Perhaps, here regularly, but

25    maybe, you know, a little late, Mr. Shields has

26    some witnesses here, and they very graciously have

27    returned after a couple of -- a couple of

28    continuances, and it's Mr. Shields' request that
```

1          MS. EVANS:  Shirley Evans, school secretary

2     at McClymonds High School where Remon served as

3     IWE, inside work experience, in the main office.

4          MR. BYRON:  Mr. Carter.  Mr. Carter isn't

5     here.

6          Mr. Bellamy.

7          MR. BELLOWMY:  Ralph Bellamy,

8     B-e-l-l-a-m-y, Remon's coach and former teacher.

9          THE COURT:  Thank you, sir.

10          MR. BYRON:  Thank very much, sir.

11     Thank you, Your Honor.

12          THE COURT:  All right.  As I indicated, I

13     have read and considered all of the authorities

14     referred to and other authorities, including the

15     appellate rulings of the Court with regard to

16     aggravating and mitigating factors.

17          I'll point out as indicated in the Quinn

18     decision, when the Court is considering an

19     indeterminate sentence as distinguished from an

20     determinate sentence, there may be a question of

21     law as to whether the statutory factors or factors

22     set forth in the Rules of Court are pertinent or

23     required to be considered.

24          I certainly believe in the Court's exercise

25     of its discretion that issues identified by the

26     mitigating and aggravating factors under the

27     Court's Rules ought to be considered and taken

28     into account in substantially the same fashion.

1     I don't think that there has been a day
2     that has gone by since the verdicts were rendered
3     in the case that I haven't thought -- spent some
4     part of the day ~~thinking~~ ~~about~~ the case and an
5     ~~appropriate~~ ~~sentence~~. And it is an awesome
6     responsibility for the Court to consider second
7     only, I think, to the question of a death penalty
8     for which Mr. Shields and Mr. Castille by Statute
9     are disqualified. And it ~~is~~ ~~not~~ ~~a~~ ~~task~~ ~~the~~ ~~Court~~
10    ~~undertakes~~ ~~lightly~~ in any fashion whatsoever.

11        But having considered all of the facts and
12    circumstances with regard to Mr. Shields, I want
13    to tell you what my ~~tentative~~ ~~sentence~~ is, and
14    then counsel for the People, Mr. Shields, on his
15    own behalf, and Mr. Byron may comment accordingly.

16        I think without question ~~Mr.~~ ~~Shields~~, to
17    use a vernacular term, ~~was~~ ~~dealt~~ ~~a~~ ~~very~~ ~~poor~~ ~~hand~~
18    ~~at~~ ~~birth.~~ ~~He~~ ~~has~~ ~~had~~ ~~the~~ ~~most~~ ~~horrific~~ ~~upbringing~~
19    ~~that~~ ~~anyone~~ ~~could~~ ~~imagine~~ if the Court accepts it,
20    and I see no reason not to accept the information
21    in the Probation Department reports, both as a
22    juvenile and in connection with the conviction in
23    this case.

24        Mr. Shields, if that information is
25    accurate, you would be ~~a~~ ~~third~~ ~~generation~~
26    ~~murderer~~. The paternal grandfather and his own
27    father both were convicted of murder, and now
28    Mr. Shields, himself, has been convicted of

1    murder.

2          Mr. Shields evidently was the ~~victim of~~

3    abuse, ~~physical~~ abuse, ~~and sexual abuse. He had~~

4    ~~very little to work with; notwithstanding,~~ I think

5    some ~~substantial efforts by his grandparents~~ who

6    are present to mitigate those family factors.

7          ~~The crime~~ that was committed here was the

8    resulting death of Mr. Nashar. It ~~seems, however,~~

9    ~~to be not an inevitable consequence of~~

10   Mr. Shields' ~~upbringing, but~~ an inevitable

11   consequence ~~of some choices that he~~ made leading

12   up to and in carrying out the death of the victim

13   of these events.

14          ~~Mr. Shields has demonstrated, in a way that~~

15   ~~is usually not available to the Court by virtue of~~

16   ~~the fact that he represented himself, his degree~~

17   ~~of ability to perceive, report and articulate~~

18   ~~matters. And, although,~~ there is information in

19   ~~the reports~~ that ~~question Mr. Shields'~~

20   ~~intellectual capability, at various times he~~

21   ~~demonstrated~~ to the Court ~~far above the minimal~~

22   ~~intellectual capability to make decisions.~~

23          And, ~~unfortunately~~, based on the evidence

24   before the Court and the jury's findings, ~~he made~~

25   ~~some very, very bad decisions under noncompelling~~

26   ~~circumstances~~ which resulted in the victim's

27   death.

28          It seems evident that there was a robbery

1  which was planned, which was botched, which was
2  accommodated and facilitated by two very dangerous
3  weapons.  One in the hands of Mr. Shields, and one
4  in the hands of Mr. Castille; that the scene of
5  the crime was cased prior to the crime; that there
6  was an opportunity to deliberate and decide
7  whether to proceed or not; that the crime was
8  accompanied by the use of ski masks and other
9  covers.
10      This wasn't a death which resulted from a
11  spur-of-the-moment confrontation, a moment of
12  passion or any other excusable circumstances.
13  Mr. Shields put it well.  "The event was beyond
14  stupid," as Mr. Shields described it, in his
15  argument to the jury.  But it was that
16  circumstance which was also completely avoidable.
17      I think that save and except for the
18  youthfulness of Mr. Shields at the time of the
19  offense, there are no factors in mitigation which
20  outweigh the factors or circumstances in
21  aggravation.  Clearly Mr. Shields is not eligible
22  for probation.  If the Court had the discretion to
23  grant probation, the Court would not exercise that
24  discretion.  And clearly a term of imprisonment in
25  State Prison is the appropriate consequence.
26      Mr. Cannady, I think, on behalf of
27  Mr. Castille has articulated the sentencing
28  choices that relate to the arming enhancements.

1    I'm ~~referring to Page 2 of Mr. Cannady's motion~~

2    ~~relating to Mr. Castille filed on September 30th,~~

3    but I think it ~~applies equally to Mr. Shields, and~~

4    has the effect of the Penal Code Section

5    ~~1170 (1) (f) and~~ People vs. Bennett~~, that the Court~~

6    ~~is obligated to impose only one of the~~

7    ~~enhancements.~~

8         And in this case ~~the choices between three,~~

9    ~~four, or ten years under~~ Penal Code Section

10   ~~12022.5,~~ an allegation which the jury found to be

11   true, without purporting to recount all of the

12   evidence which has been detailed in the probation

13   report and now corrected as to Mr. Castille and

14   the People's letter to the Probation Department

15   and to the Court as to Mr. Castille -- I'm

16   sorry -- as to Mr. Shields, ~~I see no mitigating~~

17   ~~factors~~ whatsoever which the Court -- should lead

18   the Court to conclude that Mr. Shields should

19   receive anything other than a sentence of ~~10 years~~

20   ~~on the enhancement as a determinate sentence to be~~

21   ~~served first~~ and then to be ~~followed~~ by a ~~life~~ in

22   prison ~~without~~ possibility of ~~parole. The Court~~

23   ~~specifically declines to exercise this discretion~~

24   ~~under~~ Penal Code Section ~~190.5 to grant the lesser~~

25   ~~term of 25 years to life.~~

26        Mr. Shields, ~~I don't do that lightly.~~  You

27   were a very young man when this happened.  You

28   have many, many years ahead of you.  ~~You have~~

1    ~~articulated~~ to the Court ~~some claim to remorse and~~

2    ~~redemption.~~  You will have that opportunity to

3    prove whether those are truly your feelings and

4    dedication at this point or not; ~~but I think the~~

5    ~~sentencing factor which require the Court to~~

6    ~~consider first public safety and then secondarily~~

7    ~~a punishment on all of the other factors~~

8    ~~articulated in the Code and~~ in the ~~Rules~~ of Court

9    ~~compel the Court to the conclusion, however~~

10   ~~reluctantly, that this is the most appropriate~~

11   ~~case for life without~~ possibility of ~~parole~~ to be

12   imposed.  And I say that with great sadness for

13   you and your family members and to the victims.

14        ~~That's the Court's contemplated disposition~~

15   with ~~regard to Mr. Shields.~~

16        With regard to a Statutory fine and a

17   ~~restitution fine,~~ the Court would impose a ~~fine~~ in

18   the sum of ~~$1,000 and~~ has indicated in connection

19   with Mr. Brown's sentencing earlier that all three

20   defendants be ~~jointly and severally liable with~~

21   ~~regard to restitution to be determined on~~

22   ~~December 10th.~~

23        All right.  Having said that, we'll turn to

24   the People, Mr. Mifsud.

25        MR. MIFSUD:  Your Honor, I have no further

26   comments other than those stated in my letter and

27   the indications of what I determined to be

28   aggravation in this case.  I think that the

1   forth the evidence that you said at the beginning

2   of the trial were my right to bring forth

3   witnesses and set forth evidence, and which you

4   have denied my rights.

5          And I -- just like I say, I don't blame

6   you. I can understand you, but then again I don't

7   understand. Again, it is your own understanding.

8   So I don't blame you for that because you going to

9   blame you for it; the spirit going to blame you.

10  I ain't going to do it.

11         I said what I have to say. I just

12  apologize to my grandparents for having to go

13  through this over again. I apologize to everybody

14  family that was in this and Mr. Nashar's family.

15         Like I said, nobody don't know what

16  happened that night. It just went off with what

17  the police wanted us to say, what they pulled to

18  fit they consistency, to fit what they think

19  happened. That's what this trial was on, what

20  they thought happened, the planning and the

21  plotting, all that, everything.

22         Nobody just didn't say what did you do,

23  y'all go do, all your plan. We said "no", and we

24  fit everybody in there.

25         But it is all right, though. I said what I

26  had to say. I'll be back.

27         THE COURT: Thank you, Mr. Shields.

28         At this point, the Court then is going to

1  ~~confirm~~ the ~~tentative sentence~~ indicated with

2  regard to the enhancements pursuant to Penal Code

3  Section ~~12022.5~~, the use enhancement.  I'm going

4  to impose the determinate ~~upper term of 10 years~~

5  to be served first to be ~~followed by~~ the sentence

6  of Life imprisonment ~~without parole as authorized~~

7  ~~under~~ Penal Code Section ~~190.5.~~

8       ~~Mr. Shields, I'm not sure exactly what you~~

9  ~~are telling the Court.~~  It is one thing I wanted

10 everybody to understand clearly, and that is the

11 ~~one aspect of the system that the Court is~~

12 ~~obligated to impose~~, and that's ~~public safety~~.

13      And whatever you think about the system,

14 one aspect of the system that the law likes to see

15 in place is that people can walk the streets and

16 conduct their lives and businesses without being

17 in fear of enjoying and experiencing the fear of

18 being blown away by a shotgun while standing at a

19 counter at a market where they are trying to earn

20 a living, ~~and that's a part of the system that you~~

21 ~~have violated.~~

22      I'm going to commit Mr. Shields to the

23 Department of Corrections for the term indicated.

24      The number of days of ~~credit for time~~

25 ~~served?~~

26      THE ~~BAILIFF:  1,058 actual, 159 sage~~, for a

27 ~~total~~ of ~~1,217~~ days.

28      THE COURT:  Is there any disagreement,



1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JULIET B. HALEY, State Bar No. 162823
   Deputy Attorney General
6  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
7  Telephone: (415) 703-5960
   Fax: (415) 703-1234
8  Email: Juliet.Haley@doj.ca.gov

9  Attorneys for Respondent

10

11                IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14  REMON A. SHIELDS,                    C 08-0274 JF (PR)

15                        Petitioner,    DECLARATION OF OFFICE
                                         SERVICES SUPERVISOR
16            v.

17  A. SCHWARZENEGGER, Governor of California,

18                        Respondent.

19

20        I Layton Johnson, declare as follow:

21        I am the Office Services Supervisor II for California State Prison, Sacramento (SAC).  I

22  have been employed by SAC in the capacity as the Office Services Supervisor I since February 2003

23  and as an Office Services Supervisor II  since January, 2008.  In this position I supervise the mail

24  room at the prison. Prior to supervising the mail room I worked as a General Office Assistant. In that

25  position one of my duties included the logging of all outgoing inmate legal mail.  I was also

26  responsible for processing the incoming inmate legal mail.   I performed those duties for

27  approximately two years.  I am familiar with the standard practices of the prison regarding

28  acceptance, sorting, posting, and delivery of all mail that goes in and out of the prison.

1        The document identified as "Mail Card Special Purpose (CDC 119)" is the prison's log

2 of all outgoing prisoner legal mail. It is kept in the regular course of mailroom business A log is

3 kept for each prisoner. It is the standard practice of the prison to pick up mail daily from individual

4 prisoner's cells. This is done by the individual block officers at the facility. Mail is generally

5 collected and issued during the third watch shift, at approximately 7:00 p.m. All collected mail is

6 placed in the mail bag which is picked up the next morning between 4:30 and 6:30 a.m. The mail

7 is taken to the mail room the same morning and sorted. All legal mail received from prisoners is

8 logged into their individual CDC 119. It is then picked up by the United States postal service

9 between 11:00 and 11:30 a.m. the same day. The dates of the entries on the CDC 119 reflect the

10 date the mail was received by the mail room. The mail is placed into the United States Postal

11 Service on the same day it is logged by the Office Technician in the mail room.

12        I declare under penalty of perjury that I am competent to testify as a witness, that the

13 foregoing is true and correct based on my personal knowledge except for those statements based on

14 information and belief, and as to those statements I believe them to be true, and that if called as a

15 witness, I would so testify.

16        Executed on August 11, 2008 at Represa, California.

17

18

19                    Layton Johnson
                      Office Services Supervisor II
                      CSP-Sacramento

20

21

22

23

24

25

26

27

28

72307
## MAIL CARD (CDC FORM 119)
### SPECIAL PURPOSE LETTERS


| Name: | REMON SHIELDS | (1) | |
|---|---|---|---|
| CDC: | P-64820 | **2002** | |
| **DESTINATION** | | **SENT** | |

| DESTINATION | SENT |
|---|---|
| MARY A/ATTORNEY CRIMINAL JUSTICE&LEGAL NEWS/P.O.BOX 21613,SAN JOSE,CA.95151-1613 | 01/31/02 |
| CHIEF OF INMATE APPEALS | 01/25/02 |
| STEPHEN GREENBERG(ATTORNEY) | 01/28/02 |
| CHIEF OF INMATE APPEALS | 02/01/02 |
| STEPHEN GREENBERG(ATTORNEY) | 02/04/02 |
| STEPHEN GREENBERG(ATTORNEY) | 02/15/02 |
| US DISTRICT COURT EASTERN ALLISON CLAIRE/ASSISTANT FEDERAL DEFENDER | 02/15/02 |
| B.BOWEN APPEALS COORDINATOR CSP/LANCASTER | 02/15/02 |
| CHIEF OF INMATE APPEALS LINDA RIANDA | 02/27/02 |
| US DISTRICT COURT EASTERN | 03/05/02 |
| STEPHEN GREENBERG(ATTORNEY) | 03/08/02 |
| CHIEF OF INMATE APPEALS | 03/14/02 |
| STEPHEN GREENBERG(ATTORNEY) | 03/15/02 |
| WILLIE GARY(ATTORNEY) | 03/15/02 |
| ROBERT NAVARRO(ATTORNEY) | 03/19/02 |
| ATTORNEY GENERAL'S OFFICE | 03/25/02 |
| SUPERIOR COURT SACRAMENTO COUNTY | 03/25/02 |
| STEPHEN GREENBERG(ATTORNEY) | 03/22/02 |
| US DISTRICT COURT EASTERN | 03/28/02 |
| ATTORNEY GENERAL'S OFFICE | 04/02/02 |
| DEPUTY INSPECTOR GENERAL JOHN CHEN | 04/02/02 |
| CSP/SACRAMENTO WARDEN CHERYL PLILER | 04/02/02 |
| CHIEF OF INMATE APPEALS*(2)* | 04/19/02 |
| US DISTRICT COURT EASTERN | 04/23/02 |
| CHIEF OF INMATE APPEALS | 04/23/02 |
| CORRECTIONS,CHIEF OF INMATE APPEALS | 04/26/02 |
| CHIEF OF INMATE APPEALS | 05/06/02 |
| STEPHEN GREENBERG(ATTORNEY) | 05/07/02 |
| CHIEF OF INMATE APPEALS | 05/08/02 |
| MILLARD MURPHY(ATTORNEY)PRISON LAW OFFICE GENERAL DELIVERY,SAN QUENTIN | 05/15/02 |
| US DISTRICT COURT EASTERN | 05/17/02 |
| ASSEMBLY BILL ROOM,CALIFORNIA CAPITAL*(2)* | 05/20/02 |

| | **2002** |
|---|---|
| **DESTINATION** | **SENT** |
| US DISTRICT COURT NORTHERN DISTRICT | 05/21/02 |
| US DISTRICT COURT EASTERN | 05/22/02 |
| US DISTRICT COURT EASTERN | 06/03/02 |
| *SENT INMATE COPY OF CDC#119 ON 06/05/02* | |
| STEPHEN GREENBERG(ATTORNEY) | 06/11/02 |

```
US DISTRICT COURT EASTERN                                          06/13/02
OFFICE OF THE INSPECTOR GENERAL                                    06/17/02
CALIFORNIA PERSONNEL BOARD                                         06/17/02
COURT OF APPEALS,FIRST APPELLATE DISTRICT                          06/17/02
E.MONTEIRO APPEALS COORDINATOR CSP/LANCASTER                       06/19/02
CHIEF OF INMATE APPEALS                                            06/21/02
CHIEF OF INMATE APPEALS                                            06/24/02
WILLIE E.GARY(ATTORNEY)                                            06/27/02
US DISTRICT COURT EASTERN                                          06/28/02
CHIEF OF INMATE APPEALS   (2)                                      07/03/02
US DISTRICT COURT EASTERN                                          07/03/02
SENT COPY OF CDC#119 TO INMATE ON 07/05/02
US DISTRICT COURT EASTERN                                          07/11/02
MILLARD A.MURPHY(ATTORNEY)PRISON LAW OFFICE                        07/15/02
CALIFORNIA SECRETARY OF STATE UNIFORM COMMERCIAL CODE DIVISION     07/15/02
CHIEF OF INMATE APPEALS,LINDA L.RIANDA                             07/15/02
CHIEF OF INMATE APPEALS                                            07/17/02
US DISTRICT COURT EASTERN                                          07/18/02
US DISTRICT COURT EASTERN                                          07/19/02
CLIFORNIA STATE SENATE MATT GRAY                                   07/25/02
SUPERIOR COURT SACRAMENTO COUNTY                                   07/25/02
CALIFORNIA PERSONNEL BOARD                                         08/05/02
D.T. KIMBRELL APPEALS COORDINATOR CSP/SACRAMENTO                   08/05/02
CALIFORNIA ATTORNEY GENERAL'S OFFICE                               08/05/02
CDC INTERNAL AFFAIRS                                               08/05/02
CALIFORNIA DEPARTMENT OF INSPECTOR GENERAL                         08/05/02
US DISTRICT COURT EASTERN                                          08/05/02
SACRAMENTO GRAND JURY JULIE M.FONG,FOREPERSON                      08/14/02
CHIEF OF INMATE APPEALS                                            08/15/02
STEPHEN GREENBERG(ATTORNEY)NEVADA CITY                             08/19/02
CHIEF OF INMATE APPEALS                                            08/19/02
US DISTRICT COURT EASTERN                                          08/19/02
US DISTRICT COURT EASTERN                                          08/23/02
US DISTRICT COURT EASTERN                                          08/26/02
LEGAL SERVICES FOR PRISONER                                        08/29/02
CHIEF OF INMATE APPEALS,LINDA L.RIANDA                             08/30/02
MILLARD MURPHY(ATTORNEY)                                           08/30/02
ROBERT D.BLASIER(ATTORNEY)                                         09/03/02
SENT COPY OF CDC#119 TO INMATE ON 09/04/02
CALIFORNIA ATTORNEY GENERAL                                        09/11/02
CALIFORNIA COURT OF APPEALS THIRD APPELLATE DISTRICT              09/11/02
CHIEF OF INMATE APPEALS(3)                                         09/11/02
RICK MANUEL CHIEF OF INMATE APPEALS                                09/13/02
INMATE SENT COPY OF CDC 119 09/15/02
BOARD OF CONTROL SACRAMENTO                                        09-20-02
DIRECTOR OF CORRECTIONS                                            09-20-02
US DIST COURT EASTERN   SACRAMENTO                                 9-23-02
BOARD OF CONTROL SACRAMENTO                                        10/03/02
CALIFORNIA SUPREME COURT                                           10/03/02
CALIFORNIA ATTORNEY GENERAL                                        10/03/02
ROBERT BLASIER(ATTORNEY)                                           10/08/02
CHIEF OF INMATE APPEALS                                            10/09/02
US DISTRICT COURT EASTERN                                          10/09/02
CALIFORNIA ATTORNEY GENERAL                                        10/15/02
```

```
OFFICE OF INTERNAL AFFAIRS,NORTHERN REGION              10/15/02
D.T.KIMBRELL/APPEALS COORDINATOR,CSP/SACRAMENTO         10/15/02
STEVE WHITE CALIFORNIA INSPECTOR GENERAL                10/15/02
WILLIAM GILG(ATTORNEY)                                  10/15/02
SUPERIOR COURT SACRAMENTO COUNTY                        10/25/02
US DISTRICT COURT EASTERN                               10/31/02
CALIFORNIA BOARD OF CONTROL GOVERNMEN CLAIMS DIVISION   11/13/02
US EASTERN DIST COURT CLERK SAC                         12-04-02
SAC COUNTY GRAND JURY                                   12-04-02
STATE PERSONNEL BOARD                                   12-04-02
E.S. ALAMEIDA DIR. CORRECTIONS SAC                      12-04-02
CHERYL K. PLILER WARDEN CSP-SAC                         12-04-02
SAC SUPERIOR COURT SAC                                  12-04-02
STEVE WHITE INSPECTOR GENERAL SAC                       12-04-02
CONSTANCE L/ PICCIANO ATTORNEY GENERAL SAC              12-04-02
INTERNAL AFFAIRS NORTHERN REGION RANCHO CORDOVE         12-04-02
PRISON LEGAL NEWS 2400NW ST PMB#148 SEATTLE             12-11-02
DIR CORR Chief INMATE APPEALS SAC                       12-11-02
STEVE WHITE INSPECTOR GENERAL SAC                       12-11-02
US DISTRICT COURT EASTERN                               12/12/02
STEPHEN S. HALL CA BOARD CONTROL GOVT CLAIMS CEN SAC    12/18/02
STEVE WHITE OFF INSPEC GEN SAC                          12/18/02
OFF INTERNAL AFFAIRS NO REG RANCHO CORDOVA              12/18/02
US DISTRICT COURT CENTRAL                               12/20/02
CDC DIRECTOR E.S.ALAMEIDA                               12/20/02
CHIEF OF INMATE APPEALS                                 12/30/02
CALIFORNIA LEGISLATURE SENATE PUBLICATIONS              12/30/02
ROBERT D.BLASIER(ATTORNEY)                              12/23/02
CHIP EDLESON(ATTORNEY)400 HAMILTON AVE. PALO ALTO,CA.   12/30/02
MARK S.LESTER(ATTORNEY)3737 MAIN ST. RIVERSIDE,CA.      12/30/02
KEVIN E.GAUT(ATTORNEY)11377 W.OLYMPIC BLVD.LOS ANGELES  12/31/02


DATE        DESTINATION
1-07-03     US COURT OF APPEALS  SAN FRANCISCO
1-09-03     DIRECTOR OF CORRECTIONS
1-14-03        GREENBERG  ATTY   NEVAVDA CITY  CA.
1-16-03     US COURT 9TH  SAN FRANCISCO
1-21=03     ATTY GREENBERG  NEVADA CITY CALIF.
1=24=03     ATTY GENS OFFICE (PICCIANO)  SACRAMENTO
1=24=03     US COURT EASTERN  SACRAMENTO CALIF.
1=24=03     US COURT EASTERN SACRAMENTO, CALIF.
1=28=03     CALIF LEGISLATURE SACRAMENTO
1=29=03     ED ALAMEDA DIRECTOR CDC SACRAMENTO
1=29=03     KINBRELL  APPEALS  CSP SAC
1=20=03     US COURT------ CENTRAL DIV.  LA  CALIF
2=05=03     DIRERCTOR DOC SACRAMENTO APPEALS
2=06=03     US COURT EASTERN  SACRAMENTO
2=11=03     US COURT 9TH APPEALS  SAN FRANCISCO
2=13=03     US COURT 9TH CIRCIUT  SAN FRANCISCO
2=21=03     US COURT 9TH OF APPEALS  SAN FRANCISCO
2=27=03     COPY TO INMATE
2=28=03     US COURT OF APPLEALS (CATHY PETERSON) S.F.
3=4=03      DOC APPELAS  SACRTAMENTO
```

```
3=4=03       ATTY SPECTER  PLO SAN QUENTIN
3=4=03       DOC DIRECTOR ALAMEDA  SACRAMENTO
3=6=03       US COURT OF APPEALS 9TH  SAN FRANCISCO CALIF
3=14=03      SUPERIOR COURT  SACRAMENTO
3=14=03      .US COURT  CENTRAL DIV.  L.A.
3=14=03      .ATTY GREENBERG NEVADA CITY
3=14=03      .OMBUDSMAN  SACRAMENTO
3=24=03      .PRISON LEGAL NEWS (NOT CONF.)
3=28=03      .CDC APPEALS SACRAMENTO
4-03-03      .CDC APPEALS    SACRAMENTO
4-03-03      .ATTY GREENBERG 206 SACRAMENTO ST. NEVADA CITY CALIF.
4=03=03      .ATTY GILG  SAN BRUNO CA.
4=03=03      .US COURT5  EASTERN DIC.  SACRAMENTO VALIF
4=04=03      .CDC APPEALS    SACRAMEWNTO
4=07=03      .JUDGE MUELLER US COURT EASTERN DIV  SACRAMENTO
4=07=03      .US COURT OF APPEALS (CATHY CATTERSON)) S.F. CALIF.
4=07=03      .US COURT CENTRAL DIV. L.A. CALIF.
04=09=03     .prison legal news seattle  wash.
04=14=03     .CORRECTIONS CONSULTANT  WEATHERFORD, TX
04=14=03     .APPEALS SAC
4=21=03      .3RD COURT OF APPEALS SACRAMENTO CALIF.
4=28=03      .US COURT EASTERN DIV  SACTO CA.
4=28=03      .CDC APPEALS    SAC
5=01=03      .CDC APPEALS    SACRAMENTO
05=05=03     .ATTORNEY GREENBERG  NEVADA CITY CA
05=07=03     .CDC APPEALS SACRAMENTO
5=12=03      .  CDC APPEALS SACRAMENTO CA.
05=13=03     .ATTORNEY GREENBERG  NEVADA CITY CALIFORNIA
05=20=03******PRISONERS RIGHTS UNION P.O. BOX 161321 SACRAMENTO CALIF.
05=21=03     .US COURT CENTRAL DIV LOS ANGELES CALIF.
05=21=03     .SUPREME COURT SAN FRANCISCO CALIF.
06=05=03     .CDC APPEALS SACRAMENTO CA.
6=17=03      CDC APPEALS SACRAMENTO CA.
6=20=03      .CDC APPEALS   BRANCH SACRAMENTO CA.
07=01=03     .U.S. COURT EASTERN DIVISION, SACRAMENTO CALIF.
7=09=03      US COURTYEASTERN SACRAMENTO CALIF.
8=05=03      ATTORNEY GREENBERG 206 SACRAMENTO CALIF. STREET  NEVADA CITY
CALIFORNIA
8=14=03      ATTORNEY GREENBERG SACRAMENTO CALIF.
8=20=03      US COURT  EASTERN DIVISION SACRAMENTO CALIF.
8=20=03      ATTORNEY GENERALS OFFICE SACRAMENTO CALIF.
8=22=03      US COURT6  SACRAMENTO CALIF. EASTERN DISTRICT
08/27/04     STEPHEN GREENBERG ATTY.AT LAW NEVADA CITY CA
9/15/05      SCOTT KERNAN, WARDEN CSP-SACRAMENTO
11/15/05     DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001
11/15/05     STEPHEN GREENBERG 206 SACRAMENTO ST STE 208 NEVADA CITY, CA 95959-2633 (VERIFIED)
11/18/05     STEPHEN GREENBERG 206 SACRAMENTO ST STE 208 NEVADA CITY, CA 95959
11/18/05     DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001
01/03/06     DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001
01/03/06     STEPHEN GREENBERG 206 SACRAMENTO ST STE 208 NEVADA CITY, CA 95959
01/19/06     SUNG PARK ATTY. 17620 SHERMAN WY. STE #211 VAN NUYS, CA 91407
01/20/06     STEPHEN GREENBERG ATTY. 206 SACRAMENTO ST. #208 NEVADA CITY, CA 95959
2/16/06      DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001
```

| | |
|---|---|
| 2/17/06 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 02/27/06 | ATTY. LINDA STARR, 500 EL CAMINO REAL, SANTA CLARA, CA 95053 |
| 02/27/06 | SUNG PARK ATTY. 17620 SHERMAN WY. STE #211 VAN NUYS, CA 91407 |
| 3/6/06 | PRISON LAW OFFICE SAN QUENTIN, CA 94964 |
| 3/10/06 | STEPHEN GREENBERG ATTY. 206 SACRAMENTO ST. #208 NEVADA CITY, CA 95959 |
| 3/14/06 | RICHARD HOWARD ROSENTHAL 111 SUTTER ST. SAN FRANCISCO, CA 94104 (CANNOT VERIFIY) |
| 3/16/06 | BEJAMIN COLEMAN FEDERAL DEFENDERS 225 BROADWAY SAN DIEGO, CA 92101-5008 |
| 3/17/06 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 3/17/06 | STEPHEN GREENBERG ATTY. 206 SACRAMENTO ST. #208 NEVADA CITY, CA 95959 |
| 3/17/06 | GOLDBERGER & DUNN 401 BROADWAY NEW YORK NY 10013 (CANNOT VERIFY) |
| 4/6/06 | STEPHEN GREENBERG ATTY. 206 SACRAMENTO ST. #208 NEVADA CITY, CA 95959 |
| 4/13/06 | NORTHERN CALIFORNIA INNOCENCE PROJECT 500 EL CAMINO REAL SANTA CLARA, CA 95053-0422 |
| 4/17/06 | NATIONAL LEGAL AID 1140 CONNECTICUT AVE WASHINGTON, DC 20036 |
| 5/5/06 | MATTHEW CATE INSP. GEN., PO BOX 942883 SACRAMENTO, CA 95834 |
| 5/5/06 | US. EASTERN DIST. OF CA., 501 I ST. RM 4-400, SACRAMENTO, CA 95814 |
| 5/8/06 | OFFICE OF INTERNAL AFFAIRS PO BOX 3009 SACRAMENTO, CA 95812 |
| 5/25/06. | J. WALKER – CSP-SACRAMENTO |
| 5/25/06 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 6/30/06 | D. MORTON, CSP CSP-SAC ADMIN REPRESA, CA 95671 |
| 7/21/06 | OFFICE OF THE INSPECTOR GENERAL PO BOX 348780 SACRAMENTO, CA 95834-8708 |
| 7/27/06 | PRISON LAW OFFICE SAN QUENTIN, CA 94964 |
| 8/21/06 | NORTHERN CALIFORNIA INNOCENCE PROJECT 500 EL CAMINO REAL SANTA CLARA, CA 95053-0422 |
| 8/29/06 | UNIVERSITY OF CALIFORNIA SCHOOL OF LAW 270 SIMON HALL BERKELEY, CA 94720-7200 |
| 8/29/06 | CENTRAL CALIFORNIA APPELLATE PROGRAM 2407 J STREET SACRAMENTO, CA 95816-4736 |
| 9/6/06 | LT. VENTIMIGLIA , WATCH COMMANDER CSP-SACRAMENTO |
| 9/606 | OFFICE OF THE ATTORNEY GENERAL 455 GOLDEN GATE SAN FRANCISCO, CA 94102-7004 |
| 9/6/06 | DOVEY; DIRECTOR OF CORRECTIONS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 9/6/06 | SUPREME COURT OF CALIFORNIA 350 MCALLISTER SAN FRANCISCO, CA 94102-4797 |
| 9/6/06 | US DISTRICT COURT NOERTHERN DISTRICT 450 GOLDEN GATE BLVD., SAN FRANCISCO, CA 94102 |
| 9/6/06 | A. MALFI, WARDEN, CSP-SACRAMENTO |
| 9/8/06 | WILLIAM L. SCHMIDT, ATTORNEY AT LAW 791 PRICE ST # 170 PISMO BEACH, CA 93449-2529 (VERIFIED) |
| 9/8/06 | JAMES AARON SKIDMORE II 560 N ARROWHEAD AVE #5B SAN BERNARDINO, CA 92401-1219 (VERIFIED) |
| 9/8/06 | CHARLES FRANCIS CARBONE PMB 212 3128 16TH ST SAN FRANCISCO, CA 94103 (VERIFIED) |
| 9/11/06 | GREGORY LEE RAEL 1026 3RD ST EUREKA, CA 95501 (VERIFIED) |
| 9/13/06 | ACLU OF NORTHERN CALIFORNIA 1663 MISSION ST SAN FRANCISCO, CA 94103 |
| 9/13/06 | CHARLES MARCHAND BONNEAU JR. 331 J ST #200 SACRAMENTO, CA 95814 (VERIFIED) |
| 9/18/06 | A. MALFI, WARDEN, CSP-SACRAMENTO |
| 9/25/06 | USC LAW CENTER 699 EXPOSITION BLVD., LOS ANGELES, CA 90089-0071 |
| 9/25/06 | J. BROOKS, WESTERN SCHOOL OF LAW 225 CEDAR ST., SAN DIEGO, CA 92101 |
| 9/25/06 | OFFICE OF THE FEDERAL PUBLIC DEFENDER 321 N. SPRING ST LOS ANGELES, CA 90012 |
| 10/5/06 | CHARLES MARCHAND BONNEAU JR 331 J ST #200 SACRAMENTO, CA 95814 (VERIFIED) |
| 10/16/06 | ADARI NAJEE M'FUME PO BOX 6573 MAILBU, CA 90264-6573 |
| 11/28/06 | MELVIN L EMERICH, ATTORNEY, 209 PORTOLA CT., LOS ALTOS, CA 94022 |
| 11/28/06 | INMATE APPEALS P.O. BOX 942883, SACRAMENTO, CA 94283 |
| 11/28/06 | INSPECTOR GENERAL P.O. BOX 348780, SACRAMENTO, CA 95834 |
| 11/28/06 | ACLU, NORTHERN CA., 39 DRUMM STREET, SAN FRANCISCO, CA 94111 |
| 12/12/06 | BYERS, BELL AND WARRICK, R.BYERS 1999 HARRISON ST #2010, OAKLAND, CA 94612 |
| 12/13/06 | JAMES QUINCY BUTLER, ESQ ATTORNEY, 818 18TH ST, N.W. STE.100, WASHINGTON, DC 20006 |
| 1/3/07 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 1/3/07 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 2/20/07 | ALAMEDA COUNTY SUPERIOR COURT 1225 FALLON ST., OAKLAND, CA 94612-4293 |
| 2/23/07 | ALAMEDA COUNTY SUPERIOR COURT 1225 FALLON ST., OAKLAND, CA 94612-4293 |
| 2/23/07 | US DISTRICT COURT NORTHERN DISTRICT 450 GOLDEN GATE BLVD., SAN FRANCISCO, CA 94102 |

| | |
|---|---|
| 2/26/07 | LAW OFC ROBERT SCHELL 114 MAIN ST STE 300 JACKSON, CA 95642 (VERIFIED) |
| 3/1/07 | ALAMEDA COUNTY SUPERIOR COURT 1225 FALLON ST., OAKLAND, CA 94612-4293 |
| 3/6/07 | JUDGE CLARENCE THOMAS SUPREME COURT 1 FIRST NORTHEAST WASHINGTON, CA 20543 |
| 3/6/07 | ACLU OF NORTHERN CALIFORNIA 1663 MISSION ST SAN FRANCISCO, CA 94103 |
| 3/6/07 | NORTHERN CALIFORNIA INNOCENCE PROJECT 500 EL CAMINO REAL SANTA CLARA, CA 95053-0422 |
| 3/8/07 | US DISTRICT COURT NORTHERN 450 GOLDEN GATE AVE. P.O.BOX 36060, SAN FRANCISCO, CA 94102 |
| 3/12/07 | ROBERT JOSEPH BELES 1 KAISER PLZ #2300 OAKLAND, CA 94612 (VERIFIED) |
| 3/13/07 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 3/16/07 | ALAMEDA COUNTY SUPERIOR COURT 1225 FALLON ST., OAKLAND, CA 94612-4293 |
| 3/22/07 | SAN FRANCISCO COUNTY SUPERIOR COURT 400 MCALLISTER ST. SAN FRANCISCO, CA 94102 |
| 3/30/07 | ALAMEDA COUNTY SUPERIOR COURT 1225 FALLON ST.,#209 OAKLAND, CA 94612 |
| 4/17/07 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 4/18/07 | DIRECTOR OF CORRECTIONS, SCOTT KERNAN PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 4/26/07 | DIRECTOR OF CORRECTIONS, SCOTT KERNAN PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 5/3/07 | OFFICE OF THE ATTORNEY GENERAL 455 GOLDEN GATE SAN FRANCISCO, CA 94102-7004 |
| 5/3/07 | SUPREME COURT OF CALIFORNIA 350 MCALLISTER SAN FRANCISCO, CA 94102-4797 |
| 6/4/07 | SUPREME COURT OF CALIFORNIA 350 MCALLISTER SAN FRANCISCO, CA 94102-4797 (1 BOX) |
| 6/13/07 | SUPREME COURT OF CALIFORNIA 350 MCALLISTER SAN FRANCISCO, CA 94102-4797 |
| 7/24/07 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 7/27/07 | ELIZABETH MARIAH CALVIN 11500 W OLYMPIC BLVD #441 LOS ANGELES, CA 90064 (VERIFIED) |
| 8/3/07 | NORTHERN CALIFORNIA INNOCENCE PROJECT 500 EL CAMINO REAL SANTA CLARA, CA 95053-0422 |
| 8/21/07 | CDC&R PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 9/7/07 | US DISTRICT COURT 501 I STREET SACRAMENTO, CA 95814 |
| 12/13/07 | NORTHERN CALIFORNIA INNOCENCE PROJECT 500 EL CAMINO REAL SANTA CLARA, CA 95053-0422 |
| 1/8/08 | US DISTRICT COURT NORTHERN 450 GOLDEN GATE AVE. P.O.BOX 36060, SAN FRANCISCO, CA 94102 |
| 3/21/08 | J. WALKER, WARDEN, CSP-SACRAMENTO |
| 5/22/08 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 6/11/08 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 6/16/08 | ROBERT SILLEN, MEDICAL RECIEVER 1730 TECHNOLOGY DRIVE SAN JOSE, CA 95110 |
| 7/2/08 | OFFICE OF THE ATTORNEY GENERAL 455 GOLDEN GATE SAN FRANCISCO, CA 94102-7004 |
| 7/2/08 | US DISTRICT COURT NORTHERN DISTRICT 280 SOUTH 1ST STREET SAN JOSE, CA 95113-3095 |
| **7/2/08** | **SENT INMATE COPY OF CDC 119 OUT-GOING LEGAL MAIL LOG PER APPEAL LOG # A/S 080787** |
| 7/8/08 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |
| 7/14/08 | DIRECTOR OF CORRECTIONS, CHIEF INMATE APPEALS PO BOX 942883 SACRAMENTO, CA 94283-0001 |



UNITED STATES POSTAGE

PITNEY BOWES

02.1A
0004609711
$ 05.00⁰
FEB 23 2007
MAILED FROM ZIP CODE 95670

DA COUNTY SUPERIOR COURT

Fallon Street, #209

nd, CA 94612-4293

Ramon Shields, P-64820
CSP-SAC/ B-1-129
P.O. Box 290066
Represa, CA  95671



ALAM
1225
Oak:

**CONFIDENTIAL LEGAL MAIL**